IRA M. PRESS
PETER S. LINDEN
KIRBY McINERNEY LLP
830 Third Avenue, 10th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmslaw.com
plinden@kmslaw.com

Counsel for Lead Plaintiffs

LIONEL Z. GLANCY #134180
PETER A. BINKOW #173848
MICHAEL A. GOLDBERG #188669
KARA WOLKE #241521
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

Liaison Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DOT HILL SYSTEMS CORPORATION SECURITIES LITIGATION | Case No. 06 CV 0228 JLS (WMc)<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: August 14, 2008<br>Courtroom: 6, 3rd Floor<br>Judge: Hon. Janis Lynn Sammartino |

## TABLE OF CONTENTS


INTRODUCTION ....... 1

I. LEGAL STANDARDS ....... 3

II. THE COMPLAINT'S CW ALLEGATIONS ARE SUFFICIENTLY PLED ....... 4

A. Employment Dates, Job Titles and Corroborating Details ....... 5

B. CWs' Conclusions ....... 5

C. CWs' First Hand Knowledge ....... 6

III. PLAINTIFFS' COMPLAINT PLEADS MATERIAL FALSITY ....... 7

A. Dot Hill's False Financial Results for the First Three Quarters of 2004 ....... 8

B. Misrepresentations Concerning the Integration of Chaparral ....... 9

C. Misrepresentations Concerning Operational Structure and Pre-2005 Profits ....... 10

D. Misrepresentations Concerning Dot Hill's Relations with Sun ....... 12

E. Misrepresentations Concerning Prospects and Progress with New Customers ....... 12

F. Materiality ....... 13

IV. SCIENTER IS PARTICULARLY PLED ....... 15

A. Scienter Is Properly Pled as to Each Misrepresentation ....... 15

1. Defendants' False Financial Statements ....... 16

2. The Chapparal Integration ....... 18

3. Operational Structure and Pre-2005 Profits ....... 19

4. Dot Hill's Relations with Sun ....... 20

5. Prospects and Progress with New Customers ....... 22

B. Allegations Considered as Whole Raise a Strong Inference of Scienter ....... 23

1. Scienter May Be Inferred for "Core Operations" ....... 23

2. Management Style, Management Resignations and Company Size Further Support an Inference of Scienter ....... 24

3. Defendants' Sale of $178 Million of Dot Hill Shares at Inflated and Near-Peak Prices Further Supports Scienter ....... 24

C. Plaintiffs Properly Plead the Scienter of Sauey and Kammersgard ....... 25

V. LOSS CAUSATION IS ADEQUATELY PLED ....26
A. Lack of New Customers ....29
B. The Restatement Announcement Established Loss Causation ....30
C. The April 2006 Sun Announcement Supports Loss Causation ....30
D. Chaparral Integration ....31
E. Lean Operating Structure ....31
VI. THE "SAFE HARBOR" DOES NOT APPLY ....32
A. Statements Not Challenged by Defendants ....32
B. Many of the Challenged Statements Concern Present or Historical Fact ....33
C. Omitted Present or Past Facts are Not Protected by Safe Harbor ....33
D. Defendants' Cautionary Language is Insufficient to Immunize Them ....34
VII. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(a) ....34
CONCLUSION ....35

# TABLE OF AUTHORITIES

## CASES

*America West*, 320 F.3d at 937 (2003) .......... 25, 32

*Asher v. Baxter Intern. Inc.*, 377 F.3d 727 (7th Cir. 2004) .......... 34

*Atlas v. Accredited Home Lenders Holding Co.*, 2008 WL 80949 (S.D. Cal. Jan. 4, 2008) .......... 8

*Berson v. Applied Signal Tech.*, 2008 U.S. App. LEXIS 11982 (9th Cir. June 5, 2008) .......... 6

*Blatt v. Corn Products Intern., Inc.*, 2006 WL 1697013 (N.D. Ill. June 14, 2006) .......... 14

*Brody v. Transitional Hosp. Corp.*, 280 F.3d 997 (9th Cir. 2002) .......... 13

*Brumbaugh v. Wave Sys. Corp.*, 416. F. Supp. 2d 239 (D. Mass. 2006) .......... 13, 30

*Casella v. Webb*, 883 F.2d 805 (9th Cir.1989) .......... 14

*Church of Scientology of Cal. v. U.S. Dept. of Justice*, 612 F.2d 417 (9th Cir. 1979) .......... 4

*Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116 (D. Ariz. 2007) .......... 26

*Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, 2008 U.S. Dist. Lexis 38899 (S.D. Cal. May 12, 2008) .......... 7

*Cooper v. Pickett*, 137 F. 3d 616 (9th Cir. 1997) .......... 15

*Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) .......... 4, 6, 13, 27, 29

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .......... 2, 3, 27, 32

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox*, 343 F.3d 1125 (9th Cir. 2004) .......... 32

*Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40 (D. D.C. 2006) .......... 27, 30

*Garcia v. Marshall*, No. C-90-1809 EFL, 1992 U.S. Dist. LEXIS 8550 (N.D. Cal. May 6, 1992) .......... 5

*Gaylinn v. 3Com Corp.* 185 F. Supp. 2d 1054 (N.D. Cal. 2000) .......... 8

*Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) .......... 11

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) .......... 33

*Howard v. Everex Sys. Inc.*, 228 F.3d 1057 (N.D. Cal. 2001) .......... 35

*In re 2TheMart.com Inc. Sec. Litig.*, 114 F. Supp. 2d 955 (C.D. Cal. 2000) .......... 14

*In re Adaptive Broadband*, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) .......... 24, 35

*In re Am. Bus. Fin. Serv., Inc. Sec. Litig.*, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007) .................... 34
*In re Amgen Inc., Secs. Litig.* 544 F. Supp. 2d 1009 (C.D. Cal. Feb. 1, 2008)........................... 17
*In re Amylin Pharm. Inc. Sec. Litig.*, 2003 WL 21500525 (S.D. Cal. May 1, 2003)............. 23, 34
*In re Apollo Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 906 (D. Ariz. 2005) ................................ 13
*In re Autodesk, Inc. Sec. Litig.*, 132 F. Sup. 2d 833 (N.D. Cal. 2000)........................................ 24
*In re BP Prudhoe Bay Royalty Trust Securities Litigation*, 2007 U.S. Dist. LEXIS 83007 (W.D. Wash. 2007) ......................................................................................... 15
*In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822 (D. N.J. 2006)................................ 27
*In re Cabletron Sys., Inc.*, 311 F. 3d 11 (1st Cir. 2002)................................................................ 4
*In re Cardinal Health Sec. Litig.*, 426 F. Sup. 2d 688 (S.D. Ohio 2006) .............................. 27, 30
*In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) ............................... 15
*In re Complete Management, Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D. N.Y. 2001) ................ 21
*In re CV Therapeutics, Inc.*, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2005)................................... 8
*In re Cylink*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................. 35
*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) ................................................................... 16
*In re DDi Corp. Sec. Litig.*, 2005 WL 3090882 (C.D. Cal. July 21, 2005)................................. 33
*In re Electronic Arts Inc. Sec. Litig.*, 2006 WL 27201 (N.D. Cal. Jan. 5, 2006)............. 32, 29, 30
*In re Enron Sec., Deriv. & ERISA Litig.*, 2003 WL 230688 (S.D. Tex. Jan. 28, 2003) .............. 35
*In re Hi/fn Inc. Sec. Litig.*, 2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) ................................. 25
*In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414 (D.N.J. 2002) ................................. 14
*In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791 (D. Ariz. Jan. 25, 2006)........................... 17
*In re ICG Comm'ns, Inc. Sec. Litig.*, 2006 WL 416622 (D. Colo. Feb. 7, 2006)........................ 27
*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005)................................. 34
*In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y 2001)................. 21
*In re LDK Securities Litigation*, 2008 U.S. Dist. LEXIS (N.D. Cal. May, 29, 2008)........... 25, 26
*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Sup. 2d 1248 (N.D. Cal. 2000)......................... 24
*In re Micron Techs. Sec. Litig.*, 2007 WL 1232200 (D. Id. Apr. 25, 2007) ................................ 27
*In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998)......................................... 14, 33

*In re Motorola Sec. Litig.*, 2007 WL 487738 (N.D. Ill. Feb. 8, 2007) ............................ 27, 28, 29

*In re Nature's Sunshine Prods. Liability Litig.*, 486 F. Supp. 2d 1301 (D. Utah 2007)............... 35

*In re Nike, Inc. Sec. Litig.*, 181 F. Supp. 2d 1160 (D. Or. 2002) ................................................ 17

*In re Northpoint Communications Group, Inc., Securities Litigation*, 221 F. Supp. 2d 1090 (N.D. Cal. 2002)............................................................................................ 26

*In re Omnivision Tech. Inc.*, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. 2005) ........................... 15

*In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133 (S.D. N.Y. 1999) .................................. 33

*In re Parmalat Sec. Litig.*, 414 F. Sup. 2d 428 (S.D. N.Y. 2006)................................................ 35

*In re Peerless Sys. Corp. Sec. Litig.*, 182 F. Sup. 2d 982 (S.D. Cal. 2002)................................. 24

*In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936 (N.D. Cal. May 25, 2000) ........................ 23

*In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)................ 33

*In re Read-Rite Corp. Sec. Litig.*, 115 F. Sup. 2d 1181 (N.D. Cal. 2000) .................................. 24

*In re Secure Computing Sec. Litig.*,184 F. Sup. 2d 980 (N.D. Cal. 2001).................................. 25

*In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150 (C.D. Cal. 2003)...... 5, 25, 32, 34

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)..................................... 7, 16

*In re Sipex Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30854 (N.D. Cal. Nov. 17, 2005)............... 8

*In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp.2d 1096 (D. Nev.1998) ..................................... 33

*In re Swift Trans. Co. Sec. Litig.*, 2006 WL 1805578 (D. Ariz. March 29, 2008) ...................... 19

*In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D. N.Y. 2007)......................................... 23

*In re Turbodyne Techs. Sec. Litig.*, 2002 U.S. Dist. LEXIS 25738 (C.D. Cal. March 13, 2002) ...................................................................................................... 17

*In re Vantive Corp. Sec. Litig. ("Vantive II")*, 283 F.3d 1086 (9th Cir. 2002) ................. 9, 13, 21

*In re Watchguard Sec. Litig.*, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006).......................... 24

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D. N.Y.2003) .................................... 35

*In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001) .......................................... 11

*Kaltman v. Key Energy Services, Inc.*, 447 F. Supp. 2d 648 (W.D. Tex. 2006).......................... 14

*Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005)..................... 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006).......................... 13, 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ........ 11

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........ 4, 15

*Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) ........ 24

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2nd Cir. 2004) ........ 33

*Paracor Finance, Inc. v. GE Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) ........ 35

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172 (N.D. Cal. 2005) ........ 28, 30

*Pollard v. FBI*, 705 F.2d 1151 (9th Cir. 1983) ........ 4

*Primavera Investors v. Liquidmetal Techs.*, 403 F. Sup. 2d 1151 (M.D. Fla. 2005) ........ 24

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) ........ 25

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Sup. 2d 1345 (D. Colo. 1998) ........ 25

*Richardson v. TVIA, Inc.*, 2007 WL 1129344 (N.D. Cal. April 15, 2007) ........ 27, 29

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ........ 12

*Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102 (S.D. Ohio 2007) ........ 31

*S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005) ........ 7, 13, 23

*Sekuk Global Enters. v. KVH Indus.* 2005 WL 1924292 (D.R.I, Aug. 11, 2005) ........ 25, 31

*Shields v. CityTrust Bancorp, Inc.*, 25 F.3d 1124 (1994) ........ 19

*Siemers v. Wells Fargo & Co.*, 2007 WL760750 (N.D. Cal. Mar. 9, 2007) ........ 27, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ........ 1, 3, 13, 16

*United States v. Hernandez-Escarsega*, 886 F. 2d 1560 (9th Cir. 1989) ........ 5

*Warshaw v. Xoma Corp.*, 74 F. 3d 955 (9th Cir. 1996) ........ 13, 15

*Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110 (C.D. Cal. 2005) ........ 9

*Zack v. Allied Waste Indus.*, 2005 U.S. Dist. LEXIS 35323 (D. Ariz. Dec. 15, 2005) ........ 6

STATUTES, RULES & REGULATIONS

15 U.S.C. § 78j(b) ........ 3

15 U.S.C. § 78u-5(c)(1) ........ 32

15 U.S.C. § 78u-4(b)(1). ........ 3

15 U.S.C. § 78u-4(b)(1). ........ 3
15 U.S.C. § 78u-4(b)(2). ........ 3
15 U.S.C. § 78u-4(b)(4). ........ 26
Fed. R. Civ. P. 8(a)(2) ........ 27

## INTRODUCTION

Plaintiffs' Second Amended Consolidated Complaint (the "Complaint" or "SAC") alleges that, during the Class Period, Dot Hill's share price was inflated by defendants' misrepresentation of (1) Dot Hill's financial results, (2) Dot Hill's progress in integrating Chaparral Network Storage, Inc. ("Chaparral"); (3) the viability, efficiency, success and profitability of Dot Hill's low-headcount business model; (4) Dot Hill's relationship with its largest customer, Sun; and (5) Dot Hill's progress in gaining new customers. Twenty-three confidential witnesses – employed by Dot Hill at the time of the alleged misrepresentations – describe in mutually-reinforcing detail defendants' "real-time" knowledge that these matters were not what defendants publicly represented. These witnesses' statements receive further confirmation from defendants' *post-hoc* admissions. When, as a result of such admissions and other "disclosing events", truth replaced misrepresentation, Dot Hill's share price deflated, damaging plaintiffs and the Class.

Defendants' memorandum of law in support of their motion to dismiss ("Def. Br.") suggests the Complaint be dismissed for four main reasons.

**First**, defendants argue the Complaint's Confidential Witness ("CW") allegations lack the requisite detail, and must be disregarded. Applicable Ninth Circuit authority, however, undermines defendants' assertion. While enough detail is required to ensure that the information attributed to the CW is not unreliable, plaintiff need not provide exact details when such detail would erode the CWs confidentiality. Plaintiffs' CW allegations meet the Ninth Circuit's standard, and defendants' challenge should be rejected. Moreover, plaintiffs posses of all the detail about the CWs and are prepared to submit it to the Court *in camera*, if necessary.

**Second**, defendants argue "plaintiffs fail to allege any inference, let alone a strong inference, of scienter." (Def. Br. 2; *see also* 1-27.) Defendants' scienter arguments fail because they run directly contrary to the Supreme Court's recent clarification of scienter pleading standards. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007). *Tellabs* held that, in evaluating whether the requisite "strong inference" of scienter has been raised: (1) "the inquiry... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S. Ct. at 2509; and (2) that a "complaint

will survive... if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S. Ct. at 2510.

Defendants, contravening *Tellabs*, atomize plaintiffs' scienter allegations so as to argue that each separate allegation fails individually (Def. Br. 19-27) without addressing their considerable totality (including mutually-reinforcing accounts of twenty-three confidential witnesses evidencing defendants' direct knowledge of falsity, as well as defendants' *post-hoc* admissions, defendants' receipt of $178 million from selling Dot Hill shares at near-peak prices, and suspiciously-timed resignations of Dot Hill's CEO and CFO). Simultaneously, largely through proffering competing (and significantly less plausible) inferences of innocence, defendants argue that plaintiffs fail to establish a strong inference of scienter. But as *Tellabs* makes crystal clear, merely offering a competing interpretation is not enough if the inferences of innocence are not *decidedly more* plausible than those of scienter. 127 S. Ct. at 2512; *see also* at 2513.

Additionally, defendants' arguments as to a purported absence of motive are not only hollow (in light of defendants' receipt of $178 million from insider selling at near-peak prices) and unavailing (given plaintiffs' extensive allegations of defendants' actual knowledge), but *de jure* irrelevant. *Tellabs*, 127 S. Ct. at 2511 (absence of motive no bar to finding of scienter).

**Third**, defendants argue that plaintiffs fail to establish loss causation. (Def. Br. 2, 27-29.) Again, the arguments contradict recent and squarely relevant Supreme Court authority. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) (setting forth standard for pleading loss causation). *Dura* requires only "notice" pleading of loss causation: plaintiffs must merely advert to defendants the losses claimed and the "causal connection" asserted between such losses and the alleged misconduct. The Complaint more than satisfies this standard.

Throughout, defendants characterize the Complaint as one turning on inactionable mismanagement and immaterial puffery. But plaintiffs' claims arise not from the mere existence of mismanagement but from defendants' *public disguise* of it. Dot Hill as it appeared in defendants' public statements was *materially* different than Dot Hill as it actually existed.

**Fourth**, defendants ask that the Complaint be dismissed with prejudice, arguing that, because the Court dismiss plaintiffs' prior complaint ("Court Op.") and the instant Complaint offers neither

"new theories," "new facts," nor "a single new allegation or statement," this Complaint must likewise fail. (Def. Br. 8-9.) Defendants' argument is based on a willful failure to engage both the Court Opinion and the Complaint. The Court never ruled on the merits of the prior Complaint, but dismissed it on organizational grounds (Court Op. at 5) and advised that, in the SAC, "[e]ach section... must focus on one allegation, detail who made the statement, why that statement was false or misleading, and state with particularity all the facts justifying any belief in falsity." (*Ibid*.). The SAC is organized so, and is at Court's request "substantially" shorter. *Id*. at 7. It meets this Court's and the Private Securities Litigation Reform Act's ("PSLRA") standards. For these reasons, defendants' motion to dismiss should be denied.

## I. LEGAL STANDARDS

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; and (5) economic loss and loss causation. *Dura*, 544 U.S. at 341-342. The PSLRA, 15 U.S.C. § 78u-4 *et seq*. requires that falsity be pled with particularity, and that pleadings must raise a "strong inference" of scienter. 15 U.S.C. §§ 78u-4(b)(1), (b)(2).

In *Tellabs* at 2509-10, the Supreme Court sought to prescribe a "workable construction" of the PSLRA's "strong inference" pleading standard for scienter, and issued the following clear and pragmatic guidelines:

> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.
>
> *Second*, courts must consider the complaint in its entirety... The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.[1]
>
> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences... The inference that the defendant acted with scienter need not be irrefutable, i.e., of the

[1] Justice Alito, in his concurring opinion, wrote that pursuant to the majority opinion non-particularized allegations are also relevant in determining whether such "strong inference" has been raised (*Tellabs*, 127 S. Ct. at 2516 (Alito, J., concurring)).

> "smoking-gun" genre, or even the "most plausible of competing inferences"... Yet the inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.
>
> *****
>
> We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?
>
> *****
>
> We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference. (italics in original, underline added, citations omitted)

## II. THE COMPLAINT'S CW ALLEGATIONS ARE SUFFICIENTLY PLED

Under Ninth Circuit standards, confidential witness pleadings are adequate when "sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).[2] When, as in this case, plaintiffs are able to (a) "number each witness" (b) "describe his or her job description and responsibilities" and (c) "in some instances, … provide the witnesses' exact title and to which … executive the witness reported," the Ninth Circuit concluded plaintiffs "describe the confidential witness with a large degree of specificity" and thereby satisfy the particularized detail requirement of the PSLRA. *Id.* at 1016. Plaintiffs are in possession of all of this detail, and for the reasons set out below, decided not to plead it; but can, if the court wishes, provide it to the court, *in camera*.[3]

---

[2] The Ninth Circuit's standard was adopted from the Second Circuit opinion in *Novak v. Kasaks*, 216 F. 3d 300, 314 (2000) which also has been adopted and augmented by the First Circuit. *Daou*, 411 F.3d at 1011-12 (citing *In re Cabletron Sys., Inc.*, 311 F. 3d 11, 29 (1st Cir. 2002)). Thus, the First and Second Circuits' opinions are particularly persuasive on this issue.

[3] Use of *in camera* review is appropriate. Drawing on criminal law to allow the use of confidential sources in PSLRA cases, the First Circuit stated, "[w]e also support our conclusion with a helpful analogy from an entirely different field of law." Criminal law once again provides a helpful analogy. An "agency can withhold the names, addresses, and other information that would reveal the identity of a confidential source who furnished the information." *Church of Scientology of Cal. v. U.S. Dept. of Justice*, 612 F.2d 417, 424 (9th Cir. 1979). *See also Pollard v. FBI*, 705 F.2d 1151, 1153-54 (9th Cir. 1983) (holding that *in camera* review of documents and explanatory non-public affidavit was permissible where the plaintiff had

Even if lacking details about some CWs, the Complaint satisfies the Ninth Circuit's standard, as exactitude is not required where "the information attributed to each [confidential witness] does not appear unreliable or clearly beyond the type of knowledge that each source might have" *In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003) (emphasis added).

**A. Employment Dates, Job Titles and Corroborating Details**

Contrary to defendants' reliance on *Limantour* and *Metawave* (Def. Br. 9-10), a plaintiff is not required to provide exact employment dates where such detail "would significantly erode the confidentiality of those sources." *Seebeyond,* 266 F. Supp. 2d at 1159. To be sure, divulging too much detail "could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them." *Novak,* 216 F.3d at 314.

Given Dot Hill's small size (fewer than 250 employees), specifying precise job titles, dates of employment and executive reports is equivalent to betraying the witnesses' confidentiality – and it is for that reason plaintiffs did not plead such detail. Plaintiffs have specified the place, date and content of Dot Hill's false and misleading statements (¶¶ 28, 42-53, 59-65, 80-92, 97-108)[4], as well as the underlying, undisclosed contemporaneous facts which make the statements false and misleading by using consistent, interlocking reports from twenty-three witnesses and supporting documents. *See United States v. Hernandez-Escarsega*, 886 F. 2d 1560, 1566 (9th Cir. 1989) (based upon the "interlocking nature of their stories," witness information should be treated as credible and reliable).

**B. CWs' Conclusions**

Defendants' argument that the "CWs proffer impermissible conclusions" is frivolous. (Def. Br. 10.) Defendants mislabel the factual allegations of CWs 7 and 8 regarding staffing as conclusions and challenge the CWs' first-hand knowledge of staffing. *Id*. The CWs witnessed overstaffing and understaffing on first-hand knowledge through observations. The ultimate "impermissible conclusion" that would flow from these facts would be that Dot Hill misrepresented its operational structure. The

---

requested *in camera* review of the documents and the government's public affidavits were insufficient to determine the applicability of the claimed exemption); *Garcia v. Marshall*, No. C-90-1809 EFL, 1992 U.S. Dist. LEXIS 8550, at *6-7 (N.D. Cal. May 6, 1992) (Court reviewed the confidential memoranda *in camera* to find sufficient indicia of reliability).

[4] All ¶ references hereinafter refer to the Complaint unless otherwise noted.

CWs make no such conclusions. Moreover, defendants' "impermissible conclusions" list lacks analysis and is therefore unpersuasive. (Def. Br. 10-11.)

Defendants' reliance on *Zack* is misplaced. (Def. Br. 11.) In *Zack*, the complaint failed to allege that ANY of the confidential witnesses had personal knowledge that the defendants falsified, or directed anyone to falsify, earnings or cash flow forecasts. *Zack v. Allied Waste Indus.*, 2005 U.S. Dist. LEXIS 35323, at *16 (D. Ariz. Dec. 15, 2005). As a result, plaintiffs' falsity and scienter allegations were conclusory and inadequate. By contrast, plaintiffs here have particularized allegations of scienter and falsity for each claim. Additionally, plaintiffs have pled personal knowledge on behalf of the CWs. For example, plaintiffs have alleged "CW3 and defendant Romm had had numerous discussions about CHARTS' problems and difficulties." (¶ 37(c).) This is not conclusory, and similar particularized allegations are found throughout the SAC. *See* ¶¶ 37-40, 54-57, 66-69, 93-94, 109-112, 114-124.

**C. CWs' First Hand Knowledge**

Defendants' argument that several "CWs concede that their knowledge is not first-hand" is inaccurate and must fail. (Def. Br. 11.) Simply because a CW asserts that a fact is "common knowledge" does not concede that the CW does not have first-hand knowledge of that fact. A fact is common knowledge when several people have first-hand knowledge of the same fact. It is equivalent to stating "I knew it, and so did a lot of others." Similarly, references to "hallway conversations" or instances where a CW "recalled hearing" do not automatically exclude the possibility that the CWs have first-hand knowledge.

Defendants' arguments that "CW details undermine inference of first-hand knowledge" must also fail because it is premature. (Def. Br. 11.) To reiterate, at the pleading stage plaintiff need only provide "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou*, 411 F.3d at 1015. As the Ninth Circuit found this month, "It is entirely plausible that 'engineers or technical editors' would know, *or could reasonably deduce*, that the company suffered... setbacks." *Berson v. Applied Signal Tech.*, No. 06-15454, 2008 U.S. App. LEXIS 11982, at *4 (9th Cir. June 5, 2008) (citing *Daou*, 411 F.3d 1006) (emphasis added).

In contrast, defendants would like the answers to questions that are reserved for the discovery stage of litigation. (Def. Br. 11.) Moreover, defendants should already know the answers to most of their own questions in this section. Likewise, disputes between CW allegations and defendants' assertions "must at least await discovery." *Berson* , 2008 U.S. App. LEXIS 11982 at *5.

"[I]n assessing whether a plaintiff has sufficiently pleaded scienter, the court must consider whether the total of the plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference of scienter." *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, 2008 U.S. Dist. Lexis 38899, at *12-13, *17-18, *28 (S.D. Cal. May 12, 2008) (internal citations omitted) (finding that the allegation of an anonymous witness known only as a "technical writer" supported some inference of scienter, even though lacking particularity such as time, place, and the witness' basis for knowledge and involvement in a particular conversation).

Defendants' paranthetical citation to *South Ferry* is unpersuasive, because the court stated "the fact-specific nature of the analysis means that [t]he precise amount of detail required in describing confidential witnesses varies based on the circumstances of the case." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1139-40 (W.D. Wash. 2005) (internal quotations omitted). Likewise, *Silicon Graphics II* is not helpful, because the plaintiff in that case provided merely a list of the sources of her information and did not allege any corroborating details, how she learned of the internal reports, their contents, who drafted them, or which officers received them. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

In sum, plaintiffs' CW allegations are in conformance with the governing standard. Considered in totality with the other allegations and facts, the CWs support a strong inference of scienter.

**III. PLAINTIFFS' COMPLAINT PLEADS MATERIAL FALSITY**

As per the Court's instructions (Court Op. at 5-7), the Complaint, using "substantially fewer pages," has been re-organized so each section focuses on one of five categories of alleged misrepresentation. (summarized at ¶¶ 8-9; detailed at ¶¶ 27-113.) For each category, plaintiffs (1)

identify the statements alleged to have been false or misleading[5]; (2) explain why such statements were false or misleading; (3) plead particularized facts demonstrating falsity; (4) plead particularized facts supporting scienter; and (5) give notice of loss causation.

**A. Dot Hill's False Financial Results for the First Three Quarters of 2004**

This claim is straightforward and adequately pled. First, Dot Hill's financial results during 2004 were materially false. (¶¶ 28-34.) Second, defendants admitted falsity and materiality by restating those results in February/March 2005. (¶¶ 29-3.) Third, defendants attributed the falsity of the initially-issued financial results to internal "material weaknesses" including (a) antiquated, inadequate and error-prone ERP software (¶¶ 29, 34), and (b) "an inadequate number of accounting and finance personnel with sufficient technical expertise." (¶¶ 34, 29.)

Having admitted falsity, defendants improperly contest materiality. (Def. Br. 3-4, 20.) Defendants' restatement is not only a *de jure* admission of materiality but an explicit *de facto* one.[6] The market reaction to the restatement – an immediate, one-day 10% decline – provides real-world confirmation of materiality. Law, economics and defendants' own statements attest to materiality; defendants' arguments are without merit.[7]

---

[5] Those few instances where no specific speaker is identified are "group-published information... deemed part of a collective work of those individuals involved in generating the documents". *Gaylinn v. 3Com Corp*. 185 F. Supp. 2d 1054, 1064 (N.D. Cal. 2000). Pursuant to the group-published information doctrine, plaintiffs need not attribute a statement "to a particular defendant if the plaintiff pleads that a company officer was involved in the Company's day-to-day affairs and in the preparation of its allegedly misleading statements." *In re CV Therapeutics, Inc*., No. C 03-03709 SI, 2004 WL 1753251, at *9 (N.D. Cal. Aug. 5, 2005). The Complaint does so (¶ 114.) In any event, Dot Hill is liable for the corporate-issued documents. *See Atlas v. Accredited Home Lenders Holding Co.*, No. 07-CV-488 RBB, 2008 WL 80949, at *8 (S.D. Cal. Jan. 4, 2008).

[6] *See In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *2 (N.D. Cal. Nov. 17, 2005) ("Sipex's own public admission that its financial reports for the period in question should not be relied upon and would be "restated" meant that the as-issued reports were materially inaccurate under GAAP").

[7] Defendants misleadingly compare grapes to watermelons (Def. Br. 4, 20 – amount of *net income* restated vs. total *revenue*). On an apple-to-apple basis, the restatement is much more significant (¶ 30 – "an understatement of our previously reported net loss of 37.3%...").

**B. Misrepresentations Concerning the Integration of Chaparral**

Plaintiffs' allegations are NOT that defendants made false forward-looking statements in February 2004 concerning the expected benefits of acquiring Chapparal,[8] but rather that defendants' subsequent statements of "progress" in integrating Chaparral were misleading. (¶ 41.) These public statements are pled with particularity. (¶¶ 46-53.) They are NOT forward-looking, but rather purport to describe *present* and *past* conditions – the integration was always going well, successfully and on-schedule; there was always significant progress; products were performing impressively; customers were enthusiastic. (¶¶ 46-53.) Such statements were misleading because progress, products, and performance were significantly worse than adverted. (¶¶ 54, 41, 56.)

Plaintiffs' falsity allegations rest on mutually-reinforcing CW accounts stating that product development was significantly behind management's timeline: so much so that even two years after acquiring Chaparral, defendants had yet to manufacture or sell a finished Chaparral product. (¶ 56.)

Defendants argue that plaintiffs fail to plead falsity (Def. Br. 13-14) and scienter (*Id.* at 21-22).[9] But in order to make this argument, defendants ignore plaintiffs' allegations of defendants' repeated and specific statements that the Chaparral integration was going "***very well,***" as of July 28, 2004, the acquisition was "***already a success***," and as of October 27, 2004, the integration of Chaparral's RAID controller into Dot Hill products was "***on schedule and continuing smoothly.***" (¶¶46-48,49.)

Plaintiffs' particularized allegations of falsity stem primarily from the statements of CWs statements – which, *contra* defendants' reading of the pleadings and precedent, satisfy Ninth Circuit

---

[8] Initially, the "brains" of Dot Hill's disk drives ("RAID controllers") were provided by Infortrend. (¶ 2.) Chaparral was another provider of RAID controllers. Reliance on Infortrend caused Dot Hill's products, operations, customer service and satisfaction, and margins and profits to suffer (¶¶ 2, 26) to the great dissatisfaction of Defendants and Sun. (¶¶ 57(b), 93.) Gaining operational control of RAID controller technology was one of Defendants' stated top-three goals (¶¶ 26, 42-43) because, as Defendants stated in February 2004 when they acquired Chaparral, it would allow Dot Hill to improve its technology, products, and customer service (all of which would help in gaining new customers and in keeping its largest customer, Sun, happy), reduce costs, and improve margins and revenues. (¶¶ 7, 42-44.)

[9] Because scienter and falsity here directly overlap, the two arguments boil down to one. While plaintiffs address Defendants' Chaparral integration scienter below in §_IV(A)(2), as the Ninth Circuit has long recognized, "inquiry into scienter is combined with the inquiry for falsity, as the two are generally strongly inferred from the same set of facts". *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1125 (C.D. Cal. 2005) (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002)).

standards. *See* §II. CW 15, a Dot Hill salesperson who waited more than a year in vain to be provided with a Chaparral product to sell, stated that: (a) product development was taking longer than anticipated; (b) that Dot Hill management all knew it; (c) and that management's public mantra that a Chaparral-integrated product was "right around the corner" was not congruent with reality. (¶ 56(a).) Plaintiffs' CW 15 allegations therefore establish contemporaneous[10] falsity and scienter. *Daou*, 411 F.3d at 1015. CW 6[11] confirmed CW 15's account, stating that even as of April 2006 – after two years of claims of constant progress and impressive performance – Dot Hill had yet to manufacture and sell a finished Chaparral product. (¶ 56(b).)

**C. Misrepresentations Concerning Operational Structure and Pre-2005 Profits**

The gravamen is again straightforward. Plaintiffs specify the statements (¶¶ 61-65) and financial results (¶ 72) alleged to be misleading. The former portrayed Dot Hill's low-headcount operations as sustainable, successful, profitable and extremely efficient; the latter (namely, "the financial results reported by defendants for Dot Hill before February 2005 – and especially Dot Hill's newfound profits during 2003 and 2004" - ¶ 72) seemed to provide objective confirmation.

These statements were misleading because defendants' low-headcount business model was neither successful nor sustainable but had in fact brought Dot Hill to organizational breakdown (¶¶ 59, 66, 70-78), as vividly described by numerous CWs[12] and as admitted by defendants. (¶¶ 11, 34-36, 66, 112.) Defendants admitted in early 2005 that, in order to correct Dot Hill's internal "material weaknesses" and ensure accurate financial reporting and organizational functioning, they would need to hire more and better-qualified accounting and finance personnel (¶¶ 34-36, 66, 77) and institute parallel changes in sales (¶ 112) As a result, Dot Hill's baseline operational costs nearly doubled (¶¶ 70, 77) and the profits that Dot Hill's business model had ostensibly been producing vanished (¶¶ 71,

---

[10] Defendants argue that CW 15 allegations lack requisite particularity because plaintiffs do not specify that CW 15's employment was contemporaneous with the alleged misstatements. As already stated, plaintiffs possess such detail but did not plead it. Plaintiffs confirm that CW 15 was employed by Dot Hill during 2004 and 2005 – the exact period at issue.

[11] Plaintiffs can provide CW 6's exact title, responsibilities, and dates of employment. Here, plaintiffs confirm that CW 6 was employed by Dot Hill during 2004, 2005, and 2006.

[12] Specifically, as to Dot Hill's: ERP system, internal controls and financial reporting (¶¶ 37-39); accounting department (¶¶ 40, 67); and sales department (¶¶ 67, 110-11.)

77.) These events revealed Dot Hill's pre-2005 profits to be misleading and illusory epiphenomena that had been underwritten by – and that would not have existed but for – defendants' secret, material under-investment in personnel, systems and expertise. (¶¶ 70-78.) Dot Hill's 2003 and 2004 profits were not the "pay-off" of an efficient and functional business model, but the short-term byproduct of defendants' failure to ensure minimal standards of organizational functioning that investors had always believed Dot Hill to possess.[13]

Defendants first argue that they misrepresented nothing concerning costs and staffing because they disclosed both. (Def. Br. 14-15.) But plaintiffs do not dispute that defendants spent what they said. Plaintiffs' complaint is that defendants' public description that Dot Hill's "lean" business model was working (¶¶ 59-66) was misleading in light of the *effects* of such (under)spending – organizational inadequacy and dysfunction; illusory profits that would last only as long as the underspending.

Defendants' attempt to cast Plaintiffs' allegations as inactionable mismanagement (Def. Br. 15) are misguided. Plaintiffs' claims do not arise from mere mismanagement, but because defendants *publicly disguised such mismanagement* through omission, misrepresentation and misleading statements. Such claims are actionable ones, and stand on solid Ninth Circuit precedential ground. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 927 (9th Cir. 2003) (upholding claims, essentially identical to those here, that (1) company "overstated its operating income by under-reporting maintenance and repairs expenses" while (2) "representing that the improved financial returns were due to exceptionally efficient management, rather than unsafe maintenance practices").[14]

---

[13] Plaintiffs plead with great particularity the financial (¶¶ 72-74) and operational (¶¶ 67-69; 37-39, 110-111) extent of Defendants' disinvestment, as well as the resulting organizational inadequacies admitted to by Defendants (¶¶ 66; 34-35, 77) and described by confidential witnesses. (¶¶ 37-39, 67-69, 110-111.) Such disinvestment underwrote purported profits during 2003 and 2004 (¶¶ 72-74, 78), which profits vanished in 2005 and 2006 after Defendants admitted Dot Hill's organizational breakdown and started to spend the necessary millions to correct it. (¶¶ 77, 70-71, 58.) The illusory nature of pre-2005 profits was unknown (¶¶ 78, 58-59); Defendants publicly extolled their pre-2005 business model as efficient, successful and viable. (¶¶ 59-66.)

[14] *See also In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) ("defendants failed to disclose, and made false and misleading statements concerning, the impact on the company of the internal mismanagement."); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) ("defendant was aware that

**D. Misrepresentations Concerning Dot Hill's Relations with Sun**

Plaintiffs plead with particularity the statements alleged to be false: Defendants' uniform portrayals of Dot Hill's relationship with Sun in extremely positive terms. (¶¶ 8(d), 79-92.) Plaintiffs clearly explain why those statements were false. (¶¶ 93-94.) Defendants argue that the confidential witness statements merely establish "that Dot Hill and Sun had a typical business relationship." (Def. Br. 16.) Defendants are incorrect.

Plaintiffs do not merely plead that Sun "may have had concerns from time to time with Dot Hill's products," but rather: (1) product concerns were initially (with Dot Hill's reliance on Infortrend for RAID controllers) numerous, severe and unresolved to Sun's satisfaction (¶ 93(a)-(d), (i), (j)); and (2) to solve these problems and at Sun's demand, Defendants acquired Chaparral, *but still failed* to ameliorate Sun's dissatisfactions because Dot Hill was failing to integrate Chaparral. (¶ 93(a), (e), (h), (i), (j).) Sun's concerns were longstanding and unresolved.

Dot Hill and Sun did NOT have a "typical business relationship", but rather an atypical one made extremely poor and precarious for Dot Hill by its near-total reliance on Sun. (¶ 93(f), (g).) Disparity in bargaining positions forced Dot Hill to concede to Sun; constantly under threat of the loss of Sun's business (¶¶ 93(f), (g), 94) and even to spend $72 million to purchase Chaparral at Sun's instigation. (¶ 93(a), (i).)

Finally, defendants' sole legal authority for their falsity arguments is inapposite. *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) stands for the unremarkable proposition that plaintiffs alleging statements to have been false when made must plead evidencing facts contemporaneous with the false statements. As detailed above, and unlike *Ronconi*, plaintiffs here proffer numerous, mutually-reinforcing contemporary facts evidencing falsity.

**E. Misrepresentations Concerning Prospects and Progress with New Customers**

Defendants repeatedly acknowledged the importance of gaining new customers so as to wean Dot Hill from its dependence on Sun. (¶¶ 96-97.) Defendants represented this through (1) press

---

mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of mismanagement.")

releases announcing agreements with erstwhile new customers (¶ 98); and (2) further and often-detailed commentary concerning Dot Hill's sales efforts, prospects and progress (often in response to direct analyst questions).[15] (¶¶ 97-108.) These were misleading because (1) the agreements were empty distributorships without any commitment to purchase Dot Hill products (¶¶ 96, 109) and (2) because Dot Hill's sales staff was understaffed and underskilled – as described *very* vividly by confidential witnesses (¶¶ 110-111) and as Defendants later admitted (¶ 112) – and was having little success in procuring new customers.

Defendants inappositely rely on *In re Vantive Corp. Sec. Litig. ("Vantive II")*, 283 F.3d 1086-1087 (9th Cir. 2002), to argue that allegations of inadequate hiring/training fail to demonstrate falsity.[16] But the allegations here much more closely resemble those sustained in *Daou*, 411 F.3d at 1021 (particularized confidential witnesses allegations of hiring "untrained mechanics and cable pullers" as computer technicians) and *Brumbaugh v. Wave Systems Corp.*, 416 F. Supp. 2d 239, 250-51 (D. Mass. 2006) (press release announcing agreement with Intel was misleading because agreement was a "non-exclusive licensing agreement with no minimum licensing requirements").

**F. Materiality**

In sum, defendants' false and misleading statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir.1996) (optimistic statements concerning new drug materially misleading in light of known but undisclosed regulatory concerns); *accord*, *In re Apollo Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 919-921 (D. Ariz. 2005) (allegations upheld where company spoke positively about

---

[15] *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-598 (7th Cir. 2006) (finding that the statement "We're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance" went "well beyond puffery" because "it was a direct response to an analyst's inquiry" and thus sufficiently particular and material) Abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).

[16] Falsity allegations failed in *Vantive* because they were bald declarations of belief constructed from thin *post-facto* air. Here, the allegations rest on detailed, fact-specific accounts of multiple CWs who were actually employed by Dot Hill at the time, who describe contemporaneous conditions within Dot Hill.

regulatory matters going that were negatively). Dot Hill as it appeared in defendants' public statements was *materially* different than Dot Hill as it actually existed.

It is for this reason that defendants' "puffery" argument fails. Strictly speaking, "the securities laws recognize no distinct 'puffing' exception." *S. Ferry*, 399 F. Supp. 2d at 1129. To claim that a statement is "puffery" is to claim that it is *immaterial* – that a reasonable investor would not rely on it when considering the total mix of information available. *Ibid.* (citations omitted). Here, plaintiffs allege misrepresentation of what defendants themselves identified as Dot Hill's most important matters – Sun; Chaparral; new customers – as well as Dot Hill's financial results. These were not immaterial issues. And what defendants chose to publicly say about those issues created an impression of Dot Hill *materially* different from actual existing conditions.[17]

Defendants' statements concerning Chaparral left investors only with misleading descriptions where matters were always "on schedule" and "very on track", "continu[ing] to go very well," and in which products had "achieved impressive performance benchmarks." Given that the facts were opposite and defendants knew it, plaintiffs' claims are viable ones. *Dura*, 452 F. Supp. 2d at1033 ("although statements that sales and demand for Ceclor CD were "strong,"... and that Ceclor CD was "well received" by physicians are generalized, the facts alleged in the TAC lead to a strong inference there was no reasonable basis for believing such statements to be true... Accordingly, the puffery rule does not insulate Defendants from liability.")[18]

---

[17] While obvious hyperbole, or empty and vaguely positive generalizations, *unaccompanied by supporting data or detail*, may be found immaterial puffery; where accompanied, as here, by "specific statements of fact that supposedly justify or supply a foundation for the optimism", they become actionable misrepresentation. *S. Ferry*, 399 F. Supp. 2d at 1130. For this reason, the Complaint proffers "block quotes" – to demonstrate that the positive/optimistic statements complained of were not empty, airy generalizations, but rather were accompanied by ostensible corroborating detail suggesting specific and solid basis for such statements. *See Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Kaltman v. Key Energy Services, Inc.*, 447 F. Supp. 2d 648, 661-62 (W.D. Tex. 2006) (finding statements in context to be factual and specific, not mere puffery); *Blatt v. Corn Products Intern., Inc.*, No. 05C 3033, 2006 WL 1697013, at *4 (N.D. Ill. June 14, 2006) (same).

[18] *See also In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (statements extolling expected benefits of acquisition actionable); *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 417 (D.N.J. 2002) ("integration... was going very well" and "was on or ahead of schedule" actionable); *S. Ferry*, 399 F. Supp. 2d at 1130 (claims of excellent integration abilities actionable); *In re 2TheMart.com Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 961 (C.D. Cal. 2000) (statements that website was "in

Such statements also contributed to material misrepresentation of matters with Sun. First, Dot Hill's depended on Sun for nearly all its business. Second, defendants spent $72 million at Sun's insistence to acquire Chaparral to resolve Sun's numerous operational, technological and financial dissatisfactions (severe enough to cause Sun to threaten to abandon Dot Hill). Third, this expensive cure for Sun's dissatisfactions was itself failing, investors were left only with defendants' stream of uniformly positive statements about Sun. Here too, defendants' misstatements created a false impression that materially differed from reality. And likewise, defendants' statements about Sun and Chaparral were not mere puffery, but highly material given the overwhelming importance of Sun's business to Dot Hill.[19]

## IV. SCIENTER IS PARTICULARLY PLED

### A. Scienter Is Properly Pled as to Each Misrepresentation

The PSLRA states, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The Ninth Circuit has held that [this] language… [means] that the evidence must create a strong inference of, at a minimum, deliberate recklessness.'" *In re Omnivision Tech. Inc.*, 2005 U.S. Dist. LEXIS 16009, at *12 (N.D. Cal. 2005) (internal quotations and citations omitted). Contrary to defendants' assertions (Def. Br. 19) motive is not a necessary element of scienter. *See In re BP Prudhoe Bay Royalty Trust Securities Litigation*, No. C 06-1505 MJP, 2007 U.S. Dist. LEXIS 83007 at *10 (W.D. Wash. 2007) (explaining "motive may be relevant in weighing whether defendants had the intent to

---

development" and "expected" to be running at future date actionable); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory was "in good shape" or "under control" actionable); *In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212, at *11-12 (E.D. Pa. Dec. 23, 2005) (statement that "we are on track with our own schedule" actionable where defendants knew of "serious technological flaws and significant delay"); *Makor Issues*, 437 F.3d at 597-598 (statements regarding product availability and customer demand found actionable because the "statements are particular, specific, and, according to the complaint, completely false").

[19] Defendants take issue with ¶ 44 of the SAC which alleges that analysts repeated Defendants' representations that the Chaparral acquisition would reduce costs and increase revenues. (Def. Br. 18, fn. 6). The Ninth Circuit has held that corporate defendants can be liable for false and misleading statement to securities analysts with the intent that the analysts communicate those statements to the market. *Cooper v. Pickett*, 137 F. 3d 616, 624, (9th Cir. 1997); *see also Warshaw v. Xoma Corp.*, 74 F. 3d 955, 959 (9th Cir. 1996). Plaintiffs sufficiently alleged liability under the *Cooper* theory. (¶¶42-44.)

defraud, but it is not necessary") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 127 S. Ct. 2499 (2007)).

**1. Defendants' False Financial Statements**

Defendants had actual and prior knowledge of the factors that caused them to report false financial statements for Dot Hill's 1st, 2nd and 3rd quarters of fiscal 2004. (¶¶ 37-39.) As the detailed and mutually-reinforcing statements of thirteen CW demonstrate,[20] defendants were well-acquainted with and long aware of the ERP system's inadequacies (¶¶ 37-39) and were the direct (and reckless) cause of the under-staffing. (¶¶ 40, 69.) Defendants argue that plaintiffs have not raised a sufficiently strong inference of scienter. (Def. Br. 9 fn.3, 13-15, 18.) Most of defendants' scienter arguments are *prima facie* irrelevant and meritless.[21]

Defendants proffer "inferences of innocence" that fail to meet *Tellabs'* requirement that they be *more* compelling than inferences of guilt: *e.g.*, "at best, plaintiffs' allegations show that certain Dot Hill employees would have preferred different accounting software." (Def. Br. 20.) That is *not* a compelling interpretation of the facts pled, which include (1) CW detailing the exact ERP problems responsible for the misstated financial results (¶¶ 37(b), (c), (g), (h), (i)); (2) defendants' actual, prior knowledge of such problems (¶¶ 39, 37(c), (d), (g), (i)); and (3) defendants' later admissions of the software's and staff's material inadequacy. (¶¶ 34, 29.) When, as per *Tellabs*, one considers plaintiffs' other allegations (*e.g.*, that defendants retained their known-to-be-imperfect ERP system not for business reasons but for reckless and personal reasons – *see* ¶ 38), the inference balance swings to plaintiffs. 127 S. Ct. at 2509-10.

Defendants' argue against an inference of scienter by claiming that a "benign misapplication of $700,000" caused the false financial statements.[22] The falsification of Dot Hill's financial

---

[20] Where as here the accounts of multiple witnesses corroborate each other, their reliability and weight are magnified. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

[21] Defendants sound the cry of "fraud by hindsight" and argue that mere fact of restatement does not evidence scienter. (Def. Br. 19-20). But plaintiffs nowhere suggest that it does.

[22] Defendants' citation to two analysts reports is improper. (Def. Br. 1, Garvin Decl. Ex. A and Ex. B.) "Review under Rule 12(b)(6) is confined to the allegations of the complaint, which must be accepted as true." *In re Silicon Graphics Sec. Litig.*, 183 F. 3d 970, 1002 (9th Cir. 1999). Judicial notice is improper because he analyst reports are not referenced in the SAC and are considered 'outside' the Complaint. *See*

statements was hardly "benign." First, the restatement of that $700,000 resulted in a 37% increase in the net loss Dot Hill suffered in the first quarter of fiscal 2004 ended March 31, 2004. Second, when the false financials were reported to the public, defendants Lambert (Dot Hill's CEO) and Romm (Dot Hill's CFO) publicly represented and certified that:

> (i) they were responsible for establishing and maintaining Dot Hill's disclosure controls and procedures;
>
> (ii) they designed such controls and procedures to ensure that material information was made known to them;
>
> (iii) they evaluated the effectiveness of the disclosure controls and procedures; and
>
> (iv) based on their most recent evaluation of internal control over financial reporting, they reported to Dot Hill's auditors and the audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Dot Hill's ability to record, process, summarize and report financial information.

Given defendants' later admissions that Dot Hill's first quarter 2004 financial statements were falsified as a result of a material weaknesses in internal controls, and "based on their most recent evaluation of internal control over financial reporting," defendants cannot now say they did not know at March 31, 2004 of the staffing shortages and ERP system weaknesses (as corroborated by the CWs) that resulted in the falsification of Dot Hill's first quarter 2004 financial statements.

Defendants' citation to *In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791 (D. Ariz. Jan. 25, 2006) is inapplicable here. In *Hypercom* the plaintiffs alleged "little more than the fact that Hypercom issued a financial restatement because of GAAP violations." *Hypercom*, 2006 WL 726791, at 32. By contrast, plaintiffs here have alleged significantly more, including fact-specific accounts from multiple CWs who were employed at and who describe contemporaneous conditions within Dot Hill, and who relate defendants' direct, actual knowledge of those conditions.

Similarly, defendants' reliance on *In re Nike, Inc. Sec. Litig.*, 181 F. Supp. 2d 1160 (D. Or. 2002) is misplaced. There the court refused to infer that management understood the impact of its

---

*In re Turbodyne Techs. Sec. Litig.*, 2002 U.S. Dist. LEXIS 25738, at *30-31 (C.D. Cal. March 13, 2002) Even if the court were to take judicial notice of these reports, they can only be used to "establish 'whether and when certain information was provided to the market,' not for the truth of the matters asserted in the reports." *In re Amgen Inc., Secs. Litig.* 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. Feb. 1, 2008).

new planning system on manufacturing. *Nike*, 181 F. Supp 2d at 1168-69. Assuming arguendo that this may be true of manufacturing, internal controls (and awareness of their weaknesses) are the direct responsibility of senior management: the chief executive and chief financial officer are required to certify they have personal knowledge of the company's internal controls and their weaknesses. Therefore, it is a plausible and reasonable inference that management would fully understand the impact of an internal control weakness and subsequent restatement.

Finally, defendants argue that plaintiffs offer no basis for the Court to determine that any defendant believed either that the accounting system had become inadequate or, more importantly, that it had rendered financial statements inaccurate. (Def. Br. 21.) However, managers cannot plead ignorance of problems with systems critical to a company's operations. *See Berson,* 2008 U.S. App. LEXIS 11982, at *13-16 (inferring scienter where "facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them).

**2. The Chapparal Integration**

Plaintiffs plead particular facts supporting an inference of scienter regarding defendants' Chaparral integration statements – defendant Kammersgard's strong interest in the issue (¶ 57); defendants' actual knowledge of problems/delays (¶ 56(b)) – and, more generally (1) that the matter was of such central importance that defendants' knowledge may be imputed (¶ 122) and that (2) defendants' micro-management of Dot Hill's operations gave them thorough knowledge of the matter. (¶¶ 122-123.) Plaintiffs' particularized allegations of scienter stem primarily from the statements of CWs – which, as set forth above in §II, satisfy Ninth Circuit standards. CW 15, a Dot Hill salesperson who waited more than a year in vain to be provided with a Chaparral product to sell, stated that Dot Hill management all knew product development was taking longer than anticipated, and that management's public mantra that a Chaparral-integrated product was "right around the corner" was not congruent with reality. (¶ 56(a).) Therefore, Plaintiffs' CW 15 allegations establish contemporaneous scienter. *Daou*, 411 F.3d at 1015. CW 6 confirmed CW 15's account, stating that even as of April 2006 – after two years of claims of constant progress and impressive performance – Dot Hill had yet to manufacture and sell a finished Chaparral product. (¶ 56(b).)

Defendants characterize their "optimism" about Chaparral as "genuine," and on that basis refute plaintiffs' assertion that defendants acted with scienter in making optimistic statements about Chaparral. (Def. Br. 21-22.) This is not plausible: did defendants wake up in April 2006 without a finished product (after having innocently believed at all prior times that progress had been excellent and products impressive)? It is much more likely that defendants had previously been aware that Chaparral matters were other than as publicly adverted. This inference is more compelling, especially given its confirmation by particularized facts from CWs 6 and 15. Defendants' inferences are not only less compelling than plaintiffs', but directly contradict *facts* pled by plaintiffs (which, as *Tellabs* reaffirmed, is improper). *Tellabs*, 2007 WL 1773208 at, *9-10.

Defendants rely on the opinion in *In re Swift Trans. Co. Sec. Litig.*, 2006 WL 1805578 (D. Ariz. March 29, 2008) to assert plaintiffs here fail to contradict defendants' "genuine" enthusiasm for the Chapparal acquisition. In *Swift*, plaintiffs failed to properly allege falsity as to the statements, which the court also found not to be material. *Id* at 7. But here, plaintiffs have sufficiently alleged falsity of material events through the reinforcing CW accounts evidencing that product development was significantly behind management's timeline. (¶¶ 56-57.) Defendants could not have been satisfied with the lack of progress given, and were keenly aware that it was jeopardizing their relationship with their largest customer, Sun, as well as delaying the attraction of new customers.

Defendants' citation to *Shields v. CityTrust Bancorp, Inc.*, 25 F.3d 1124 (1994) is unavailing. In *Shields* the plaintiff lacked corroborating circumstantial evidence to support an inference that the statements about a "prosperous future" were made with the requisite recklessness. *Id.* at 1129. General statements about a "prosperous future" are markedly different and less probative than the statements alleged here; specifically, that a core technology integration at an undiversified company that relies on one customer for the majority of its revenues was "***already a success***," "***on schedule***," and "***going smoothly***."

**3. Operational Structure and Pre-2005 Profits**

Plaintiffs raise a strong inference of scienter through the mutually-reinforcing accounts of many CW who describe defendants' actual knowledge of Dot Hill's organizational inadequacies and

underspending as they were occurring, (¶¶ 37-39, 67, 69,110(e), 111(c)), as well as by defendants' later admissions (¶¶ 66, 34-35, 112) of those very inadequacies.

Defendants argue that plaintiffs fail to plead facts demonstrating defendants' awareness of Dot Hill's organizational inadequacies. (Def. Br. 22.) In fact, plaintiffs allege particular facts evidencing just such awareness. (¶¶ 37-39, 67, 69, 110(e), 111(c).) That multiple confidential witnesses all agree on this point only further solidifies the inference of scienter. *Daou*, 411 F.3d at 1015. And defendants' proffered inference of innocence – that defendants were merely being "diligent in controlling company expenses" and that "if anything... defendants were trying to improve the company's financial results" (Def. Br. 23) – is not more compelling than an inference of scienter. Defendants' "explanation" contravenes the facts pled – particular facts evidencing defendants' actual knowledge of the disfunctions caused by their inadequate spending. (¶¶ 39, 37(c), (d), (g), (i), 110(e), 111(c).) And the idea that defendants were trying to improve Dot Hill's financial results actually supports scienter: after Dot Hill's financial results initially *appeared* to have been improved by defendants' actions (¶¶ 59, 72-75, 78, 126), defendants quickly sold $178 million of Dot Hill stock at near-peak prices of $15.50 per share. (¶¶ 75, 115-121.)

Defendants cite to *Metawave*, but in *Metawave* the court found insufficient allegations of scienter because "Plaintiffs [did] not provide details such as any meetings [management] attended at which the lack of … demand was discussed." *Id.* at 1075. In contrast, plaintiff here has alleged sufficient facts to establish scienter regarding the misrepresentations of the operational structure, including the corroborating statements of CWs and the admissions of defendants. (¶¶ 34-35, 66-78.)

**4. Dot Hill's Relations with Sun**

Plaintiffs plead particularized facts evidencing knowing falsity: namely, mutually-reinforcing accounts from ten CWs who describe, *inter alia*, Sun's dissatisfactions with Dot Hill's products, service, technology and prices. (¶ 93(a)- (j).)

Defendants recycle their falsity arguments to attack scienter (Def. Br. 16-17) to the same lack of applicability, authority and effect. *Contra* defendants, plaintiffs plead more than "customer service

issues" that even if known to defendants would not support scienter.[23] Rather, a host of product, price, performance and operational dissatisfactions so severe that, at Sun's insistence and at Sun's threat, Dot Hill spent $72 million to acquire Chapparal – in the hope to solve those problems – and then failed during the next two years to develop a Chaparral product. (¶ 93.) Plaintiffs have pled particularized facts evidencing defendants' actual knowledge: Dot Hill and Sun personnel met regularly to discuss Sun's dissatisfactions and how to resolve them, and senior management was briefed on those meetings (¶¶ 123(h), 93(b)); Kammersgard immersed himself in Chaparral issues. (¶ 57.)

Scienter is further supported by mutually-reinforcing CW statements attesting to defendants' micro-management (¶ 123), and by the very small size of the company coupled with the extreme importance of the issue. (¶ 122.) Given that Sun was responsible for 80%-90% of Dot Hill's revenues, and that the Chaparral acquisition was driven by Sun as a solution to the problems between Dot Hill and Sun, defendants must have monitored both their relationship with Sun and the Chaparral integration very closely. *See, e.g., In re Complete Management, Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325 (S.D. N.Y. 2001) (it "thoroughly strains credulity to imagine that the individual defendants... were ignorant of problems with "largest single" customer). An inference of innocence (*i.e.*, that defendants were unaware of longstanding problems whose expensive hoped-for solution was also failing) is highly implausible, and is much less plausible than the inference of scienter, which therefore prevails. *Tellabs*, 2007 WL 1773208, at *9-10. *Contra* defendants, the contract extensions (¶¶ 90-92) do not evidence that defendants' "optimism about the Sun relationship was well-founded"

---

[23] Defendants' argument that "mere existence of customer complaints does not equal overall customer dissatisfaction" (Def. Br. 23, citing *Vantive*, 283 F.3d at 1088-38), is inconsistent with both logic and law. Logically, the existence of Sun's complaints *actually does indicate "overall" customer dissatisfaction* given that Sun provided Dot Hill with more than 80% of its revenue. Legally, in *Vantive*, the key word is "vague": customer dissatisfaction there was generally alleged without any particular or evidencing facts. (283 F.3d at 1088-1089). Plaintiffs' allegations here, unlike *Vantive*, are supported by numerous and mutually-reinforcing particularized facts, including (i) the exact customer dissatisfied; and (ii) particular dissatisfactions over the course of two years, both with Dot Hill's old products and with the new technology that was supposed to solve the initial dissatisfactions. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 768 (S.D.N.Y 2001) (customer complaints support inference of scienter).

(Def. Br. 16, 24), but rather, unbeknownst to the market, Dot Hill's continued subordination to Sun. (¶¶ 93(f), (g), 94.)[24]

Furthermore, defendants completely mischaracterize the opinion in *Wet Seal*. In *Wet Seal*, the company issued numerous press releases announcing the risk of store closings throughout the class period, *as well as* a specific risk disclosure in its SEC filings, including the importance of the back-to-school season, an explanation of the risks associated with ongoing operating losses, and disclosure of the decline in comparable store sales. *Id.* at 1164-65. Dot Hill's boilerplate risk disclosure is far from analogous. Every company risks losing a customer; defendants here were aware of, but did not disclose Sun's (Dot Hill's largest customer) dissatisfactions with Dot Hill's products, service, technology and prices.

Defendants argue that "allegations of meetings to discuss problems do not establish why or how defendants deliberately misrepresented Dot Hill's relationship with Sun." (Def. Br. 23.) However, "alleged meetings raise a strong inference that defendants were aware of … client's dissatisfaction." *Berson*, 2008 U.S. App. LEXIS 11982, at *14. Also "the size of the contract and the prominence of the client raise a strong inference that defendants would be aware." *(Id.)* Plaintiffs have alleged that Sun represented 80-90% of Dot Hill's revenue. (¶ 4.)

**5. Prospects and Progress with New Customers**

Plaintiffs particularly allege that defendants had actual knowledge of the sales department's deficiencies. (¶¶ 110(e), 111(c).) Defendants inappositely rely on *Vantive*, 283 F.3d at 1086-87, to argue that allegations of inadequate hiring/training fail to demonstrate scienter.[25] But the allegations

---

[24] Dot Hill and Sun were not tied by mutual reciprocity and satisfaction (as Defendants portrayed), but much more precariously by Sun's interest in exploiting an unequal relationship to wring maximum price concessions under threat of abandoning Dot Hill. (¶¶ 93(f), (g), 94.) The contract extensions belied Defendants' representation of them (¶¶ 90-92) and concretely affirms the accounts of confidential witnesses. (¶ 93(f), (g).)

[25] Scienter allegations failed in *Vantive* because they were bald declarations of belief constructed from thin *post-facto* air. Here, the allegations rest on detailed, fact-specific accounts of multiple confidential witnesses who were actually employed by Dot Hill at the time, who describe contemporaneous conditions within Dot Hill, and who relate Defendants' direct, actual knowledge of those conditions. Defendants' proffered inference of innocence – that Defendants may not have shared the confidential witnesses' opinions of Dot Hill's sales force – is not credible, especially in light of Defendants' later admission that the confidential witnesses were correct.

here much more closely resemble those sustained in *Daou*, 411 F.3d at 1021 (particularized CW allegations of hiring "untrained mechanics and cable pullers" as computer technicians) and *Brumbaugh*, 416 F. Supp. 2d at 250-51 (press release announcing agreement with Intel was misleading because agreement was a "non-exclusive licensing agreement with no minimum licensing requirements").

**B. Allegations Considered as Whole Raise a Strong Inference of Scienter**

As detailed above, plaintiffs raise a strong inference of scienter by pleading numerous, particular, mutually-reinforcing facts directly evidencing defendants' actual knowledge. When considered together with additional facts and factors pled by plaintiffs, the inference becomes more compelling still. *See Dura Pharms*, 452 F. Supp. 2d 1005, 1015,1028 (finding scienter adequately pled after Ninth Circuit vacated initial finding of no scienter based on 'atomized' analysis and instructed court to consider scienter allegations as a whole); *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949-50 (9th Cir. 2005) (finding allegations of actual knowledge *together with* motive to raise strong inference of scienter).

**1. Scienter May Be Inferred for "Core Operations"**

Allegations of actual knowledge are superfluous where "it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's key officers." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1139. The misstatements complained of here concern what defendants themselves identified as their three foremost issues: Sun; Chaparral; and new customers. It is common sense to infer, given the absolute centrality of these matters, that defendants actively made themselves aware of the status of each. It is highly implausible to imagine that defendants were "in the dark" about the status of any.[26]

[26] *See, e.g., In re Amylin Pharm. Inc. Sec. Litig.*, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003) (scienter pled where statements concerned company's top-priority product); *In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000) (facts critical to core operations are known to company and its key officers); *Am. W*, 320 F.3d at 943 n.21 (same); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 339-340 (S.D. N.Y. 2007) (scienter for company's "life blood").

**2. Management Style, Management Resignations and Company Size Further Support an Inference of Scienter**

Executive positions and responsibilities suggest scienter but by themselves do not demonstrate it. Here however, vividly-detailed and mutually-reinforcing statements from multiple confidential witnesses provide particular factual basis for an inference of scienter. *See, e.g.*, ¶¶ 123-124, 39(a), 57, 111(c) (evidencing in various contexts the individual defendants' micro-management of and/or detailed awareness of Dot Hill's operations). Where such facts pave the logical bridge between defendants' positions and defendants' knowledge, a strong inference of scienter is raised.[27]

That Dot Hill was a small company with few employees (for most of the Class Period, fewer than 250) magnifies the inferences of scienter already raised by consideration of "core operations" and "management style". Even defendants' purported authority to the contrary supports plaintiffs' claims.[28] Suspiciously-timed executive departures, such as those of Lambert and Romm in early 2006 shortly before Dot Hill revealed that Sun would turn elsewhere for future data storage products, support an inference of scienter.[29] Defendants' limited authority is not to the contrary.[30]

**3. Defendants' Sale of $178 Million of Dot Hill Shares at Inflated and Near-Peak Prices Further Supports Scienter**

"Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter". *Daou*, 411 F.3d at 1022 (citations omitted).

---

[27] *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004); *Primavera Investors v. Liquidmetal Techs*., 403 F. Sup. 2d 1151, 1158 (M.D. Fla. 2005) (confidential witness description of "hands on" CEO and weekly meetings). Defendants' cases to the contrary (Def. Br. 26) are inapposite: *In re Autodesk, Inc. Sec. Litig*., 132 F. Sup. 2d 833, 844 (N.D. Cal. 2000) (plaintiffs relied entirely on allegation that defendants received "internal reports" but provided no specifics about content of reports or how such contents contradicted defendants' public statements); *In re Peerless Sys. Corp. Sec. Litig*., 182 F. Sup. 2d 982, 994 (S.D. Cal. 2002) (plaintiffs failed to demonstrate how defendants learned of purported true/adverse information – unlike here, where twenty-three confidential witnesses provide firsthand accounts).

[28] *See In re Watchguard Sec. Litig*., 2006 WL 2038656, at *4 (W.D. Wash. Apr. 21, 2006) (acknowledging generally that "one may infer that certain critical corporate information is known to high-ranking officers"; finding size of company inadequate as *sole* basis for scienter where plaintiffs, unlike here, failed to otherwise link defendants and knowledge).

[29] *In re Adaptive Broadband*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002); *In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Sup. 2d 1248, 1274 (N.D. Cal. 2000).

[30] *In re Read-Rite Corp. Sec. Litig*., 115 F. Sup. 2d 1181 (N.D. Cal. 2000) (resignation did not demonstrate scienter where resignation was the *only evidence alleged to support scienter*).

*Contra* defendants', insider selling here surpasses all relevant thresholds. The four Individual defendants sold 1.5 million Dot Hill shares at near-peak prices for $23.1 million. (¶¶ 19-22, 115-121.) The proceeds here exceed amounts found suspicious.[31] The percentage of holdings sold – 37% for Kammersgard; 34% for Lambert; 96% for Romm; 38% for Sauey – far exceed percentages held to be suspicious.[32]

Defendants argue that they sold "before any of the purportedly misleading statements" and before any share price inflation. They are incorrect on both grounds. Plaintiffs' clearly pled misrepresentations prior to defendants' September 2003 stock sales had the effect of nearly tripling Dot Hill's share price to $18 per share. (¶¶ 10, 25, 38(c)(d), 60-63, 72-75, 78, 80-83, 97-101, 117.) In fact, the timing issue a damning one for defendants, who sold large percentages of their shares at near-peak prices shortly before the shares lost approximately half their value. *America West*, 320 F.3d at 939 (2003) ("Equally troubling is the fact that the stocks were sold... near the stock's peak... and just prior to the stock's decline... and subsequent plunge").

### C. Plaintiffs Properly Plead the Scienter of Sauey and Kammersgard

Defendants' challenge plaintiffs' use of the group published doctrine to plead the scienter of defendants Sauey and Kammersgard. Plaintiffs have properly alleged scienter as to Mr. Sauey and Mr. Kammersgard even without the group-pleading doctrine. "Upon the laying of a proper factual foundation that information was known within a corporation, it may be inferred that facts critical to a business's core operations or an important transaction are known to a company' responsible officers." *In re LDK Securities Litigation*, 2008 U.S. Dist. LEXIS at *44 (N.D. Cal. May, 29, 2008) citing *In re*

---

[31] Citations are legion. *See, e.g., Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) ($1.4 million each by two insiders); *America West*, 320 F.3d at 938 (four officers received $4.5 million; directors received $9 million); *In re Secure Computing Sec. Litig.*,184 F. Sup. 2d 980, 989 (N.D. Cal. 2001) ($5 million total). Dot Hill's own sales (10 million shares; net proceeds of approximately $154 million) in a secondary stock offering supports a strong inference of scienter. *Sekuk Global Enters. v. KVH Indus., Inc.*, 2005 WL 1924202, at *14-15 (D. R.I. Aug. 11, 2005); *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Sup. 2d 1345, 1359 (D. Colo. 1998).

[32] *See, e.g., Provenz*, 102 F.3d at 1491 (20% raised scienter inference); *In re Hi/fn Inc. Sec. Litig.*, 2000 WL 33775286, at * 10 (N.D. Cal. Aug. 9, 2000) (collective sales of 20%, consisting of individual sales of 100%, 74%, 40% and 0%); *In re Seebeyond*, 266 F. Supp. 2d at 1168 (7.6% for proceeds of $18 million); *Oracle*, 380 F.3d at 1232 (2.1% of shares for astronomical proceeds).

*Northpoint Communications Group, Inc., Securities Litigation*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002).

In *In re LDK Securities Litigation*, plaintiffs claimed that "defendants doctored LDK's financial statement and inventory and made public statements to make the company appear more profitable than it actually was, thereby inducing more investments….[and that] accounting irregularities… [caused] the value of LDK's stock [to plummet]." *Id.* at 2. Defendants argued that plaintiffs improperly relied on group pleading doctrine. *Id.* at 34. Relying on *Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1123-24 (D. Ariz. 2007) the court found "there was sufficient scienter without relying on group-pleading doctrine." *LDK* at 34. Plaintiffs properly alleged: that defendants were notified of the purportedly improper accounting practices during the time of the misleading statements and prior to the IPO (*Id.* at 37-38); that the company issued a false press release (*Id.* at 39-40); and that defendants were on notice that the financial statements were misleading. *Id.* at 40-43.

Here, Kammersgard served as Dot Hill's CTO, President, and CEO at different times. (¶ 20.) Sauey was director of Dot Hill during the Class Period. (¶ 21.) Plaintiffs have alleged that Kammersgard and Sauey were on notice that that CHARTS (Dot Hill's Enterprise Planning Software) was an ineffective system. (¶¶ 37(g), (h), 38. 38(f), 39(b)), Defendant Sauey developed the ERP system and was aware of its flaws. (¶¶ 38(a)(b), 39.) Defendant Kammersgard was aware of the understaffing issues. (¶¶ 40(b)-(g), 67(f), 69(d), 110(e).) Numerous false press releases and financial reports were issued. (¶¶ 28(a)-(f).) Kammersgard, as CTO was on notice of the problems with RAID controller technology. (¶ 57(a)(b).) Kammergard was aware of the shortcomings of Infortrend. (¶ 93(j).) And Kammergard and Sauey had a very hands-on approach to management. (¶¶ 123(a)-(h), 124.)

Therefore, plaintiffs have sufficiently pleaded liability as to Kammersgard and Sauey even without regard to group-published information doctrine.

## V. LOSS CAUSATION IS ADEQUATELY PLED

A private plaintiff claiming securities fraud must prove that the defendant's fraud caused an economic loss. 15 U.S.C.S. § 78u-4(b)(4). However, at the pleading stage plaintiffs need only

"provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. *Dura Pharms., Inc. v. Brudo*, 544 U.S. 336, 346 (2005) (emphasis added). Loss causation allegations are subject to Fed. R. Civ. P. 8(a)(2) pleading standards, which merely require "a short plain statement of the claim showing that the pleader is entitled to relief" and which "are not meant to impose a great burden upon plaintiff." *Dura* at 346.

The complaint satisfies this standard in summary form (¶¶ 12, 121), in detailing specific effects of specific conduct (¶¶ 75-76,90, 95, 96, 113), and, to ensure clarity and understanding, in a section dedicated to loss causation. (¶¶ 126-132.)

Post *Dura*, "plaintiffs [must] allege not only that the purchase prices was artificially propped-up, but they also [must] allege – and this is where they get beyond *Dura's* objections – that they were hurt when the prop was kicked out." *In re Micron Techs. Sec. Litig.*, 2007 WL 1232200, at *2 (D. Id. Apr. 25, 2007). In the archetypal scenario, defendants often "kick out" the prop themselves through a "corrective disclosure" that admits prior statements as misrepresentations (e.g., an announcement that previously issued financial results must be restated). Causal connection can be established through a "series of disclosing events," just as plaintiffs have alleged here. However, the required causal connection can be established even in the absence of such 'classic' corrective disclosure.[33] This is

---

[33] *See In re Motorola Sec. Litig.*, 2007 WL 487738, at *28-35 (N.D. Ill. Feb. 8, 2007); *In re Daou*, 411 F.3d at 1026 (even though there was no "corrective disclosure" regarding improper accounting practices at the time of the stock price drop, loss causation allegations upheld because stock price fell "after defendants began to reveal figures showing the company's true financial condition"); *Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *5 (N.D. Cal. April 15, 2007) ("a corrective disclosure is not necessary where the subject of the misrepresentation and omissions caused the loss.") (citing cases, citations omitted); *Siemers v. Wells Fargo & Co.*, 2007 WL760750, at *14 (N.D. Cal. Mar. 9, 2007) ( loss causation adequately pled despite fact that "there was no drop in share value after the truth was revealed") (citing *Dura*, citations omitted, emphasis added); *Sekuk*, WL 1924202, at * 17 (loss causation properly alleged where stock price fell on news of reduced quarterly revenues, even though company did not expressly then admit that such reduction was fallout from earlier revenue manipulation scheme); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D. N.J. 2006) (loss causation adequately pled where truth was revealed through "series of disclosing events", in which stock first dropped upon "non-specific" disclosure of SEC inquiry and later slightly increased upon classic corrective disclosure – *i.e.*, subsequent announcement of restatement); *In re ICG Comm'ns, Inc. Sec. Litig.*, 2006 WL 416622, at * 9 (D. Colo. Feb. 7, 2006); *Brumbaugh*, 416 F. Supp. 2d at 256 ("*Dura* does not require that a corrective disclosure precede a stock's decline"); *In re Cardinal Health Sec. Litig.*, 426 F. Sup. 2d 688, 760 (S.D. Ohio 2006) ("the Court agrees that where the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify "corrective disclosures" causing the decline in stock value") (citing numerous cases, citations omitted); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D. D.C. 2006); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d

exactly what plaintiffs have alleged here. Defendants' false and misleading statements (and misleading financial results) artificially inflated Dot Hill's stock price to over $18 per share during 2003. ( ¶¶ 12, 72-75, 126.) The first prong of *Dura* – artificial inflation caused by alleged misconduct – is therefore satisfied. All the more so given that broader market and industry trends *cannot* account for Dot Hill shares' sharp appreciation during 2003. (¶ 132.)

Subsequently, even as broader market and industry indices were *rising* (¶ 132), Dot Hill shares *declined* from such $18 heights to below $4 per share as a result of a "series of disclosing events" (¶¶ 12, 121, 129-131; *see also* 76-77, 95-96, 113) by which the truth concerning the matters allegedly misrepresented by defendants became known. *In re Motorola*, 2007 WL 487738, at *30-31. *Dura's* second prong – notice of claimed economic loss and of the claimed causal connection between that loss and the alleged misconduct – is thus clearly satisfied.

These "disclosing events" included: (1) gradual market understanding during 2004 that defendants' statements regarding new customers were misleading, causing Dot Hill shares to decline during 2004 from approximately $16 to $8 per share (¶¶ 12, 113, 121, 129);[34] (2) defendants'

---

1172, 1178 (N.D. Cal. 2005) (series of partial disclosures and disclosing events). Further, the language used in *Dura* (such as "before the relevant truth begins to leak out" and "after the truth makes its way into the marketplace") does not contemplate an immediate corrective disclosure preceding the stock decline.

[34] Defendants' loss-causation protestations here are flatly wrong. *See* Def. Br. 28 ("plaintiffs cannot plead loss causation by pointing to a stock drop that occurred before the alleged misconduct became known"). Directly to the contrary, plaintiffs do identify Defendants' statements concerning "non-Sun" customers alleged to have been untrue, do allege when the public became aware of such untruths, and do identify resulting losses. To be clear, what plaintiffs have alleged is not that Defendants made an explicit corrective disclosure (e.g., that their sales efforts were failing), but rather that a "series of disclosing events" (in the form of financial results that time and again failed to reveal revenues from the new customers) gradually revealed the falsity of Defendants' ongoing claims of progress. *See* citations in fn. 37, *supra*; *In re Motorola*, 2007 WL 487738, at *31-32 ("As a practical matter, however, the truth that a misrepresentation or omission conceals can make its way into the market, resulting in dissipation of a fraudulently inflated share price, long before a company issues a formal "corrective" announcement, and by a variety of other ways... Prior to an unambiguous public announcement, the operation of one or more phenomena may lead to a complete market realization of the truth. One way is a series of earlier, smaller disclosures by the issuer or others that gradually leads market participants whose actions set price to conclude that the misstatement was false... Another would be a growing quiet awareness... that previously publicly-available facts, which for a time had gone unnoticed or seemed unimportant, were in fact inconsistent with the misstatements. Yet another is that the higher earnings or sales in the future that one would have predicted based on the misstatement do not materialize or the poor financial condition of the issuer, which the misstatement masked, subsequently becomes obvious... Precluding a plaintiff from establishing loss causation merely because of the absence of the kind of explicit corrective disclosure that Defendants would require, where the market in fact learned and absorbed the relevant truth anyway, seems unduly harsh.") (citations omitted).

February 2005 corrective disclosures (a) that defendants had materially misrepresented Dot Hill's 2004 financial results, (b) that defendants' low-headcount business model was not the success claimed but rather had resulted in organizational breakdown and inadequacy, and (c) that going forward Dot Hill's costs would rise (and profits fall) as defendants endeavored to raise Dot Hill to basic levels of organizational functioning that investors had assumed Dot Hill to possess – all of which caused Dot Hill's share price to fall below $6 per share (¶¶ 12, 77, 121, 130);[35] and (3) defendants' April 2006 disclosure that Sun would take future business elsewhere, which caused Dot Hill shares to decline from approximately $6 per share to below $4 per share. (¶¶ 12, 95, 121, 131.)

**A. Lack of New Customers**

Plaintiffs adequate pleaded loss causation regarding the misrepresentations regarding new customers. In 2004, as Dot Hill's revenues obstinately failed to evidence contribution from erstwhile new customers and sales progress described elsewhere by defendants, Dot Hill shares lost half their value. (¶¶ 113, 121, 129.)

Defendants' arguments (Def. Br. 27-28) fail as a matter of law. The required causal connection can be established even in the absence of a corrective disclosure. *See In re Motorola Sec. Liti*g., WL 487738, at *28-35 (N.D. Ill. Feb. 8, 2007); *Dauo*, 411 F. 3d at 1026 (even though there was no "corrective disclosure" regarding improper accounting practices at the time of stock drop, loss causation allegations upheld because stock price fell "after defendants began to reveal figures showing company's true financial condition"); *Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *5 (N.D. Cal. April 15 2007) ("a corrective disclosure is not necessary where the subject of the misrepresentation and omissions caused the loss."(citing cases, citations omitted); accord *In re*

---

[35] An immediate material price decline following disclosure that previous financial results were false is the *ne plus ultra* of clear and adequate loss causation, wrapping untruth, corrective disclosure, and loss in one tightly-bound package. Defendants concede causation (Def. Br. 27) but incorrectly contest loss (*Id.* at 27-29). But loss was adequately alleged (¶ 130) and is easily determined precisely through judicial notice, which would reveal that, after Defendants made their disclosures on February 3, 2005, Dot Hill shares lost 10% of their value on February 4, 2005 (falling from their February 3, 2005 close of $6.36 per share to a February 4, 2005 close of $5.70 per share). That Dot Hill's stock price later recovered (only later to fall even farther) is of no import. *In re Electronic Arts*, 2006 WL 27201, at *2 ("Although defendants argue the price subsequently recovered, plaintiffs' allegations that they suffered economic losses and were damaged as a result of the ... share price decline are sufficient").

*Cardinal Health Sec. Litig.*, 426 F. Supp 2d 688, 760 (S.D. Ohio 2006) (citing cases) (citations omitted); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 & n.9 (D. D.C. 2006); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1178 (N.D. Cal. 2005) (series of partial disclosures and disclosing events).

Moreover, contrary to defendants' argument "*Dura* does not require that a corrective disclosure precede a stock's decline." *Brumbaugh v. Wave Sys. Corp.*, 416. F. Supp. 2d 239, 256 (D. Mass. 2006).

**B. The Restatement Announcement Established Loss Causation**

Again defendants' argument must fail. When defendants revealed Dot Hill's material internal control weaknesses and admitted the financial results' falsity, Dot Hill shares lost 10% of their value. (¶ 130.)

Plaintiffs have alleged that the Feb. 2005 announcement sent Dot Hill stock from $7 to approximately $5.70. (¶¶ 12, 130.) Defendants would like to argue that a "bounce back" in the stock vitiates any loss. But loss is easily determined precisely through judicial notice, which would reveal that following defendants' disclosures on February 3, 2005, Dot Hill shares lost 10% of their value (falling from a February 3, 2005 close of $6.36 per share to a February 4, 2005 close of $5.70 per share). Regardless, the bounce back is of no significance. *See In re Electronic Arts,* 2006 WL27201, at *2 ("although defendants argue the price subsequently recovered, plaintiffs allegations that they suffered economic losses and were damaged as a result of the … share price decline are sufficient"); *See also Siemers v. Wells Fargo & Co.*, 2007 WL760750 (N.D. Cal. Mar. 9, 2007) (loss causation adequately plead despite the fact that "there was no drop in share value after truth was revealed") (citing *Dura*, citations omitted, emphasis added). Therefore, plaintiff's pleadings are sufficient to establish loss causation.

**C. The April 2006 Sun Announcement Supports Loss Causation**

Plaintiffs plead clear notice of loss causation regarding the Sun misrepresentations: share price declines and economic losses following corrective disclosure. (¶¶ 95; 12, 79, 121, 131.) Defendants argue that the April 28, 2006 announcement was not a corrective disclosure because there was no misrepresentation regarding its relationship with Sun. (Def. Br. 28.) However, defendants made

constant representations about the strength and quality of their relationship with Sun and that their technology integration was proceeding excellently and would entice customers and improve profit margins. (¶¶ 12, 130.) This announcement revealed the extent of the problems that plagued the relationship and caused Dot Hill shares to lose 21% of their remaining value in one day, and continued to decline to as low as $3 in the following weeks and months. (¶¶ 95, 121,) *Sekuk Global Enters. v. KVH Indus.* 2005 WL 1924292, at *17 (D.R.I, Aug. 11, 2005) (loss causation properly alleged where stock price fell on news of reduced quarterly revenues, even though company did not expressly then admit that such reduction was fallout from earlier revenue manipulation scheme). *See also Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102,1119 (S.D. Ohio 2007) ("statements may have been accurate to a certain extent…, [but not where] Defendants omitted disclosing other material information)." Therefore, plaintiffs have adequately pleaded loss causation as to the Sun announcement.

**D. Chaparral Integration**

Defendants stated that Chapparal integration would help gain new customers and improve profit margins. (¶¶ 7, 8(b), 12, 41-53.) In reality, Dot Hill was having serious problems integrating Chapparal products into its products and realizing a financial benefit. (¶¶ 9(b),(e).) These problems also resulted in the termination of the Sun relationship. (¶ 9(d).) Plaintiffs have alleged that these problems were revealed as a result of the February 2005 restatements (¶ 12), resulting in a stock price drop, discussed *supra*. Therefore, plaintiffs have adequately pleaded loss causation regarding Chaparral integration.

**E. Lean Operating Structure**

Defendants' argument is spurious and without merit. Plaintiffs have adequately alleged loss causation as to the operational structure in spades. (*see* ¶¶ 58-78, 126-132.) Specifically, plaintiffs allege that new, ostensible profitability in 2003 inflated Dot Hill's shares, which subsequently declined upon corrective disclosures (¶¶ 75, 121,126-132) – but not before defendants sold $178 million of Dot Hill shares at near-peak prices. (¶¶ 115-121.)

Disclosing the existence of a lean operating structure while failing to disclose related material information, such as the lack of a sales force to secure new revenues, (¶ 71) and that the staff

reductions were the sole reason for any profits (¶¶ 73-74, 76, 78), does not preclude fraud. *See Abercrombie* at 1119. Once again, the corrective disclosure came in February 2005 (¶ 77) and resulted in a stock price drop. Therefore, plaintiffs have adequately pleaded loss causation regarding the lean operating structure.

## VI. THE "SAFE HARBOR" DOES NOT APPLY

Defendants reliance on *Employers Teamsters* for their assertion that a forward looking statement accompanied by cautionary warnings cannot form the basis of a securities fraud claim is misplaced. That case stands for exactly the opposite proposition. *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox*, 343 F.3d 1125, 1134 (9th Cir. 2004) (where actual knowledge of falsity exists, no safe harbor protection is merited or granted). It is well-settled that the law is the opposite of what defendants say it is.[36] As are the facts. *Contra* defendants' contention that "most of the statements at issue" were forward-looking and accompanied by meaningful cautionary warnings (Def. Br. 30), the statements (1) were not forward looking; (2) were not accompanied by *meaningful* cautionary language; and (3) were made with actual knowledge that they were false or misleading.

### A. Statements Not Challenged by Defendants

The Complaint pleads five categories of misrepresentations. Defendants challenge only three: the Chaparral, Sun, and new customer allegations. The remaining two – admittedly false and allegedly misleading financial statements (¶¶ 27-40; 66-78); and statements concerning operational structure (¶¶ 58-65) – are nowhere challenged, and are clearly above challenge.

---

[36] *America West*, 320 F.3d at 937 n. 15 ("strong inference of actual knowledge has been raised... thus... excepting these statements from the safe harbor rule altogether"); *In re Dura*, 452 F. Supp. 2d at 1034 (same); *In re Electronic Arts Inc. Sec. Litig.*, 2006 WL 27201 (N.D. Cal. Jan. 5, 2006) ("plaintiffs are not foreclosed by 15 U.S.C. § 78u-5(c)(1) from basing such claim on forward-looking statements accompanied by cautionary statements. Such statements are actionable if knowingly false when made"); *In re Seebeyond*, 266 F. Supp. 2d at 1165 ("Congress could not have intended to foster the dissemination of information that is known to be false or misleading").

**B. Many of the Challenged Statements Concern Present or Historical Fact**

Most of the statements in the three categories challenged by defendants are clearly not forward-looking[37] and thus not subject to safe harbor protection. *Livid Holdings*, 416 F.3d at 947-949 (citing cases); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *16 (C.D. Cal. July 21, 2005) (safe harbor inapplicable to present or historical fact).

**C. Omitted Present or Past Facts are Not Protected by Safe Harbor**

There is no safe harbor for omissions concerning existing facts known to defendants but not disclosed. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2nd Cir. 2004). Faced with omissions analogous to those here[38], courts have found them actionable rather than protected.[39]

---

[37] Regarding Chapparal: "acquisition of Chaparral... has already proven to be a success" (¶ 47); "Chaparral acquisition continues to go very, very well. We are very pleased with how that is going, with the products, with the technology..." (¶ 48); "The integration and upgrade of the Chaparral controller... is on schedule and continuing smoothly" (¶ 50); "The Chaparral integration of their technology continues to go very well... The product is looking very good, performance is looking very good, so we are very on track" (¶ 51); *see also*, ¶¶ 52-53. Regarding Sun: "that relationship is progressing smoothly... we have maintained an excellent relationship" (¶ 80); "interaction between the two companies remains highly positive..."(¶ 81); "our relationship with Sun has never been better. The products are being well-received. The quality of the products is outstanding" (¶ 85); "contract extension demonstrates the high level of confidence that [Sun] has in our ability to produce innovative products and to bring them to market successfully... our relationship with Sun is stronger than ever") (¶ 87); "we have solidified our continued business with Sun." (¶ 92); *see also*, ¶¶ 86, 88, 90, 91.

[38] Defendants' failure to disclose their problematic and deteriorating relationship with their largest customer, their inability to gain new ones, the difficulty they were encountering in integrating their new technology, and the snowballing results of their operational disinvestment, all rendered their cautions meaningless and the safe harbor inapplicable. *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp.2d 1096, 1117-18 (D. Nev.1998) (general cautionary statements insufficient to grant safe harbor protection when defendants knew of specific cost overruns for which they gave no cautionary statement). Disregarding "warning signs" or "red flags" can produce a strong inference that defendants issued forward looking statements with actual knowledge that the statements were misleading. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557-58 (6th Cir. 2001).

[39] *See, e.g., In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at * 13 (N.D. Cal. Aug. 10, 2005) (denying protection where complaint turned on "omissions of past and current facts" regarding sales difficulties and "technical problems with its core products"); *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D. N.Y. 1999) ("...defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements. The safe harbor and bespeaks caution doctrines do not apply to these omissions."); *In re MobileMedia*, 28 F. Supp. 2d at 930 (statements concerning future benefits of acquisition found actionable where accompanied by a failure to disclose known facts concerning integration difficulties – "Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial").

**D. Defendants' Cautionary Language is Insufficient to Immunize Them**

Even assuming that a few of the statements challenged by defendants are forward-looking, the PSLRA requires *meaningful* cautionary language to be present for safe harbor to apply.[40] When as here statements are knowingly false, the only possible meaningful caution is one warning that the statements are lies. *In re Seebeyond*, 266 F. Supp. 2d at 1165. That is why courts deny safe harbor when they find scienter (*see* cases cited in fn. 30, *supra*).

Nor is boilerplate a meaningful cautionary warning, especially when it consists of vacuous tautologies rather than specific, existing risks. *In re Amylin*, 2002 WL 31520051, at *9. Where, as here, "the cautionary language remained fixed even as the risks changed", courts find ritual boilerplate rather than meaningful caution.[41] *Contra* defendants, referral to risk factors in SEC filings is neither solution nor absolution. *In re Immune Response*, 375 F. Supp. 2d at 1035.

**VII. THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(a)**

Pleading requirements for Section 20(a) liability have been met (and exceeded) here. Plaintiffs have alleged primary violations of Section 10(b) and that the Individual defendants were senior executives involved in Dot Hill's day-to-day operations and "directly or indirectly" controlled Dot Hill. (¶¶ 19-23, 114, 122, 124, 151.)[42] Plaintiffs do not rely solely on defendants' high-level positions, but plead particular facts evidencing actual control and detailed awareness. (¶¶ 123, 39(a), 57, 111(c).) Finally, as alleged with particularity where relevant, the Individual Defendants also signed, participated in, or were directly responsible for making false and misleading statements in

---

[40] For purposes of a motion to dismiss, meaningful caution exists only where statements are accompanied by "enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading". *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033-1034 (S.D. Cal. 2005) (citations omitted).

[41] *Asher v. Baxter Intern. Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). Dot Hill's "cautionary" warnings included in all press releases did not change during the Class Period.

[42] These allegations suffice for Defendant Sauey. *In re Am. Bus. Fin. Serv., Inc. Sec. Litig.*, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007). Furthermore, evidence suggests Sauey was not merely an "outside" director: Sauey was the Company's founder, Defendant Lambert's father-in-law (¶¶ 19, 21) and did not sit on board committees that required independent director membership.

filings, conference calls and press releases, and were involved in the underlying decisions and business matters at the heart of the fraud. Such allegations more than suffice.[43]

## CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully submit that defendants' motion to dismiss should be denied in its entirety.

DATED: June 19, 2008

Respectfully submitted,

GLANCY BINKOW & GOLDBERG LLP

By: /s/ Kara M. Wolke

LIONEL Z. GLANCY #134180
PETER A. BINKOW #173848
MICHAEL A. GOLDBERG #188669
KARA WOLKE #241521

GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

*Liaison Counsel for Lead Plaintiffs*

KIRBY McINERNEY LLP
IRA M. PRESS
PETER S. LINDEN
830 Third Avenue, 10th Floor
New York, NY 10022

*Lead Counsel for Lead Plaintiffs*

---

[43] Allegations of control "are not averments of fraud" and "therefore need not be pleaded with particularity". *In re Parmalat Sec. Litig.*, 414 F. Sup. 2d 428, 440 (S.D. N.Y. 2006) (citing cases); *In re Enron Sec., Deriv. & ERISA Litig.*, 2003 WL 230688, at *11-14 (S.D. Tex. Jan. 28, 2003) (same, surveying caselaw). Adequate pleading requires only a "short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person". *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D. N.Y.2003); *accord*, *In re Adaptive*, 2002 WL 989478, at * 19 (pleading that "individual defendants held important positions in the company is sufficient"); *In re Cylink*, 178 F. Supp. 2d 1077,1089 (N.D. Cal. 2001) (allegations that individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [the company], which they exercised" were sufficient). Plaintiffs "need not allege that the individual defendants actually participated in the wrongful conduct or exercised actual power." *In re Cylink*, 178 F. Supp. 2d at 1089 (citing *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1065 (N.D. Cal. 2001) and *Paracor Finance, Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)); *In re Nature's Sunshine Prods. Liability Litig.*, 486 F. Supp. 2d 1301, 1313-1314 (D. Utah 2007).