1  IRA M. PRESS
   PETER S. LINDEN
2  KIRBY McINERNEY LLP
   825 Third Avenue, 16th Floor
3  New York, NY 10022
   Telephone:  (212) 371-6600
4  Facsimile:  (212) 751-2540
   Email:      ipress@kmslaw.com
5              plinden@kmslaw.com

6  *Counsel for Lead Plaintiffs*

7  LIONEL Z. GLANCY #134180
   PETER A. BINKOW #173848
8  MICHAEL A. GOLDBERG #188669
   GLANCY BINKOW & GOLDBERG LLP
9  1801 Avenue of the Stars, Suite 311
   Los Angeles, CA 90067
10 Telephone: (310) 201-9150
   Facsimile:  (310) 201-9160
11 E-mail:     info@glancylaw.com

12 *Liaison Counsel for Lead Plaintiffs*

13

14              UNITED STATES DISTRICT COURT

15             SOUTHERN DISTRICT OF CALIFORNIA

16

| 17 | | Case No. 06-CV-0228-JLS (WMc) |
| 18 | | <u>CLASS ACTION</u> |
| 19 | IN RE DOT HILL SYSTEMS CORPORATION SECURITIES LITIGATION | <u>THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS</u> |
| 20 | | |
| 21 | | <u>JURY TRIAL DEMANDED</u> |
| 22 | | |

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION ..................................................................... 1

II.    JURISDICTION AND VENUE.................................................................... 5

III.   THE PARTIES ........................................................................................... 6

IV.    BACKGROUND........................................................................................ 7

V.     DEFENDANTS' MISREPRESENTATIONS .............................................. 8

       A.    Defendants' Admittedly False Financial Statements ................................. 8

       B.    Defendants' Misrepresentations Concerning Dot Hill's Basic Operational
             Structure ........................................................................................ 18

       C.    Defendants' Misrepresentations Concerning Dot Hill's Relations with Sun
             Microsystems and Its Efforts to Integrate Chaparral............................... 29

       D.    Defendants' Misrepresentations Concerning Dot Hill's Prospects and Progress
             With Potential New Customers .......................................................... 38

VI.    ADDITIONAL EVIDENCE OF SCIENTER ............................................. 50

VII.   LOSS CAUSATION ............................................................................... 55

VIII.  EFFICIENT MARKET ........................................................................... 58

IX.    CLASS ACTION ALLEGATIONS........................................................... 59

# I.
## SUMMARY OF THE ACTION

Lead Plaintiffs, on behalf of themselves and all others similarly situated, upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigations of Plaintiffs' counsel and, as indicated, the statements of numerous confidential witnesses, identified herein as "CW___" and described further on Exhibit A, attached hereto, states as follows:

1. This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Dot Hill Systems Corporation ("Dot Hill" or the "Company") between April 23, 2003 and April 27, 2006, inclusive (the "Class Period"). The action asserts claims against Dot Hill and certain of its officers and directors for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

2. Dot Hill provides data storage devices (essentially, hard disk drives) in the form of modular, stand-alone units as well as larger storage network systems. To help ensure data reliability, Dot Hill's storage devices employ RAID (Redundant Array of Independent Disks) technology. The RAID controllers in Dot Hill's storage devices were not Dot Hill products, but rather were obtained from a Taiwanese company, Infortrend. Dot Hill was thus forced to rely on Infortrend for fixes, upgrades and improvements for its products, and was therefore forced to cede significant operational control over its products. Additionally, Dot Hill's margins and profits were dependent on, and suffered from, the costs charged by Infortrend for providing RAID controllers.

3. During 2001 and 2002 (prior to the Class Period), Dot Hill saw its sales and revenues plummet by approximately 66%. In response, Dot Hill restructured itself to reduce costs and reduce employee headcount by: (i) outsourcing substantially all its manufacturing to Solectron Corporation ("Solectron") and jettisoning most of its manufacturing employees and operations; (ii) switching, from employing a large sales force to sell products directly to end-users, to an indirect sales model in which Dot Hill sold its equipment to original equipment manufacturers ("OEMs") and to analogous non-end user entities (such as value-added resellers ["VARs"] and system integrators ["SIs"]) who

then sold to end-users; and (iii) sharply reducing sales/marketing and administrative headcount and expenses. For instance, Dot Hill's sales/marketing staff at the end of 2003 numbered less than half the number of such staff during 2000, and Dot Hill's sales/marketing expenses for 2003 were less than half of such expenses for 2000.

4. Contemporaneously, during 2002, Dot Hill secured a contract from a large OEM customer, Sun Microsystems ("Sun") to provide Sun with data storage systems, which Sun would then re-package and sell as storage devices for its own server and hardware products. Throughout the Class Period, sales to Sun accounted for the vast majority of Dot Hill's revenues – generally between 80% and 90% each quarter.

5. On April 23, 2003, the start of the Class Period, Dot Hill forecasted its first quarterly profit after 10 quarters of losses. Throughout the following two years, Dot Hill consistently reported quarterly profits. As a result, Dot Hill's share price increased sixfold during 2003, from $3 per share to more than $18 per share.

6. In September 2003, Defendants took advantage of Dot Hill's seeming change of fortunes to complete a successful secondary stock offering in which Dot Hill sold approximately 10 million shares at $15.50 per share, raising approximately $154 million, and in which the four Individual Defendants sold a further $23.1 million of Dot Hill stock.

7. In February 2004, flush with cash from the offering, Dot Hill purchased another provider of RAID controller technology, Chaparral Network Storage, Inc. ("Chaparral") for $72 million. Defendants stated that the Chaparral acquisition would allow Dot Hill, by integrating Chaparral's controllers, to improve its technology, to develop more appealing products that would serve its biggest customer, Sun, and gain new customers for Dot Hill and increase revenues, to gain full operational control over its products rather than have to depend on Infortrend's actions and timetables, and in so doing to reduce Dot Hill's costs and improve its profit margins.

8. Defendants, during the Class Period, represented that:

(a) Dot Hill's reported financial statements accurately stated Dot Hill's results of operations;

(b)     Dot Hill's restructured, "lean and mean" operating structure (i.e., substantially reduced headcount) was successful;

(c)     Dot Hill's relationship with Sun was excellent because, *inter alia*, integration of Chaparral technology was proceeding successfully; and

(d)     Dot Hill was making strong progress in gaining additional revenue-generating customers.

9.     In fact, these representations were materially false and/or misleading because Defendants knowingly or recklessly misstated or concealed material adverse facts from the investing public, including, without limitation:

(a)     certain of Dot Hill's reported financial results and financial statements were materially false, as Defendants admitted when forced to restate those results in March 2005;

(b)     underneath the facade constructed by Defendants – which seemed to show a fast-growing, remarkably lean and efficient organization generating more than $1 million in revenue per employee – was an ineffective organization with inadequate internal systems, staffing and financial controls, whose reported pre-2005 profits, underwritten by sharp cost-cutting in systems, personnel and expertise, and whose growth, undermined by the same cost-cutting, were misleading and illusory (as demonstrated by the sharp rise in costs in 2005 and 2006 and the consequent transformation of profits into losses, and by Defendants' admission that inadequate accounting staffing levels contributed to material internal control weaknesses);

(c)     Sun was actually dissatisfied with Dot Hill products, technology, costs and operations, and regularly communicated this dissatisfaction to Dot Hill. Dot Hill was having serious problems integrating Chaparral controllers into Dot Hill products, preventing Dot Hill from selling purportedly improved products to Sun because those products did not then exist, and consequently preventing Dot Hill from realizing the financial benefits due to, among other things, the integration of Chaparral technology. Sun's dissatisfactions led Sun to decide against purchasing the new Dot Hill products featuring Chaparral controllers; Sun ultimately chose – as Dot Hill disclosed at the close of the Class Period on April 28, 2006  – to use another storage device provider for its future supply of data storage systems; and

**1**         (d)     Dot Hill's progress with other, non-Sun customers was much worse than

**2** stated: in part because of technology/engineering difficulties associated with integration of Chaparral

**3** controllers in Dot Hill devices; and in part because Dot Hill's sales department was understaffed,

**4** under-skilled, starved of resources, and simply unable to and incapable of generating significant sales.

**5**        10.    Defendants' statements concerning Dot Hill's financial and operational results during

**6** 2003 and 2004 were materially false and/or misleading. Underneath the public facade of a "lean",

**7** efficient organization whose average revenue per employee was $1 million (one of the highest such

**8** ratios in the U.S.) was, in fact, an organization whose founders and officers (the Individual

**9** Defendants) starved it of resources to such an extent that: (i) Dot Hill's antiquated internal

**10** operational and financial systems (its Enterprise Resource Planning software – "ERP"), its controls,

**11** and its accounting department were found by Dot Hill's auditor to have material weaknesses and to

**12** have caused material misrepresentation of Dot Hill's financial results; and (ii) Dot Hill's

**13** sales/marketing operations had become essentially inoperational. Dot Hill's stated financial results

**14** during 2003 and 2004 were, unbeknownst to the public, subsidized by the Individual Defendants'

**15** refusal to spend the funds necessary to meet standards of organizational functioning and

**16** accounting/financial accuracy that investors had assumed Dot Hill had always possessed.

**17**        11.    Ultimately, Dot Hill was forced to restate previously-issued financial statements for

**18** three quarters of 2004, and was forced thereafter to invest during 2005 – as previously and

**19** unbeknownst to the public it had not – sufficient funds to ensure that its basic organizational

**20** functioning, and its accounting staff levels and expertise, met requisite standards. In restating

**21** previously-issued financial statements, Defendants admitted in February 2005 and March 2005 that,

**22** contrary to its previously issued financial statements and certifications of certain officers, Dot Hill

**23** had internal control weaknesses (which were responsible for Dot Hill's inaccurate financial

**24** statements) themselves were the result of (i) Dot Hill's inadequate staffing and expertise levels and

**25** (ii) inadequate Enterprise Resource Planning ("ERP") software and systems. Thereafter, as Dot

**26** Hill's costs rose through increased spending on staffing and systems, the profits that Dot Hill had

**27** initially been reporting during the beginning of the Class Period (2003 and 2004) could no longer

**28** be sustained, and Dot Hill's quarterly results were transformed to losses (2005 and 2006).

12.     During the Class Period, Dot Hill shares traded at inflated prices (e.g., Dot Hill shares quickly rose from approximately $6 per share at the start of the Class Period to more than $18 per share) caused by Dot Hill's materially false and/or misleading financial results, Defendants' representations about the success and viability of Dot Hill's "lean" business model, Defendants' representations about Dot Hill's relationship with Sun and the integration of Chaparral technology (necessary for that relationship), and Defendants' representations about Dot Hill's progress with potential new customers. Inflation was followed by deflation, however, as the market increasingly came to learn the truth concerning Dot Hill. During 2004 and early 2005, as the heralded non-Sun revenues failed to appear despite Defendants' constant claims of progress with new customers, Dot Hill shares declined from approximately $16 per share to $8 per share. When Defendants revealed in February 2005 that Dot Hill would restate three quarters of financial statements to correct errors, that Dot Hill's financial controls contained material weaknesses and inadequacies, that Dot Hill would be forced to spend millions of dollars to acquire more and better-expertised accounting staff as well as a new ERP software system, further inflation was wrung from Dot Hill's share price, which fell to below $6 per share. Concerns over the potential loss of the Sun contract (and the corresponding failure to successfully integrate Chaparral) – despite Defendants' constant representations about the excellent nature of their relationship with Sun – contributed the final deflationary ingredient. When Dot Hill announced on April 28, 2006 that Sun would look to another provider for its future line of entry-level storage products, Dot Hill shares lost 21% of their remaining value in one day, falling from $5.78 per share on April 27, 2006 to $4.55 per share on April 28, 2006 and thereafter continuing to decline to as low as $3 per share in the following weeks and months.

## II.
## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

14.     Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this

District.  Dot Hill has its principal place of business at 2200 Faraday Avenue, Suite 100, Carlsbad, California, 92008, where the day-to-day operations of the Company are directed and managed.

15.     In connection with the acts, conduct and other wrongs complained of, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

### III.
### THE PARTIES

16.     Lead Plaintiff, the General Retirement System of the City of Detroit, purchased Dot Hill common stock during the Class Period as detailed in the certification previously filed with this Court and was damaged thereby.

17.     Lead Plaintiff, the Police & Fire Retirement System of the City of Detroit, purchased Dot Hill common stock during the Class Period as detailed in the certification previously filed with this Court and was damaged thereby.

18.     Defendant Dot Hill is headquartered in this District and incorporated in Delaware. Dot Hill provides digital data storage systems solutions, ranging from individual stand-alone data storage units to large storage area networks, integrating hardware and software products.  Dot Hill was formed in 1999 through the combination of Box Hill Systems Corp. and Artecon, Inc.  Artecon was founded by Defendants James L. Lambert, Dana W. Kammersgard, and William R. Sauey, all of whom were senior officers and directors of Artecon and who – as discussed below – were senior officers and directors of Dot Hill during the Class Period. Dot Hill's stock is traded in an efficient market on NASDAQ under the ticker symbol "HILL".

19.     Defendant James L. Lambert ("Lambert") was a founder of Dot Hill and, at all times relevant hereto until August 2004, a director of Dot Hill as well as its Chief Executive Officer, President, and Chief Operating Officer.  Between August 2004 and his February 2006 resignation, Lambert continued to serve as Dot Hill's CEO and as Vice Chairman of the Company's Board of Directors.   During the Class Period, Lambert received more than $7.3 million from the sale of 472,000 shares of Dot Hill stock, representing approximately 26% of his Dot Hill stock holdings. Lambert is Defendant Sauey's son-in-law.

20.     Defendant Dana W. Kammersgard ("Kammersgard") was a founder of Dot Hill and, at all times relevant hereto until August 2004, Dot Hill's Chief Technical Officer.  Between August 2004 and February 2006, Kammersgard served as Dot Hill's President; beginning in February 2006, Kammersgard became Dot Hill's Chief Executive Officer.   During the Class Period, Kammersgard received more than $3.1 million from the sale of 202,000 shares of Dot Hill stock, representing approximately 26.5% of his Dot Hill stock holdings.

21.     Defendant William R. Sauey ("Sauey") was a founder of Dot Hill and, throughout the Class Period, a director of Dot Hill.  Between 1984 and 1999, Sauey was Chairman of Artecon's (Dot Hill's predecessor's) Board of Directors, and continued as Chairman of Dot Hill's Board until July 2000.  Sauey is Lambert's father-in-law.  During the Class Period, Sauey received $11.6 million from the sale of 752,000 shares of Dot Hill stock, representing approximately 29.5% of his Dot Hill stock holdings

22.     Defendant Preston S. Romm ("Romm"), at all times relevant hereto until March 2006, served as Dot Hill's Chief Financial Officer and Treasurer.  During the Class Period, Romm received more than $992,000 from the sale of 64,000 shares of Dot Hill stock, representing approximately 18.8% of his Dot Hill stock holdings.

23.     By reason of their positions, the officers and/or directors identified (collectively the "Individual Defendants") had access to material inside information about Dot Hill and were able to control directly or indirectly the acts of Dot Hill and the contents of the representations disseminated during the Class Period by or in the name of Dot Hill.

## IV.
## BACKGROUND

24.     Dot Hill initially manufactured its data storage devices and sold them directly to actual end-user customers.  During the technology and internet boom of the 1990s, that business model worked successfully for Dot Hill as it sold its devices to ever-multiplying dot-com companies.  As the internet bubble burst in and after 2000, Dot Hill's sales declined drastically and the company became unprofitable.  During 2000, revenues were $121.2 million; during 2001, $56.3 million; during 2002, $46.9 million.  Throughout 2001 and 2002, Dot Hill reported losses each quarter, causing it to burn cash at a substantial rate.  By the end of 2002, Dot Hill had $12.1 million cash remaining.

25. In response, prior to the Class Period, Defendants radically restructured Dot Hill. First, Dot Hill closed its manufacturing operations and outsourced substantially all of its manufacturing operations to Solectron. Second, Dot Hill transferred from a direct sales model (selling directly to end-user customers) to an indirect model (selling to OEMs, SIs and VARs). Both measures allowed Dot Hill sharply to reduce its employee headcount and corresponding labor/salary costs. For example: Dot Hill had 138 sales/marketing employees during 2000, but only 66 such employees in 2003; 42 management/administrative employees during 2000 but only 17 such employees in 2003; and 86 customer service employees during 2000 but only 2 during 2003. Third, Dot Hill entered into a contract to provide Sun with data storage products that Sun would package in Sun-branded attachable storage to its own server and hardware products. Thus, in the early months of 2003, as substantial revenues from the Sun contract were starting to pour in and to form the vast majority of Dot Hill's revenues, Dot Hill's stated top priorities were as follows: (1) to keep Sun satisfied so as to ensure continuation of the 80%-90% of Dot Hill's revenue base; (2) to gain new customers so as to diversify the revenue base and decrease near-total dependence on Sun; (3) to end the costs, problems and delays imposed by using Infortrend's RAID controllers by acquiring RAID controller technology and incorporating it into Dot Hill products; and (4) to keep personnel and other costs at extremely low levels so as to be able to report greater profits and higher average revenue per employee.

## V.
## DEFENDANTS' MISREPRESENTATIONS

### A. Defendants' Admittedly False Financial Statements

#### 1. Overview

26. In February 2005, Defendants admitted that Dot Hill's previously-issued financial statements were materially inaccurate due to a lack of controls resulting from the inadequacy of Dot Hill's Enterprise Resource Planning ("ERP") software (known as "CHARTS") and to under-staffing in and inexperience of Dot Hill's accounting department. Several former Dot Hill employees confirmed that those problems were known to Dot Hill management throughout the Class Period.

### 2. The Misrepresentations

27.     Dot Hill announced materially false financial results for the first three quarters of 2004, and in 2005 restated those results – thereby admitting their material inaccuracy:

        (a)     on April 28, 2004, in Dot Hill's press release announcing financial results for the first quarter of 2004; in a conference call that day with analysts; and on May 15, 2004, in Dot Hill's Q1 2004 Form 10-Q, Dot Hill reported gross profit of $13.5 million and a net loss of $1.9 million for the first quarter of 2004;

        (b)     on July 28, 2004, in Dot Hill's press release announcing financial results for the second quarter of 2004; in a conference call that day with analysts; and on August 9, 2004, in Dot Hill's Q2 2004 Form 10-Q, Dot Hill reported gross profit of $17.7 million and net income of $5.8 million for the second quarter of 2004, and gross profit of $30.6 million and net income of $4.1 million for the first six months of 2004; and

        (c)     on October 27, 2004, in Dot Hill's press release announcing financial results for the third quarter of 2004; in a conference call that day with analysts; and on November 9, 2004, in Dot Hill's Q3 2004 Form 10-Q, Dot Hill reported gross profit of $15.5 million and net income of $3.6 million for the third quarter of 2004, and gross profit of $46.1 million and net income of $7.7 million for the first nine months of 2004.

28.     In Dot Hill's reports on Form 10-Q for the quarters ended March 31, 2004, June 30, 2004 and September 30, 2004, defendants Lambert and Romm each certified, *inter alia*, that:

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.
> 4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>        a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

* * *

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

29.    In Dot Hill's reports on Form 10-Q for the quarters ended March 31, 2004, June 30, 2004 and September 30, 2004, defendants Lambert and Romm caused Dot Hill to represent, *inter alia*, that:

Our chief executive officer and chief financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in the Securities Exchange Act of 1934, as amended, Rule 13a-15(e) as of the end of the period covered by this Periodic Report on Form 10-Q, have concluded that as of the end of such period, our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the Commission's rules and forms.

### 3.    Falsity - Defendants' Admissions

30.    Dot Hill's financial results and financial statements for the first three quarters of 2004 were materially false when issued. Defendants first so admitted on February 3, 2005, in a press release and Form 8-K and conference call. Dot Hill specifically acknowledged that "investors are cautioned not to rely on the Company's historical financial statements for the periods noted." Dot Hill restated those financial results on March 16, 2005, in Dot Hill's 2004 Form 10-K and in amended forms 10-Q for the first three quarters of 2005. In the February 3, 2005 press release, Defendants attributed the errors and inaccuracies in its financial statements to material weaknesses in internal controls that resulted from (a) inadequate staffing in Dot Hill's finance/accounting department and (b) an outdated Enterprise Resource Planning system. As the February 3, 2005 press release disclosed the existence of:

internal control deficiencies that constitute material weaknesses relating to [Dot Hill's] financial closing process, inventory processing and processing related to fixed assets. The company attributes these material weaknesses primarily to its aged enterprise resource planning (ERP) software package and the lack of the proper accounting resources to manage the information as reported by this ERP system       given its limitations.

The February 3, 2005 press release explained that "the company's rapid revenue growth in recent years and related increase in both the number and complexity of transactions has put a strain on its

ERP system and accounting personnel", and admitted that remedying the problem would require "additional accounting resources and improved information technology capabilities."

31.     In the amended Form 10-Q, filed on March 16, 2005 for the first quarter of 2004, Dot Hill explained:

Restatement

In February 2005, we discovered that a data entry error was made in the first quarter of 2004 during the order entry process that resulted in an over billing of approximately $0.7 million of a third party manufacturer for certain parts sold to them. This error resulted in an understatement of our previously reported net loss of 37.3% and an overstatement of our gross profit of 5.2%. Accordingly, accounts receivable and cost of goods sold for the three months ended March 31, 2004 have been restated to reflect the correction of this error. We also discovered that during the first quarter of 2004 certain revenue and cost of goods sold related to transactions with a third party manufacturer had not been properly eliminated. While this error had no impact on our previously reported net loss, it resulted in an overstatement of revenue of 1.9%, and overstatement of cost of goods sold of 2.3%. Accordingly, revenue and cost of goods sold have been restated to reflect the proper elimination of both revenue and cost of goods sold related to such transactions. Additionally, we determined that our presentation of cost of goods sold, sales and marketing expense and research and development expense was incorrect due to a mis-classification of certain customer support and sustaining engineering activities as sales and marketing and research and development expense instead of cost of goods sold. While these errors in classification had no impact on our previously reported net loss, they resulted in an overstatement of gross profit of 4.6%. Accordingly, cost of goods sold, sales and marketing expense and research and development expense for the three months ended March 31, 2004 have been restated to properly reclassify these expenses. The impact related to the classification of similar expenses for the comparable 2003 period is considered immaterial.

*****

Evaluation of Disclosure Controls and Procedures

...In February 2005, we discovered that a data entry error was made during the order entry process that resulted in an over billing of our third party manufacturer for certain parts sold to them. Accordingly, accounts receivable and cost of goods sold for the three months ended March 31, 2004 have been restated to reflect the correction of this error. This represents a material weakness in our internal control...

We also discovered that certain revenue and cost of goods sold related to transactions with our third party manufacturer had not been fully eliminated. Accordingly, revenue and cost of goods sold have been restated to reflect the elimination of both revenue and cost of goods sold related to such transactions. Additionally, we determined that our presentation of cost of goods sold, sales and marketing expense and research and development expense was incorrect due to a mis-classification of certain customer support and sustaining engineering activities as sales and marketing and research and development expense instead of cost of goods sold. Accordingly, cost of goods sold, sales and marketing expense and research and development expense for the three months ended March 31, 2004 have been restated... (Amended Q1 2004 Form 10-Q, pp. 5 and 29)

32.     A material weakness in internal controls is, as Dot Hill's auditors, Deloitte & Touche LLP explained:

> a significant deficiency, or aggregation of deficiencies, that does not reduce to a relatively low level the risk that material misstatements in financial statements will be prevented or detected on a timely basis by employees in the normal course of their work. An internal control significant deficiency, or aggregation of deficiencies, is one that could result in a misstatement of the financial statements that is more than inconsequential. (2004 Form 10-K at p. 45)

33.     Dot Hill's amended Form 10-Q, filed on March 16, 2005 for the second quarter of 2004, contained an admission similar to that in the first quarter 10Q, admitting to "a material weakness in [its] internal control." (Amended Q2 2004 Form 10-Q, p. 34)

34.     Similarly, in the amended Form 10-Q, filed on March 16, 2005 for the third quarter of 2004, at p. 5, Dot Hill admitted that its previous "presentation of cost of goods sold, sales and marketing expense and research and development expense was not correct," and the inaccuracy "resulted in an overstatement of gross profit of 4.6% for the three months ended September 30, 2004 and 4.3% for the nine months ended September 30, 2004." Dot Hill also admitted the one transaction had been "entered twice resulting in an overstatement of inventory and understatement    of cost of goods sold of approximately $0.2 million. This error resulted in an overstatement of our previously reported net income of 4.9% and an overstatement of our gross profit of 1.1% for the  three months ended September 30, 2004 and an overstatement of our previously reported net income of 2.3% and an overstatement of our gross profit of 0.4% for the nine months ended September 30, 2004." (Amended Q3 2004 Form 10-Q, p. 5)

35.     On March 16, 2005, Dot Hill filed its Form 10-K for 2004 (the "2004 Form 10-K") and amended Forms 10-Q/A for the each of the first three quarters of 2004, in which Dot Hill completed the restatement announced on February 3, 2005, and in which Dot Hill and Dot Hill's auditors further detailed Dot Hill's internal controls, their weaknesses, the corrective actions Dot Hill was taking, and the ensuing expenses. The 2004 Form 10-K stated, in relevant part:

> _Material weaknesses related to entity level controls at Dot Hill_.   We have restated our financial statements to correct errors as announced in February 2005, and a number of events provide indications of an ineffective financial closing process at Dot Hill as of December 31, 2004. **Management believes that such events are the result of (i) an inadequate number of accounting and finance personnel with sufficient technical expertise in the area of U.S. GAAP and financial reporting    at both our corporate headquarters and foreign subsidiaries,** (ii) failure to    document

with sufficient support the prior application of our accounting policies, practices and procedures, and (iii) lack of effective deterrent controls and detective controls to properly apply U.S. GAAP to our financial reporting process. As a result, management has concluded that as of December 31, 2004 there were deficiencies in the design and execution of our entity‑level controls that constituted material weaknesses in our internal control over financial reporting.

*Material weakness related to internal controls over inventory at Dot Hill*. We have identified a material weakness related to our internal control over inventory processing as of December 31, 2004. This weakness was the result of inadequate understanding and documentation of a reconciling item between our general ledger and perpetual inventory listing. **Management believes that the material weakness described above was the result of** (i) the use of our general ledger to process customer support transactions that should not impact our financial statements and (ii) **the limitations present in our historical enterprise resource planning (ERP) software requiring a significant number of manual processing steps.**

In order to address the material weaknesses identified above, management has undertaken the following corrective measures:

**We intend to strengthen our accounting and financial reporting function by the addition of at least two certified public accountants with recent relevant experience, of which one will be in a senior managerial position. Additionally, we will add to our clerical staff in the areas of accounts payable and general accounting...** **Additionally, we intend to hire additional staff in various areas of the company, including but not limited to, financial planning and analysis, order entry and materials management...**

We are in the process of developing a plan to oversee the implementation of a new ERP software package... (2004 Form 10-K, pp. 43-46) (emphasis added)

36.      Had Dot Hill actually operated with adequate accounting staff and systems during the Class Period, its costs would have been materially higher and its reported profits correspondingly lower.  Indeed, as Dot Hill stated in its Form 10-K filed on March 16, 2005, in which Dot Hill detailed its restatement of previously-issued financial results and admitted material weaknesses in internal systems and controls, Dot Hill's costs would rise in the future as a result of investing in the adequate accounting and sales staffing and systems that the public had always assumed Dot Hill already had:

We expect general and administrative expenses to increase in 2005 as compared to 2004 due to the continuing cost of complying with various corporate governance regulations and the cost of corrective actions we intend to take as a result of such regulations... (2004 10-K, p. 34)

37.      As Defendants admitted, the restatement resulted in part from inadequate staffing and expertise in Dot Hill's financial/accounting department, and in part from the inadequacy and failures of Dot Hill's Enterprise Resource Planning software.  ERP software is supposed to integrate all data

and processes within an organization – such as payroll, accounts receivable, accounts payable, inventory, billing, purchasing, financial reporting, etc. – into a single unified system operating over a single database. Dot Hill's ERP software (known as "CHARTS") did not do so, and this basic failure harmed Dot Hill's operations and distorted its reported financial results. As Defendants admitted – in the February 3, 2005 press release, Form 8-K and conference call; in Dot Hill's Form 10-K filed on March 16, 2005; and in an April 27, 2005 conference call – the restatements and control weaknesses stemmed in part from CHARTS' inability to integrate data between/under Dot Hill's various departments, which inability necessitated numerous manual data entry operations which increased the risk of, and actually resulted in, error.

### 4. Scienter

38. Numerous confidential witnesses interviewed in the course of plaintiff's investigation – all former employees of Dot Hill – confirmed Defendants' Class Period awareness of CHARTS' defects and the resulting problems and inaccuracies, based on their own personal experiences. Despite Defendants' knowledge of CHARTS' defects, the Individual Defendants were personally and improperly committed to CHARTS, recklessly disregarded its flaws, and refused to spend the funds necessary to acquire a functional system. These facts were admitted by Dot Hill in its March 16, 2005 Form 10-K when it stated that the misrepresented financial figures were a direct result of (i) an inadequate number of accounting and finance personnel with sufficient technical expertise in the area of U.S. GAAP and financial reporting" and "(ii) the limitations present in our historical enterprise resource planning (ERP) software requiring a significant number of manual processing steps." The Confidential Witness statement below directly support these reasons for the misrepresentations.

(a) CW 1 was a Dot Hill buyer whose job responsibilities included working with engineers to purchase materials for their products. CW 1 worked for Dot Hill from late 2004 until mid-year 2006 and reported to a purchasing manager and Vice President of Operations. As a buyer, CW 1 observed that Dot Hill's ERP system was inadequate because it caused difficulties and mistakes in routing information and often resulted in error-containing reports;

(b)     CW 2 was a manager in the marketing Dot Hill's marketing department from mid 2000 until early 2004 who planned new marketing programs.  CW 2 reported to the Director of Marketing. CW2 stated the CHARTS system was inadequate for several reasons: (1) the CHARTS' subsystems (e.g., accounts payable, accounts receivable, inventory) could not and did not communicate with and/or update each other automatically; (2) there was no way to see everything (e.g., who the customer was, what their billing/payment status was) in a single system.  Because of these problems, much of the accounts payable and accounts receivable work was done manually by comparing information and transferring information between multiple printed reports.  CW 2 recalled several instances in which alternative ERP system vendors had made presentations to Dot Hill, but that Dot Hill stayed with its system, despite knowledge of the system's defects, because it had already been paid for and because it had been developed by Defendant Sauey;

(c)     CW 3 was a Dot Hill operations executive responsible for managing relationships with other business entities and purchasing prototypes.  CW 3 worked for Dot Hill from 2002 until mid 2005 and reported to Senior Vice President of Operations.  CW 3 stated that the CHARTS system was antiquated; that CHARTS included separate modules for accounts payable, accounts receivable, inventory and purchasing; that the data provided by the CHARTS system was unverifiable "mystery meat" because the CHARTS system did not provide data links to reveal data sources and/or the formulas of data manipulations; that CHARTS frequently produced mis-classifications of costs, and that further mis-classification occurred through frequent manual over-rides.  CW 3 had numerous conversations and regular contact with Defendant Romm.  Through those conversations personally knows that Defendant Romm was aware of CHARTS' problems because they had discusses CHARTS problems and difficulties.  During these conversations Defendant Romm stated that Dot Hill did not have money to buy a new ERP system (despite the fact that Dot Hill had raised more than $150 million through its September 2003 secondary equity offering).

(d)     CW 7 was a senior engineering executive who reported directly to Defendant Kammersgard.  CW 7 worked for Dot Hill from mid 2001 until early 2006.  CW was responsible for managing all engineering organizations, sustaining engineering activities, testing and interoperability activity, product delivery, budgeting, project scheduling, manpower assessment, productivity metrics,

and project and program management activities. Through CW 7's responsibilities, CW 7 learned that communication between departments could not be done automatically through CHARTS but had to be accomplished by transferring data into excel spreadsheets that were then sent back and; that CHARTS was not up to the task of maintaining operations and order flow with Solectron (Dot Hill's manufacturer) and that consequently Dot Hill's engineering department acquired another software system, titled AGILE, that could work adequately with Solectron; that Dot Hill's CHARTS system was unable to connect to – and was not physically connected in any way to – Dot Hill's AGILE engineering software (used by engineering to build bills of materials – i.e., engineering purchase orders for materials for prototypes); that while such disconnects could still work in a small company, Dot Hill required a better system and more people; that the system's above-mentioned problems caused delays in his ability to purchase equipment for Dot Hill's new product prototypes; and that Defendant Kammersgard knew that CHARTS was an ineffective system;

(e)     CW 8 was an accountant with Dot Hill from late 2004 until mid 2006. CW 8 worked in accounts payable and used CHARTS and Oracle software. CW 8 reported to an accounts payable supervisor. Based upon CW 8's experience with CHARTS, CW 8 believed CHARTS was an inadequate account system because it was old and archaic and because it didn't link and aggregate and update data (such as purchasing, billing, accounts receivable, etc.) in one report (so that, for instance, one could see at a glance for any customer or account or order how much material was remaining, what payments if any had already been made, what the approval status was, what modifications had been made, etc.). CW 8 believed that as a result of such disconnects, departments were "on different planets" so that, for instance, purchasing did not receive required approvals to purchase items, which in turn prevented accounting from paying invoices when they were received;

(f)     CW 9 was an OEM account manager for Dot Hill from 1997 through mid 2006. CW 9's job responsibilities included assisting the sales department in non-Sun sales, which included entering sales orders into the CHARTS software program. CW 9 reported to the Senior Vice President of Sales Operations. CW 9 states that the CHARTS software was difficult to use and that it did not have adequate inventory controls. CW 9 further stated that cycle counts were often wrong and that adjustments had to be made to inventory. CW 9 explained that CHARTS was unable

to aggregate and link data from different subsystems, that generating comprehensive reports from CHARTS was impossible, and that data analysis could only be accomplished by downloading data from different CHARTS subsystems into an Excel spreadsheet. CW 9 stated that senior management knew of the problems with the CHARTS software program. ; and

(g)     CW 11 was a senior accounts payable clerk for Dot Hill from the beginning of 1999 until mid 2003 and she reported to the controller. CW 11's responsibilities included overseeing day-to-day operation of accounts payable group. In the exercise of CW 11's responsibilities, CW 11 learned Dot Hill had been looking into a new ERP system but that management decided not to invest in one because of cost concerns.

39.     Also known to Defendants during the Class Period was the other factor that Defendants later admitted drove Dot Hill's materially-inaccurate financial reporting – the lack of adequate accounting staffing. This is confirmed by numerous confidential witnesses, including:

(a)     CW 22, a certified public accountant, was a Sarbanes Oxley ("SOX") consultant in the accounting department from the summer of 2004 until the end of 2005. CW 22 was hired to assist in the implementation of SOX, specifically to consult on Section 404, which requires management and an external auditor to report on the adequacy of the company's internal control over financial reporting. CW 22 trained corporate staff on SOX and conducted testing for compliance with SOX. CW 22 stated that Defendant Romm and Norm Farquhar of Dot Hill's Board of Directors knew about the big issues being identified by the auditors "every step of the way". CW 22 reported to the Director of Finance and stated that CW 22 personally met with the auditors and the audit committee. CW 22 stated that Dot Hill's accounting department was so understaffed that until he arrived, it did not have a single certified public accountant or anyone experienced in Sarbanes-Oxley compliance or with audit procedures;

(b)     CW 8 was an accountant with Dot Hill from late 2004 until mid 2006. CW 8 worked in accounts payable and used CHARTS and Oracle software. CW 8 reported to an accounts payable supervisor. CW 8 worked closely with the accounting department and had daily exposure to the accounting team. CW 8 observed that at the end of each month, the accounting department had great difficulty in completing the work to close the books. For about a one week period each month,

the accounting department would work from 7:00AM until 11:00PM and then take home work to continuing working there. During that week, CW 8 stated that it was common for the accounting department to work 80-90 hours. Based on CW 8's experience, CW 8 believed that the department was understaffed and that the workload was too large for the staff on hand; and

(c)     CW 1 was a Dot Hill buyer whose job responsibilities included working with engineers to purchase materials for their products. CW 1 worked for Dot Hill from late 2004 until mid-year 2006 and reported to a purchasing manager and Vice President of Operations. AS CW 1 was involved with purchase, CW 1 spoke with the accounts payable once or twice a day regarding discrepancies. CW 1 observed that the under-staffing was so severe that accounting personnel were forced to work fifteen-hour days and to work on weekends. CW 1 stated that the understaffing resulted in the accounts payable department falling behind, late payments, mis-routed and incorrect invoices.

40.     All of these witness accounts taken together demonstrate that Defendants did have scienter of the problems with CHARTS and the inadequate staffing, which Defendant admitted led to the misrepresented figures in the company's financial statements.

**B.     Defendants' Misrepresentations Concerning Dot Hill's Basic Operational Structure**

**1.     Overview**

41.     Throughout the Class Period, Defendants tried to endear Dot Hill to investors by touting Dot Hill's "lean and mean", low-overhead operating structure. Defendants frequently touted the alleged success of this low-cost business model, emphasizing that Dot Hill's "average revenues per employee" were more than $1 million (one of the highest such figures in the United States). In fact, inadequate staffing was hampering Dot Hill's sales force and its accounting staff, causing sales to lag and ultimately forcing Dot Hill to restate earnings and to commit to extensive and expensive hiring going forward. As Dot Hill increased headcount and expenses in 2005 and 2006 to bring its organizational functioning to levels of adequacy that investors had always presumed Dot Hill to possess, Dot Hill's Class Period profits were revealed to be misleading, illusory epiphenomena (underwritten by inadequate organizational spending) and Dot Hill instead began to report quarterly losses.

## 2. The Misrepresentations

42.     Throughout much of the Class Period (until February 2005), Defendants portrayed Dot Hill as an extraordinarily efficient organization, generating remarkable revenue growth and revenues per employee of over $1 million, transforming what had been constant quarterly losses into what seemed constant quarterly profits.   In actuality, Dot Hill was something entirely different: a ramshackle and inadequately-maintained organization unable to maintain its current speed without coming apart at the seams.

43.     In Dot Hill's April 23, 2003 quarterly conference call with analysts, in response to a question about employee headcount, Defendant Lambert stated firmly his commitment to operating Dot Hill at an extremely low headcount:

> We are below 200 people and we are going to stay there... we are going to run the business with less than 200 people.

44.     On July 23, 2003, Dot Hill issued a press release announcing financial results for the second quarter of 2003, including dramatic revenue growth and the first quarterly profit in 3 years. The July 23 press release also raised 2003 revenue guidance from $171.5 million to $180 million, and earnings guidance from $0.21 per share to $0.25.   Additionally, the July 23 press release contained statements from Defendants Lambert and Romm touting the claim that Dot Hill had "realigned headcount to plan", stating that the new business model and cost-cutting was working splendidly and was producing average revenues per employee of approximately $1 million.

45.     In Dot Hill's July 23, 2003 quarterly conference call with analysts, Defendants Lambert and Romm made further positive comments about the purported success of Dot Hill's sales model and sales efforts, which allowed Dot Hill to report revenue growth at the same time as it cut costs, which combination allowed Dot Hill to report average revenue per employee of $1 million. Defendant Romm stated:

> For the second quarter in a row, nearly every financial indicator improved from both a year ago and the previous quarter. Net revenue increased for the second quarter of this year to $48.4 million, an impressive 332 percent increase over the second quarter a year ago and an equally impressive 59 percent increase over the first quarter of this year.
>
> I'm pleased to report that this business model has allowed Dot Hill to reap benefits  that we predicted it would. One, **we've been able to decrease many of the expenses that are associated with manufacturing of service as well as expenses of sustaining a**

**larger direct sales force.** Because of this, selling, general and administrative expenses were relatively flat compared last quarter, despite a 59    percent increase in revenue... **[O]ur focus on indirect sales and outsourcing to manufacturing and outsourcing large portions of our service organization enabled us to decrease headcount in those departments. Dot Hill's annualized revenue per head is now over $1 million as compared to a year ago's second quarter of $184,000 per person. Plus, decreases in other departments** allowed us  to grow our engineering team by 25 percent and to focus on the core competency, designed as innovative products. The result of all this is that we have generated $9.1 million of positive cash flow with an ending cash balance of $30.7 million and no    debt.

In short, our second quarter results are **proof positive that Dot Hill's business plan works**. (emphasis added)

During the same conference call, in response to an analyst's question concerning Dot Hill's headcount, Defendant Romm, reiterating Defendants' commitment to keep a low headcount and high average revenue per employee, replied that Dot Hill employed "under 200, and that's the kind of model we're operating on this year".

46.    In Dot Hill's October 22, 2003 quarterly conference call with analysts, Defendants Romm and Lambert made representations concerning, inter alia, the organizational quality and efficiency of Dot Hill and its business model, which, despite continued headcount reductions in sales and other departments, was continuing to generate large revenue increases and to produce average revenues per employee of more than $1 million.  Defendant Romm stated:

For the second consecutive quarter Dot Hill's posted record profits and net revenue... For the third quarter in a row nearly every financial indicator improved from both a    year ago and the previous quarter. Net revenue increased during the third quarter of    this year to $51 million an impressive 494 percent increase over the third quarter a    year ago, and a sequential 5 percent increase over the second quarter 2003. This is    our fourth consecutive quarter of increasing revenue.

We [continue] to take advantage of numerous operational and cost benefits which we have explained during our last few conference calls....

**[O]ur focus on indirect sales, the outsourcing of manufacturing and the outsourcing of a large portion of our service organization enables us to keep headcount low. Dot Hill's annualized revenue per head has more (indiscernible) than a million dollars for the past two quarters. Plus personnel decrease in other departments allows us to focus on our engineering team (indiscernible) products. The operating model we implemented late last year continues to yield its desired results.** (emphasis added)

47.    In Dot Hill's January 28, 2004 conference call with analysts, Defendants Lambert and Romm once again made representations concerning the organizational quality and efficiency of Dot Hill and its business model, which, despite continued headcount reductions in sales and other

departments, was continuing to generate large revenue increases and to produce average revenues per employee of more than $1 million. Defendant Lambert stated:

> All I can say is, what a difference a year makes. I'd like to take a moment and recap some of the highlights of 2003 for Dot Hill. It's not often that a CEO has the privilege to reflect on such a positive year.
>
> Preston has already mentioned the exceptional financial results for 2003 but our successes did not end there. During 2003 we successfully moved to a business model which has enabled us to grow our profits substantially and outsource manufacturing to Solectron, our contract manufacturer. This enabled us to decrease head count and increase annualized revenue per employee from $299,000 at the start of 2003, to $1,190,000 by the end of 2003.
>
> *****
>
> ... the company has been restructured to reflect the correct business model for Dot Hill, and that model has been tested throughout 2003 with great results...

During the same conference call, in response to an analyst's question concerning headcount, Defendant Lambert reiterated that Dot Hill had very few employees and was functioning extremely well with that number:

> It's still under 200. We don't have any plans to grow our head count significantly. You'll probably see it grow a little bit each quarter but we watch that very carefully with the model we have and the leverage that we are able to get with our partners. We just don't see us having to grow that significantly.

48.     In Dot Hill's July 28, 2004 conference call with analysts, Defendant Lambert again stated that Dot Hill's fundamental operating model was working excellently and producing revenues in excess of $1 million per employee. Defendant Lambert said that he was "happy" to announce that Dot Hill has "gotten [its] revenue per employee on an annualized basis back over $1 million per employee"; Defendant Romm, further discussing the average revenue per employee metric, added that average revenue per employee is "something Jim [Lambert] and I track, so we were over $1.1 million a person per year".

### 3.     Falsity, Defendants' Admissions, and Scienter

49.     Defendants' above-mentioned statements portrayed Dot Hill as an efficient and capable organization whose operations were successfully and profitably running with a very low headcount. These statements were false. Defendants' low-headcount business model was neither viable nor successful; in fact and to the contrary, it had resulted in organizational dysfunction and breakdown and was having an adverse impact on various aspects of Dot Hill's business. Defendants themselves admitted in February-April 2005 (*see also* ¶¶ 31-35 *supra*) that: (i)     they had

systematically under-invested in personnel, systems and expertise to such an extent that Dot Hill's internal controls were inadequate to the basic task of producing materially correct financial statements; and (ii) that bringing Dot Hill's personnel, systems and expertise to adequate levels would entail millions of dollars per year in additional operating costs.

(a)     Defendants admitted in Dot Hill's 2004 Form 10-K (filed on March 16, 2005) that:

> We expect general and administrative expenses to increase in 2005 as compared to 2004 due to the continuing cost of complying with various corporate governance regulations and the cost of corrective actions we intend to take as a result of such regulations (2004 10-K, p. 34)

> We will continue our efforts to grow our non-OEM sales during 2005. Accordingly, we expect sales and marketing expenses for the year ending December 31, 2005 will exceed spending levels incurred during 2004 (2004 10-K, p. 33).

> Management believes that [the restatement and Dot Hill's financial control weaknesses] are the result of (i) an inadequate number of accounting and finance personnel with sufficient technical expertise in the area of U.S. GAAP and financial reporting... In order to address the material weaknesses [] we intend to strengthen our accounting and financial reporting function by the addition of at least two certified public accountants with recent relevant experience, of which one will be in a senior managerial position. Additionally, we will add to our clerical staff in the areas of accounts payable and general accounting... Additionally, we intend to hire additional staff in various areas of the company, including but not limited to, financial planning and analysis, order entry and materials management... We are in the process of developing a plan to oversee the implementation of a new ERP software package... (2004 10-K, pp. 43-44) (emphasis added)

(b)     Defendant Romm, in an April 27, 2005 conference call, similarly admitted:

> I think you'll start seeing an increase in G&A [i.e., General and Administrative Expenses] throughout the rest of this year as we implement a new ERP package and put in some of the infrastructure that we need to get SOX compliant. A new MIS package is probably, you know, all in with training and implementation and buying the system and people to put it all in. You know, those things aren't cheap... They're probably a couple million dollars plus...
>                                         *****
> [It will require hiring] more people and then some temporary people to backfill existing people to -- until it gets implemented... They aren't, you know, inexpensive things to do... [The expenses will appear] more third quarter, fourth quarter than second. But some in the second quarter, too. But the, the benefit of it is, you know,     the Company can grow without adding a lot of people to do the core work of, you know, inputting orders and shipping product and collecting the data for it and we     have a number of systems and processes that aren't tied together and what we're   looking for is a closed loop system that, you know is all keying off the same raw    data...

50.     Defendants praised their lean business model and represented its efficiency despite their knowledge that the company really was suffering from its failure to employ an adequate number

of people to successfully run the business. Defendants knew that their statements about the efficiency of their lien business model were misleading because they admitted, as noted above, that the lean business model resulted in inadequate internal controls that could not perform the basic task of producing materially correct financial statements. Defendants knew that bringing their personnel up to an adequate level would result in millions of dollars more per year in operating expenses. Failing to hire more personnel when it was clear that inaccuracies resulted from the lean business model demonstrates intent or, at least, deliberate recklessness by the Defendants. Numerous confidential witnesses interviewed in the course of plaintiffs' investigation confirmed that under-staffing at Dot Hill was severe, particularly in sales, marketing and accounting and that Defendants knew, when touting their lean business model, that the model was not as efficient as represented and was harming those aspects of Dot Hill's business:

(a) CW 22, an internal auditor at Dot Hill from August 2004 through November 2005, who reported to Dot Hill's Vice President of Finance for the first several months at Dot Hill and then to Defendant Romm, stated that during his tenure, Dot Hill's accounting department was inexperienced and understaffed as a whole and, in particular, had no experience with Sarbanes Oxley or audit procedures. Upper management, including Defendant Romm, knew of this understaffing and inexperience and hired a Vice President of Finance to "clean up." This individual left Dot Hill several months after CW 22 arrived.

(b) CW 1 was a Dot Hill buyer whose job responsibilities included working with engineers to purchase materials for their products. CW 1 worked for Dot Hill from late 2004 until mid-year 2006 and reported to a purchasing manager and Vice President of Operations. CW 1 observed that the under-staffing was so severe that accounting personnel were forced to work fifteen-hour days and to work on weekends. CW 1 stated that the understaffing resulted in the accounts payable department falling behind, late payments, over payments, mis-routed and incorrect invoices. CW 1 knew this because he interacted with that department on a regular basis. To promote a lean business model at the expense of accuracy in the accounting department demonstrates, at a minimum, a deliberate recklessness on behalf of the Defendants;

1    (c)    CW 6 was a senior manager in marketing from 2000 through mid 2006. CW 6's
2    job responsibilities included market research and writing and editing of information about products
3    that Dot Hill had completed. CW 6 reported to Omar Barraza who directly reported to Defendant
4    Kammersgard. CW 6 stated that he personally observed accounting staff working unusually long
5    hours, at least eleven each day. CW 6 was copied on an email in which Defendant Kammersgard
6    acknowledged that accounting was "already backed up." To allow severe understaffing problems to
7    cause damage to the company in order to avoid the additional operating expense demonstrate
8    deliberate recklessness, at a minimum;

9    (d)    CW 8 was an accountant with Dot Hill from late 2004 until mid 2006.  CW 8
10   worked in accounts payable and used CHARTS and Oracle software.  CW 8 reported to an accounts
11   payable supervisor.  CW 8 worked closely with the accounting department and had daily exposure to
12   the accounting team.  CW 8 observed that at the end of each month, the accounting department had
13   great difficulty in completing the work to close the books.  For about a one week period each month,
14   the accounting department would work from 7:00AM until 11:00PM and then take home work to
15   continuing working there.  During that week, CW 8 stated that it was common for the accounting
16   department to work 80-90 hours.  Based on CW 8's experience, CW 8 believed that the department
17   was understaffed and that the workload was too large for the staff on hand leading to reduced
18   productivity. To allow severe understaffing problems to cause damage to the company in order to
19   avoid additional operating expense demonstrates deliberate recklessness;

20   (e)    CW 15 was an OEM salesperson for Dot Hill from September 2004 through
21   October 2005.  CW 15's job responsibilities included building relationships with other manufacturers
22   to eventually have them sell Dot Hill products on an OEM basis.  CW 15 reported to the Vice
23   President of Sales.  CW 15 stated that Dot Hill's sales department was understaffed because of the
24   Individual Defendants' directive to maintain a ratio of revenue to employees in excess of $1 million
25   per employee. To allow severe understaffing problems to cause damage to the company in order to
26   avoid additional operating expense demonstrates deliberate recklessness; and

27   (f)    CW 2 was a manager in the marketing Dot Hill's marketing department from
28   mid 2000 until early 2004 who planned new marketing programs.  CW 2, who reported to the

Director of Marketing, Omar Barraza, worked with the sales team on sales administration and in generating and managing leads that were later passed to the sales team. CW 2 stated that Dot Hill's sales failures were in part due to lack of sufficient resources devoted to sales and marketing, and in part due to the fact that Dot Hill was not hiring competent salespeople. CW 2 stated that, instead, Dot Hill was filling its sales positions with persons who had neither much experience in sales nor much experience in technology – people without the knowledge, tools or experience required for the position. For instance, CW 2 stated (as did CW 14), that Dot Hill had hired one salesperson whose only previous sales experience had been selling flowers. CW 2 stated that Dot Hill was hiring such inadequate salespersons because the sales salaries it offered were very low and failed to attract any better and more experienced salespersons. CW 2 stated that CW 2 and the marketing director, Mr. Barraza, both had so concluded, and that CW 2 knew that the marketing director had met with Defendant Kammersgard to explain the problem and to suggest Dot Hill revise its salary structure to as to attract and hire a better-qualified sales team. CW 2 said that Kammersgard disregarded these suggestions because Kammersgard felt Dot Hill products were so good that they did not need any sales effort at all but merely needed to be presented to customers by knocking on their door. To allow severe understaffing problems to cause damage to the company in order to avoid additional operating expense demonstrates deliberate recklessness.

51. Numerous confidential witnesses interviewed in the course of plaintiffs' investigation confirmed that Defendants' underspending on Dot Hill's ERP system and accounting department had created systemic organizational dysfunction to the point that the department could not adequately perform its job (as alleged in detail at ¶¶ 35-37); other confidential witness confirmed the same with respect to Dot Hill's sales/marketing spending (as alleged in detail below). To allow underspending to cause damage to the corporation by eliminating its ability to function efficiently demonstrates deliberate recklessness on the part of the individual Defendants.

52. Numerous confidential witnesses stated that such under-staffing (and under-spending) was the *direct* result of the Individual Defendants' self-imposed directive to maintain Dot Hill's headcount at levels that allowed Defendants to continue to report average revenues per employee of $1 million or more for Dot Hill (among the highest revenue/employee ratios in corporate America),

and that Defendants resisted hiring more employees (which might have had the effect of decreasing average revenue per employee), including:

(a) CW 6 was a senior manager in marketing from 2000 through mid 2006. CW 6's job responsibilities included market research and writing and editing of information about products that Dot Hill had completed. CW 6 reported to Omar Barraza who directly reported to Defendant Kammersgard. CW 6 stated that Dot Hill's understaffing problems resulted from Defendants Lambert and Kammersgard's start up mentality mindset to always spend as little as possible;

(b) CW 7 was a senior engineering executive who reported directly to Defendant Kammersgard. CW 7 worked for Dot Hill from mid 2001 until early 2006. CW 7 was responsible for managing all engineering organizations, sustaining engineering activities, testing and interoperability activity, product delivery, budgeting, project scheduling, manpower assessment, productivity metrics, and project and program management activities. CW 7 met with Defendants Kammersgard and Romm each month to go over cost roll-ups. CW 7 stated that Defendant Kammersgard intentionally structured Dot Hill with a lean business model and that Kammersgard's emphasis on maintaining such average revenue/employee levels not only stifled hiring but was "hell" and stifled growth.

(c) To allow severe understaffing problems to cause damage to the company in order to avoid additional operating expense demonstrates deliberate recklessness.

**4.  Impact**

53.  Ultimately, after Defendants' admissions in February and March 2005 of inadequate staffing and systems (detailed above), Dot Hill's administrative costs nearly doubled as Dot Hill was forced to invest in the systems (including a properly-functioning ERP system from Oracle), capability and expertise that investors had previously assumed that Dot Hill had always possessed.

54.  Given Dot Hill's continuing failures to secure new revenues from new customers, and with Dot Hill's costs rising as a result of their new investment in systems and personnel that the market had theretofore assumed Dot Hill already possessed, Dot Hill's reported profits during 2005 and 2006 began to decline and ultimately were transformed into losses. Dot Hill's reported financial results throughout 2005 and 2006 are not alleged here to have been misleading, because, unlike Dot

Hill's previously-issued financial results, they started to reflect the true costs of administering Dot Hill's operations.

55.     The financial results reported by Defendants for Dot Hill *prior* to February 2005 – and especially Dot Hill's newfound profits during 2003 and 2004 – were misleading.  In fact, Dot Hill's profits – its $12 million of net income for 2003, and its $11.6 million of net income for 2004 – were secretly subsidized by Defendants' cost cuts and cost controls that had, unbeknownst to the public, rendered Dot Hill's accounting staff, accounting systems, and sales staff unable to perform their normally-expected functions.

56.     For instance, Dot Hill halved its sales/marketing personnel between 2000 (138 employees) and 2003 (66 employees).  As compared with Dot Hill's 2000 sales/marketing expenses of $31.7 million, Dot Hill spent only $14.1 million on sales/marketing in 2003 (i.e., $17.6 million less than in 2000) and $16.8 million in 2004 (i.e., $14.9 million less than in 2000)  Without such cost reductions, Dot Hill's reported profits for 2003 ($12 million) and 2004 ($11.6 million) would not have been profits at all.

57.     Similarly, Dot Hill's reported profits were underwritten by the similar reductions in management/administrative personnel.   Defendants halved such personnel between 2000 (42 employees) and 2003 (17 employees)  (Interestingly, general/administrative expenses did not decline proportionately but in fact were slightly higher in 2003 than in 2000 because of sharp increases in executive pay and bonuses to the Individual Defendants).  Had Dot Hill had an adequately-staffed general/administrative function during 2003 and 2004, its profits would have been materially less than reported (or would not have been profits at all).

58.     During 2003, however, the operational effects of these cost reductions were unknown to the public: it seemed simply that Dot Hill was a "lean" or "efficient" organization.  Thus, as Dot Hill's operating model appeared viable and successful in 2003 – Dot Hill's reported revenues increased dramatically and Dot Hill's quarterly losses were transformed into profits – Dot Hill's stock price tripled from $6.79 per share on April 23, 2003 to above $18 per share in September 2003.  On September 23, 2003, the Defendants took advantage of Dot Hill's inflated stock price and completed a secondary stock offering, raising approximately $178 million through the sale of 11.5 million Dot

Hill shares at $15.50 per share. Approximately 1.5 million of the shares offered were sold by the Individual Defendants, who collectively received approximately $23.1 million from their share sales. As a reward for their successful efforts to increase Dot Hill's share price, the Individual Defendants were given unprecedented bonuses for 2003: Lambert received a $1.27 million bonus; Kammersgard approximately $780,000; and Romm $488,000.

59.     Thereafter, however, the public facade began to unravel. As Dot Hill's revenues failed to evidence much progress (despite Defendants' protestations to the contrary) in gaining new customers, Dot Hill's share price slid steadily during 2004 from $16 per share at the start of the year to $8 per share by year-end. Such new customer / new revenue failures were a direct function of Dot Hill's broken sales department which – after its one success with Sun in 2002 – was finding it difficult to achieve any other sales.

60.     Then, in February/March 2005, Dot Hill admitted to material weaknesses in its internal controls, stemming from inadequate investment in accounting staff, accounting expertise, and ERP systems/software (*see* ¶¶ 31-35 above). Defendants admitted that they would have to expend significant funds on hiring more accounting staff, hiring accounting staff with better expertise, and replacing Dot Hill's antiquated, inadequate and error-producing ERP system with an adequate and accurate ERP system (*see* ¶¶ 31, 66 above). As those costs began to make themselves felt during 2005 (general and administrative costs during 2005 of $12.9 million were almost double the $6.9 million figure for such costs during 2000), Dot Hill's profits vanished and its quarterly losses resumed.

61.     Had Dot Hill actually operated with adequate staffing and systems during the Class Period, its costs would have been materially higher and its reported profits correspondingly lower. Indeed, as Defendants admitted in the 2004 Form 10-K, Dot Hill's costs would rise in the future as a consequence of making necessary investments for the creation of adequate accounting and sales staffing and systems that the public had always assumed Dot Hill already had. Conversely, had Defendants disclosed during 2003 and 2004 that Dot Hill's reported profits for 2003 and 2004 came at the expense of inadequate staffing, error-prone information systems and porous internal controls, the investing public would have viewed the Company's reported financial results   in a different light

1   – as they ultimately viewed the situation when the truth was finally revealed.  Defendants' failure to

2   disclose these facts was misleading and demonstrates their scienter in falsely  promoting the lean

3   business model without disclosure that it was at the expense of adequate accounting and sales staffing

4   and systems.

5   **C.    Defendants' Misrepresentations Concerning Dot Hill's Relations with Sun
        Microsystems and Its Efforts to Integrate Chaparral**

6   **1.    Overview**

7   62.    Throughout the Class Period, Sun Microsystems was Dot Hill's largest and most

8   important customer, accounting for 80%-90% of the revenues Dot Hill reported each quarter.

9   Consequently, investors found the status of Dot Hill's relationship with Sun to be of the utmost

10  materiality, and the relationship was a subject of analyst inquiry at virtually every quarterly

11  conference call during the Class Period.  While Dot Hill maintained that the relationship was as

12  strong as could be, that was often far from the truth.  Plaintiffs' confidential witnesses confirmed that

13  Sun expressed constant dissatisfaction with the service and technology that it was receiving from Dot

14  Hill.  To improve its technology so that Sun would continue its relationship with Dot Hill, Dot Hill

15  acquired Chaparral and promised to integrate Chaparral's RAID technology (which, Defendants

16  claimed, would result in decreased costs, increased margins and profits, and revenue growth with Sun

17  and non-Sun new customers).

18  63.    Defendant consistently maintained that the integration of Chaparral's RAID

19  technology was proceeding smoothly and had generated enthusiastic customer response.  In fact, the

20  integration of Chaparral's technology into Dot Hill's products was fraught with problems from the

21  start.  Dot Hill's sales staff did not have a product to sell, and customers were frustrated over the lack

22  of a product to buy.   According to confidential witnesses, even by the end of the Class Period in

23  April 2006, Dot Hill had failed to sell/ship any Chaparral-integrated products.

24  64.    After repeated demands to remedy the situation were not heeded to Sun's satisfaction,

25  Sun severed relations with Dot Hill.  When Sun's move away from Dot Hill was disclosed publicly

26  on April 28, 2006, it triggered immediate investor panic and material devaluation of Dot Hill's stock

27  price:  Dot Hill shares lost 21.3% of their value in one day, falling from $5.78 to $4.55, and then

28  continued steadily to decline to below $4 per share in the following weeks.

### 2. Defendants' Misleading Statements Concerning Sun and the Progress of the Chaparral Integration

65. On January 28, 2004, Dot Hill issued a press release announcing that its original sales agreement with Sun had been extended by Sun for another three years:

**Dot Hill Receives OEM Agreement Extension from Sun Microsystems**

CARLSBAD, Calif., Jan. 28 -- Dot Hill Systems Corp. (Nasdaq: HILL) today announced that the existing three-year OEM partner agreement with Sun Microsystems, Inc., first announced in May 2002, has been extended. The agreement will now continue through May 22, 2007, a two-year extension to the original agreement.

"We have been delivering high-quality, highly-marketable products to Sun for more than a year now, and we believe that the extension to the OEM agreement validates our technology and our long-term commitment to deliver outstanding services and products," said Jim Lambert, Dot Hill's president and chief executive officer. "This contract extension demonstrates the high level of confidence that a market leader like Sun has in our ability to produce innovative products."

66. On January 28, 2004, Dot Hill issued a press release announcing its financial results for the fourth quarter and the year of 2003, for both of which it reported further dramatic revenue and profit growth, and forecast further revenue growth for 2004. Additionally, the January 28 press release contained further statements from Defendant Lambert concerning the quality of Dot Hill's relationship with Sun:

Shipments to our major OEM customer grew to $48.5 million for the fourth quarter... Today, we announced that our key OEM customer extended our agreement with them by two years until May of 2007, and we look forward to working together to bring additional new and exciting products to market... We have never been more optimistic about Dot Hill's future...

67. In Dot Hill's January 28, 2004 quarterly conference call with analysts, Defendant Lambert put Dot Hill's relationship with Sun as the company's greatest priority:

...we have set clear goals for ourselves in 2004. The goals are as follows. First, we will continue to make our relationship with our largest OEM customer a success...

68. On February 24, 2004, Dot Hill issued a press release announcing that it had acquired Chaparral, a developer of RAID controllers. Dot Hill's press release stated that the acquisition of Chaparral and its RAID controller technology represented a decisive step to the fulfillment of one

---

of Dot Hill's three primary goals: to gain full operational control over its storage products by acquiring its own RAID controller technology. The Chaparral acquisition, according to the February 24 press release, would – through enhancing Dot Hill's technology, products, market share, operational efficiency and its margins – also help Dot Hill achieve its other two primary goals: maintaining a good relationship with Sun; and recruiting new customers.

69. On February 24, 2004, Defendants Lambert and Romm hosted a conference call with analysts to discuss the Chaparral acquisition. During the conference call, Defendant Lambert stated, *inter alia*:

> **the Chaparral acquisition was very key for us. It really, I believe, addressed one of our two outstanding issues that analysts and Wall Street kind of holds over our head. One was that we didn't own 100 percent of our IP stack. Now we do.**
>
> \*\*\*\*\*
>
> It will allow Dot Hill to integrate proprietary controller intelligence into our storage solutions and add valuable resources to its innovative product development team. We believe that owning our own controller technology is an important step in remaining competitive and will allow us to more fully control our own destiny.
>
> \*\*\*\*\*
>
> We're really very, very excited about this acquisition. It really brings some new, significant capabilities to Dot Hill. **It's going to allow us to compete more effectively... We're going to own 100 percent of the IT. It's going to allow us to bring new software features to market much, more quickly...**
>
> \*\*\*\*\*
>
> **And it really gives us total -- pretty much, total control, now, over all the IP in our stack. And at the end of the day that will allow us to react much quicker to anything that any of our OEM customers, you know, enhancements that they would like to have done to the product.** (emphasis added)

70. Analyst reports issued on February 25, 2004 by Lehman Brothers and Robert W. Baird & Co. reiterated top rankings for Dot Hill based on the Chaparral acquisition, repeating Defendants' representations that the Chaparral acquisition would reduce costs and increase revenues and earnings. In the days following Dot Hill's announcement of the Chaparral acquisition, Dot Hill shares rose more than 15%, from approximately $12 per share to above $14 per share.

71. On March 8, 2004, Defendant Romm gave a presentation on Dot Hill to investors gathered at the Deutsche Bank Securities Information Technology Hardware Conference. In his presentation, Romm stated that the Chaparral acquisition would transform Dot Hill into a more viable provider to OEM customers:

> One of the bangs we had on us when we were bidding for the Sun business was, we're nothing more than an OEM of a third party in Taiwan. And the controller board is really where the brains of the disk array sits, So it's imperative for us to own that

technology. And **I think it's really a gateway to win other major OEM business. They'll view us as a technology partner as opposed to just a box, a disk vendor. They will view us as a technology partner, one who can do some customization or be very flexible and do some unique things for a particular OEM versus another one. Time to market in the OEM world is critical, and owning this technology allows us to get to market much faster and in a much more flexible manner.** (emphasis added)

72.     At the same conference, Defendant Romm highlighted the importance of Sun to Dot Hill:

We have also recently signed an OEM agreement with Sun Microsystems. We signed it in May of 2002, just recently announced an extension to carry it through May of 2007. We supply all of Sun on an OEM basis their low-end storage... Sun has accounted for in the last number of quarters 84 to 86 percent of our total revenue base... thank goodness we won this piece of business with Sun, otherwise we would be among the walking dead. But there is a customer concentration issue which we really put high on our priority list.

*****

Last quarter, we figured we were 22 percent of Sun's storage revenue based on what we think their gross margins are and what we sold to them. We think there's an opportunity to grow that through a number of areas. Sun is improving their cash rate of storage to servers, partly because of our product offering and other things they're doing. We think there's an opportunity to keep growing there. There's new products coming that we're going to offer Sun that Sun will offer their customers. We think we're in a very strong position to maintain our sole leadership with Sun's low product range. (emphasis added)

73.     In Dot Hill's July 28, 2004 quarterly conference call with analysts, Defendant Lambert reiterated that Dot Hill had making significant progress on its three most important goals, including maintaining a good relationship with Sun. Concerning Sun, Defendant Lambert stated:

Going forward, we remain focused on the corporate goals that we have mentioned in the preceding quarters' calls. We continued to make the relationship with our largest OEM customer a success, and this quarter we started shipping the new Serial ATA and Ultra320 Blade products. (emphasis added)

74.     In Dot Hill's October 27, 2004 quarterly conference call with analysts, Defendants Lambert and Romm reiterated that Dot Hill had making significant progress on its three most important goals, including maintaining a good relationship with Sun. Concerning Sun, Defendant Romm stated:

As stated in previous calls, we continue to focus on making the relationship with our largest OEM customers successful, and we believe we have increased our market share within that customer's organization yet again this quarter. Further, we anticipate that our

largest customer's focus on their new volume server and software products will benefit Dot Hill in the long-term as our volume storage systems are a good complement to those products.

75.     On October 27, 2004, Dot Hill issued a press release announcing its financial results for the third quarter of 2004.  Additionally, although the October 27 press release stated that the integration of the Chaparral RAID controller into Dot Hill products was "on schedule" and "continuing smoothly", it also stated that it would be released to customers "in 2005" – rather than, as Defendants had previously represented – the first or second quarter of 2005.  The October 27, 2004 press release stated, in part:

> Dot Hill's acquisition of Chaparral, which took place in February, has furthered the company's technological capabilities. **The integration and upgrade of the Chaparral controller into Dot Hill's SANnet systems is on schedule and continuing smoothly.** We expect to release the integrated system to our customers       in 2005. (emphasis added)

76.     In Dot Hill's October 27, 2004 conference call with analysts, Defendant Lambert, responding to analyst questions concerning the Chaparral technology integration, stated:

> So as we move forward with the Chaparral technology and (indiscernible) systems, we'll really have a broader product line to sell because we can sell the complete systems or we can sell just the RAID controller, and we could also sell our software components.
>
> *****
>
> **The Chaparral integration of their technology continues to go very well.** As a matter of fact, we are demo-ing some of the initial capabilities down at Storage Networking World today and yesterday and this week. **We believe we are still on   track for the timeline that we talked about before, which is into Q1, Q2 of next year to start incorporating those into our products and actually start shipments     of those. Potentially, we'd start shipment to some customers earlier than others, but we are very pleased that that. The product is looking very good,          performance is looking very good, so we are very on track.** (emphasis added)
>
> *****
>
> We're pretty optimistic both about our prospects with SATA and our largest  customer... (emphasis added)

77.     On September 26, 2005, October 5, 2005, and October 20, 2005, Dot Hill issued, in press releases and Forms 8-K, further announcements concerning 'new' agreements for Sun to purchase Dot Hill products.  **Dot Hill represented these agreements as further signs of its successful relations with Sun, emphasizing that the agreements extended the timeline (to five years) and the products involved (Dot Hill's new generation of Chaparral-integrating**

**products).** These announcements temporarily buoyed Dot Hill's share price to approximately $7 per share from the end of September 2005 until year-end 2005.

78. On October 26, 2005, Dot Hill issued a press release announcing its financial results for the third quarter of 2005, and proclaiming Dot Hill's "extended and expanded" contracts with Sun:

> Due in large part to our attractive product roadmap, one of our key customers, Sun Microsystems, extended and expanded our agreement until January 2011. **Sun also awarded us a new OEM product agreement which will incorporate Dot Hill's proprietary controller technology and data management services software.** (emphasis added)

79. Defendant Lambert made further laudatory statements during Dot Hill's October 26, 2005 conference call with analysts:

> Ultimately, our focus going forward is to execute on all of our objectives, with the tremendous opportunities that lie ahead for us. **We are in an extremely advantageous position as we have solidified our continued business with Sun, with new product awards, and the extension of our agreement.**
>
> ＊＊＊＊＊
>
> I think that in the long-term, looking forward, that we believe that our revenue with Sun will continue to actually grow... (emphasis added)

### 3. Scienter Concerning Sun and the Progress of the Chaparral Integration

80. Defendants' above-mentioned statements were false and/or misleading because Dot Hill's relationship with Sun was less positive than extolled publicly by the Defendants, in large part because Defendants knew at the time those statements were made that the integration of the Chaparral technology was not proceeding as represented. Defendants claimed that Dot Hill would begin shipping integrated products in 2005 and continued to make affirmations that the integration was proceeding as scheduled. As demonstrated by the confidential witness statements below, Defendants knew when those statements were made that integrated products would not be sold or shipped on schedule. Thus, the benefits that Defendants claimed would result from the Chaparral acquisition (lower costs, improved margins, products more attractive to customers, increased revenues and profits), which benefits Defendants constantly claimed to be imminent, were in fact much more remote (at best) than the market had been led to believe.

81.     In a February 3, 2005, conference call with analysts, when pressed by analysts' questions regarding sales of Dot Hill products that integrated Chaparral technology, Defendant Lambert, through a haze of positive commentary about successful product demonstrations and enthusiastic customer responses, admitted that Dot Hill had yet to ship and sell any such products and that the timetable could slip:

> I think that, when we bought the Company at the end of February, I think when we talked to you after that time, that we had said to you the end of the first quarter or the second quarter of this year is when we had anticipated that that might be. That is still coming along very nicely.
>
> **At this point in time, we have already demonstrated a number of new products based upon the Chaparral technology to multiple Tier 1 OEMs successfully. So those went very well and we are very pleased with that. So, the timing for when we actually start shipping those products is certainly this year.** The quarters when we do it is really a bit dependent on some of our partners and when they are ready to bring it to market. So, I do not anticipate that that will happen in the first quarter of this year; it's more likely that it would beat later in the second quarter, or the third quarter, when you might actually see a formal announcement. That would not mean that we wouldn't be shipping some of it before that time.
>
> *****
>
> **Well, we haven't started shipping any of our new generation products based upon the Chaparral technology yet.** We are still shipping some of the existing Chaparral products, so we have a number of new designs that, as I said, we have working and **we have demonstrated now to a number of different Tier 1 OEMs and it's looking very nice**. (emphasis added)

82.     In fact, according to confidential witnesses, by the close of the Class Period in April 2006 Dot Hill had yet to sell/ship any such new generation products integrating the Chaparral technology. Multiple confidential witnesses interviewed in the course of plaintiffs' investigation confirm that Dot Hill's progress in integrating Chaparral were much worse than Defendants publicly represented:

(a)     CW 15 was an OEM salesperson for Dot Hill from the summer of 2004 until the fall of 2005. CW 15's job responsibilities included building relationships with other manufacturers to eventually have them sell Dot Hill products on an OEM basis. CW 15 reported to the Vice President of Sales. CW 15 stated that CW 15 left Dot Hill after more than a year because the OEM sales team was never given the promised Chaparral product to sell. CW15 recalled Dot Hill management constantly stating that the new Chaparral-integrated product was "right around the corner", but it never actually came. CW15 did not blame this problem on engineering incompetence,

but rather on management expectations divorced from reality. CW15 stated that the product development was taking longer than anticipated and that Dot Hill management all knew it;

(b) CW 6 was a senior manager in marketing from 2000 through mid 2006. CW 6's job responsibilities included market research and writing and editing of information about products that Dot Hill had completed. CW 6 reported to Omar Barraza who directly reported to Defendant Kammersgard. CW 6 stated that in late April 2006, Dot Hill had only been able to produce a prototype storage device with Chaparral RAID technology, and yet to manufacture or sell a finished device. CW 6's experience in marketing made CW 6 privy to information concerning what products were available.

83. The shortcomings of Chaparral could not have been overlooked by Dot Hill management, especially as management repeatedly and misleadingly reassured the investing public of Dot Hill's progress on the Chaparral front. Defendant Kammersgard's position as Chief Technology Officer ensured that he was kept abreast of and understood all important issues and problems concerning Dot Hill's product development, including and especially the issue of integrating Chaparral's RAID controller technology.

84. Despite Defendants' knowledge that the integration was not coming along as they had represented, and their knowledge of Sun's continuing dissatisfaction with Dot Hill's technology due to its failure to integrate the Chaparral technology as promised, Defendants also continued to misrepresent Dot Hill's relationship with Sun. As demonstrated below, the relationship between Sun and Dot Hill was not nearly as rosy as the picture painted by Dot Hill in its representations to the public, mostly because of Dot Hill's failure to integrate the Chaparral technology.

85. In fact, Sun was dissatisfied with Dot Hill's technology (stemming from Dot Hill's inability to integrate Chaparral's technology, operations and service, and costs. These facts were described by multiple confidential witnesses interviewed in the course of plaintiffs' investigation demonstrate Sun's dissatisfaction with Dot Hill's products and support the allegation that the relationship between Dot Hill and Sun was not as rosy as the picture Defendants painted in their

public statements.

(a) CW 17 was a program manager from late 1990 until mid 2006. CW 17's job responsibilities include functionality restoration, updates, and bug fixes. CW 17 reported to a manager who reported to the Senior Vice President of Operations. CW 17 stated that Sun personnel observed that there were problems with the codes governing Infortrend's RAID controller devices (i.e., the RAID controllers purchased by Dot Hill prior to Dot Hill's purchase of Chaparral and Chaparral's RAID technology), and that Sun and Dot Hill disagreed over the severity of those problems. CW17 stated that Infortrend imposed numerous bureaucratic delays in fixing known bugs in its products and in providing upgrades that would fix those bugs. CW 17 stated that, consequently, Sun wanted Dot Hill to get a new RAID controller technology, and that Dot Hill acquired Chaparral because of Dot Hill's and of Sun's dissatisfactions with Infortrend. CW 17's accounts support the allegation that Sun was dissatisfied Dot Hill's product and that Defendants knew about it because Defendants acquired Chaparral in hopes of satisfying Sun's concerns;

(b) CW 19 was a systems test engineer during the summer of 2003 who worked on testing Dot Hill's products and on Infortrend's firmware, fixes and functionality enhancements, described how Dot Hill recorded every bug in a tracking system that was constantly updated. CW19 personally attended the meetings at Sun during which bugs and other issues were discussed. According to CW19, during 2003 there were approximately 115 Level 4 bugs (critical enhancements that needed fixes) and 12 Level 1 bugs (critical bugs that must be resolved in the next update). Level 1 bugs were serious enough to affect all product users and to cause data corruption problems. CW 19 stated that Dot Hill and Sun employees met twice a week, on Mondays and Fridays, to discuss Sun's problems with Dot Hill products, including data corruption problems, and how those problems could be solved. CW 19's accounts support the allegation that the relationship between Sun and Dot Hill was not as rosy as Defendants portrayed;

(c) CW 7 was a senior engineering executive who reported directly to Defendant Kammersgard. CW 7 worked for Dot Hill from mid 2001 until early 2006. CW was responsible for managing all engineering organizations, sustaining engineering activities, testing and interoperability activity, product delivery, budgeting, project scheduling, manpower assessment, productivity metrics,

and project and program management activities. Through CW 7's position, CW 7 had personal knowledge concerning the relationship between Sun and Dot Hill. CW 7 stated there was a structural problem in Dot Hill's relationship with Infortrend – Infortrend did not benefit as much from helping Dot Hill as it would benefit from supplanting Dot Hill and doing business directly with Sun. Consequently, CW 7 stated, when problems with Infortrend controllers arose at various times, Dot Hill would practically have to beg Infortrend for fixes. CW 7 added that Sun made it clear to Dot Hill that if Dot Hill didn't have its own RAID controller technology, Sun would discontinue its relationship with Dot Hill. CW 7 also stated that, as of early 2006, Dot Hill had yet to release a product containing Chaparral RAID controller technology, because Dot Hill hadn't yet figured out how to successfully integrate Chaparral's controllers. CW 7's account supports the allegation that the relationship between Sun and Dot Hill was not as rosy as the picture Defendants painted; and

(d) CW 6 was a senior manager in marketing from 2000 through mid 2006. CW 6's job responsibilities included market research and writing and editing of information about products that Dot Hill had completed. CW 6 reported to Omar Barraza who directly reported to Defendant Kammersgard. CW 6 stated that the Sun account was lost mid 2006 and that six months previous to that, CW 6 had conversations with his boss during which his boss expressed concern about the Sun account, noting that it was in serious trouble.

### 4. Impact

86. On April 28, 2006, Dot Hill issued a press release disclosing that Sun had decided to award, to a Dot Hill competitor, the development of a future data storage product that Dot Hill had been providing to Sun. Dot Hill shares immediately lost 21% of their remaining value, falling on April 28, 2006 from $5.78 to $4.55, and then continued to decline in the ensuing weeks and months to as low as $3 per share.

### D. Defendants' Misrepresentations Concerning Dot Hill's Prospects and Progress With Potential New Customers

#### 1. Overview

87. Throughout the Class Period, in an effort to minimize investor concerns about Dot Hill's over-dependence on a single customer, Defendants made numerous public representations

concerning supposed inroads Dot Hill was making in acquring new customers that would provide new sources of revenue. Similarly, Defendants also regularly issued press releases announcing agreements Dot Hill had signed with various VARs and SIs to distribute, repackage and/or resell Dot Hill products, which likewise seemed to promise new sources of revenue and new revenues. In fact, due to a skeletal, inexperienced sales staff and flawed/delayed products, Dot Hill was not having much success landing new revenue-generating customers. And, despite Defendants' flurry of press releases announcing agreements with numerous VARs and SIs that misleadingly suggested widening distribution of Dot Hill products and new revenues from new customers, such agreements were merely empty distributorship agreements that did not mandate any actual sales of Dot Hill products and that most often, in fact, produced little or no revenue at all. In fact, according to several CWs there were either no signed agreements with new customers or the agreements failed to include material terms such as quantities, indicating that those agreements carried no guarantees of future or long term orders, as repeatedly represented by Defendants to the public during the class period. Consequently, as the market began to see that new customers and new revenues sources were failing to appear despite Defendants' constant representations to the contrary, Dot Hill's share price significantly deflated, falling from approximately $16 per share in 2004 to approximately $8 per share in early 2005.

### 2. Defendants' Misleading Statements

88. Beginning in May 2003, Dot Hill issued numerous press releases during the Class Period announcing agreements with various resellers and systems integrators, which made it appear as if Dot Hill products were gaining widespread market distribution (and thus that Dot Hill would gain new revenues from new customers). For example:

(a) On May 12, 2003, Dot Hill issued a press release announcing that it had reached an agreement with reseller Caen Engineering to sell Dot Hill products;

(b) On June 11, 2003, Dot Hill issued a press release announcing that it had

reached an agreement with "a leading systems integrator in Japan", Panasonic Solution Technologies Co., Ltd to sell Dot Hill products in Japan;

(c)     On June 24, 2003, Dot Hill issued a press release announcing that it had reached an agreement with a British value-added reseller Simply Networking Solutions, Ltd. to sell Dot Hill products in the United Kingdom;

(d)     On July 8, 2003, Dot Hill issued a press release announcing an agreement reached with another manufacturer, Bodacion Technologies, that would integrate Dot Hill's products into its own;

(e)     On September 15, 2003, shortly before its secondary stock offering, Dot Hill issued a press release that it had reached an agreement with "a leading Japanese systems integrator", NS Solutions Corp., to sell Dot Hill products to "its extensive customer base";

(f)     On November 19, 2003, Dot Hill issued a press release announcing that it had reached an agreement with a leading Japanese systems integrator, NTT Data Systems Corp., to sell Dot Hill products to NTT's "varied customer base, including telecommunications providers, enterprises, universities and government agencies";

(g)     On March 18, 2004, Dot Hill issued a press release announcing that certain Dot Hill products would be offered as storage options for certain IBM products; and

(h)     On April 19, 2004, Dot Hill issued a press release announcing that it had reached an agreement with value added distributor ACAL Nederland BV, "well known throughout Europe", to sell Dot Hill products to its customers.

89.     On July 23, 2003, Dot Hill issued a press release announcing its financial results for the second quarter of 2003.  Additionally, the July 23 press release contained statements from Defendants Lambert and Romm concerning numerous agreements Dot Hill had signed with value-added resellers and system integrators, a further new agreement with a "major storage vendor", and progress made with further potential new customers:

**Dot Hill Exceeds its Second Quarter Guidance, Posts Record Profits and Revenue Increases Guidance for Full Year**

**CARLSBAD, Calif.– July 23, 2003 – Dot Hill Systems Corp. today announced financial results for the second quarter ended June 30, 2003. Net revenue increased to $48.4 million for the second quarter of 2003, compared to $11.2 million for the second quarter of 2002, and $30.5 million for the first quarter of 2003. This represents a 332 percent increase year over year, and a 59 percent increase quarter over quarter...**

*****

**...We are pleased with the reception our products have received at many top-tier customers and prospects, and we look forward to furthering these new relationships."**

"During the second quarter, we announced partnerships with companies like General Dynamics, Panasonic Solution Technologies and Wausau Financial Systems, each of which will deliver our SANnet solutions to its end-user customers. These partnerships and others like them demonstrate our commitment to the channel and to increasing our OEM and indirect sales revenue going forward.."

"Additionally, we recently signed a two year agreement with a major storage vendor under which we will license our SANpath® software application...**We are very encouraged by this agreement, as it validates the strength and quality of our software offerings. Additional details of this relationship will be forthcoming." (emphasis added)**

90.     In Dot Hill's July 23, 2003 conference call with analysts, Defendants Lambert and Romm reiterated the positive financial guidance and made further positive comments about the purported success of Dot Hill's sales model and sales efforts.  Concerning new customer progress, Defendant Lambert stated:

**Last conference call, I reported that Dot Hill's sales efforts were focused on signing up new channel partners. We recently signed an OEM agreement with     a top tier and storage vendor.** Pursuant to that agreement, which has an initial term     of two years, Dot Hill enhanced and customized its SANpath (ph) software package     to run with this customer's storage systems. The customer plans to distribute   SANpath, along with certain models of its newest storage system. Dot Hill will     receive royalties based on the number of servers that each storage system connects     to... This is an important agreement for us. The quality of our hardware solutions      have already been validated through OEM agreements. This agreement is next in line     to the software partnerships we currently have in place with companies such as StorageTek and Falconstore (ph ). We believe that this contract will provide an additional level of validation of Dot Hill as a licensed source of stand-alone software packages.

**During the second quarter, we announced partnerships with companies such as General Dynamics, Panasonic Solution Technologies and Wausau Financial Systems, each of which will deliver our SANnet solutions to its end user customers. Dot Hill is committed to its indirect sales model and these partnerships are evidence of our success in selling through the channel. Virtually all end-users now**

**receive Dot Hill products through OEMs, system integrators, service providers and resellers.** (emphasis added)

91.     On January 28, 2004, Dot Hill issued a press release announcing its financial results for the fourth quarter and the year of 2003, for both of which it reported further dramatic revenue and profit growth, and forecast further revenue growth for 2004.   Additionally, the January 28 press release contained further statements from Defendant Lambert concerning the progress Dot Hill was enjoying with other signed and potential customers:

> **"We ended the year by adding several new customers to our growing list of partners, including NEC and NTT Data Systems, and will continue to focus on increasing    revenue through strategic partnerships such as these during 2004."**
>
> *****
>
> "We have never been more optimistic about Dot Hill's future. We are in discussions with our largest OEM customer regarding the addition of new products to our current agreement. Over the past year, we have signed up several new systems integrators and we are in discussions with several tier- one and tier-two OEM customers. We expect these events to increase 2004 net revenue by as much as 40 to 50 percent over that of 2003 net revenue... (emphasis added)

92.     In Dot Hill's April 28, 2004 conference call with analysts, Defendant Lambert downplayed analysts' revenue concerns and reiterated that Dot Hill was making significant progress on its three most important goals, including recruiting new customers to further grow and diversify revenues:

> **[W]e are vigorously working to diversify our revenue stream by adding new customers** and sustaining successful relationships with our existing partners. We realize that this goal is, perhaps, the most important, as we must not rely on one customer for the majority of our business.... (emphasis added)

93.     In Dot Hill's July 28, 2004 conference call with analysts, Defendant Lambert proffered a positive report on Dot Hill's progress with new customers:

> Going forward, we remain focused on the corporate goals that we have mentioned in the preceding quarters' calls. We continued to make the relationship with our largest OEM customer a success... **Secondly, we've continued to work on diversifying our revenue stream by adding new OEMs and partners to our customer mix. We consistently meet with each Tier 1 OEM so that we are kept abreast of all potential business opportunities. Additionally, our new product technologies will enable us to bid on potential new OEM business going    forward. In all, we feel that we are in**

**an excellent position to win new business and diversify our revenue stream.**
(emphasis added)

94.     On the same July 28, 2004 conference call, when pressed repeatedly by analysts on Dot

Hill's revenues, and especially Dot Hill's revenues from customers other than Sun, and even more

especially revenues from the various VARs and SIs whose agreements to distribute Dot Hill products

had been previously and prominently proclaimed by Defendants, Defendant Lambert stated:

> **[T]here was a few OEMs that we won and talked about last year that started to ship their products and ramp. Probably the biggest one was NEC over in Japan. And we probably shipped to them close to about $1 million. This was there -- really kind of their first quarter of product shipments.** Another account that we have won and talked about and is starting to ramp -- and again, this one was in Japan       -- was NS Solutions. They're one of the largest system integrators in Japan. And then the rest of it was from existing customers -- Motorola, General Dynamics, both of  whom we've been doing business with for awhile -- and numerous others.
>
> *****
>
> **We are continuing our engagement with all of the Tier 1 OEMs on a regular basis. As I think we had said last quarter, we actually received and replied to        two volume RFQs for two of the Tier 1 OEMs -- in addition to many numerous Tier 2 OEM opportunities, not only in the U.S. but also in Europe and in Asia. Our current products, our technology, our business model continue to be very well-received by all parties concerned. We are continuing discussions currently with Tier 1 OEMs whose RFQs we responded to, and with other OEMs and    other Tier 2 OEMs all around the world. We believe that we have the right products, the right technology, a great roadmap and business model to be very successful. So believe me, we are working very, very, very hard, and it's the Company's number-one priority to get other Tier 1 and Tier 2 OEMs signed up.** Unfortunately, the timing on these things goes as fast as we would like, and these are very important decisions for Tier 1 and Tier 2. And they take their own time. We will continue to be optimistic, and like I say, working with all the Tier 1 OEMs, our goal      is on a daily basis. (emphasis added)

95.     In Dot Hill's October 27, 2004 conference call with analysts, Defendant Romm stated,

concerning new customer progress:

> We are continuing to work diligently with other potential OEMs to diversify our revenue stream. We realize that this is our most important goal as we must work to reduce our revenue concentration.
>
> Last quarter we signed up several new Tier 2 customers and continue to make traction with many Tier 2 accounts. We continue to work on integrating the Chaparral technologies into our storage systems and anticipate the release of these integrated products in 2005.
>
> We are also developing other products with increased technological capabilities that will enable us to continue to offer innovative solutions to our partners. Additionally, we will be able to offer components as well as complete systems to our current OEM customers

and prospects. We look forward to the quarters ahead, and are confident that they will provide long-term opportunities and growth for the company. We have a solid balance sheet and financial strength to bring the company to the next level.

*****

We're pretty optimistic both about our prospects with SATA and our largest customer. We are quite pleased with the traction we are getting with the Tier 2 customers and people like NEC and Motorola, NS Solutions, growing revenue, those are all relatively new to this year. And the prospect list we continue to talk to. We are also kind of pleased with where we are with some of the other Tier 1s or Tier 1.5, but we have not forecasted those for next year.... We think conservatively we could see total revenue growing in the mid-teens, maybe slightly high teens next year. The non-Sun business, we can see growing at a more rapid rate, next year, than that. (emphasis added)

96.     Furthermore, during the October 27, 2004 conference call, Defendant Lambert, responding to analyst questions concerning non-Sun related revenues and progress on the Chaparral technology integration, stated:

...We are getting traction in a number of our accounts that we talked about. For example, in the last call, NEC, an OEM in Japan, NS (ph) Solution, a system integrator in Japan. Both of those continued to ramp in the September quarter. We are anticipating that the will continue to ramp in the December quarter. We are working very hard at getting a number of other ones that we have signed up to get their products into production and start ramping.

*****

We are continuing to pursue all the Tier 1s and many Tier 2s on a daily basis. Last quarter and the quarter that just ended, the September quarter, we received and replied to another volume RFQ from a Tier 1 OEM. We are continuing to discuss that response with that Tier 1 OEM. If you remember the quarter before in the June quarter, we had received and replied to two volume RFQs from Tier 1 OEMs. We believe we have a strategy in place, we're working the strategy; we believe it's working. We have good relationships with all the Tier 1 OEMs. We've got a number of what we would call Tier 1.5 OEMs that we are talking to. In addition, we are continuing to talk to the numerous Tier 2 OEMs all around the world. We signed up a number last quarter, and we would hope that we are going to be able to do at least that amount this quarter. Our current products, technology and future products, continue to be well received by the parties we are talking to. And we are talking to some of them about selling just components as opposed to complete systems. We believe that we are well-positioned with our business model and our technology and roadmaps to continue our success in the future.

97.     Finally, during the October 27, 2004 conference call, certain of Defendants' statements were challenged by analysts' questions expressing doubts about: (i) Defendants' identification of macroeconomic factors as the cause of Dot Hill's disappointing revenue performance and revenue outlook, when numerous other factors suggested Dot Hill should show stronger revenue growth; and

(ii) Dot Hill's growth prospects going forwards.  Defendants Lambert and Romm did not then reveal

any of the material adverse facts concerning Dot Hill's dysfunctional organization and operations

which were in fact underlying Dot Hill's current and future revenue disappointments, but instead

continued to reiterate the purported numerous customer prospects in  Dot Hill's pipeline:

> DAN RENOUARD: ...Your growth rate has been declining on a year-over-year basis. Meaningfully, your guidance implies a larger decline, sort of decelerating to 5 or 6% year-on-year. So I guess the question is, what is going to be the catalysts of growth next year and beyond? Is it, outside of SATA at Sun, are there other opportunities that you see or think you have in front of you at Sun? Is it an execution game at Sun? Is it purely non-OEM? Maybe you could just talk to, either in some   detail or at a high-level, how you think this business grows?

> JIM LAMBERT: ...We were, like I said, disappointed with the ramp of SATA, but    we optimistic for the long-term. We are working on a number of fronts, and we      believe that the business model that we're employing really positions us well for the future compared to some of our competitors. **But here's where we see the potential growth coming from in, say, over the next two years timeframe that you mentioned. First of all, we are focused on -- we have a group of people focused    on the Tier 1s. We have one today, and we believe that over time we can win an additional Tier 1 OEM.**

> **We have probably the largest group of the people focused on the Tier 2 OEM opportunities, and we believe there's about 200 of those around the world. We have an internal goal to try to have 50 of them as customers. We already have     a set of them, maybe a dozen or so plus or minus. If each one of those could do, say, on average 5 million -- if we had 50 of them, that might be 250 million --    and I'm talking kind of hypothetical here at a higher level. If, say, our largest OEM customer is doing 250 million, and let's say another Tier 1 is doing 50 million or 100 million, and then we are also putting more effort into our channel business, and I think you'll see us doing more there in the future. And we could do 50 million from that. So all of those types of things that I'm talking about  here are all organic, internal growth.** (emphasis added)

### 3.    Falsity and Scienter

98.    The above-mentioned statements concerning Dot Hill's prospects for and progress with

new customers (and the consequent promise of new, non-Sun revenue sources) were materially false

and/or misleading. For example, the July 23, 2003 statement "these partnerships [with companies such

as General Dynamics, Panasonic Solution Technologies and others] demonstrate our commitment to

the channel and to increasing our OEM and indirect sales revenue going forward…" was false because

CW 9, a former OEM account manager for Dot Hill from 1997 through June 2006, had not seen any

existing agreements that discussed future negotiations of quantities, which meant there were no

guarantees for future orders.  CW 9 also recalled that other contracts with new customers were small and in most cases "one-off" orders.  "One-off" orders meant that Dot Hill could not expect any repeat business from these customers.  Moreover he did not believe these agreements were not signed by customers and did not include material terms for future business.

99.     The January 28, 2004 press release as to NIT Data Systems was also misleading for the same reasons.

100.    Dot Hill's April 28, 2004 conference call statement "we are vigorously working to diversify our revenue stream by adding new customers and sustaining successful relationships with our existing partners…" is false because as mentioned above many agreements with new customers were "one-off", not properly executed, and were missing material terms necessary to sustain successful relationships.  Moreover, CW15, a Dot Hill sales person from 2004 to 2005, stated that Dot Hill's sales department was understaffed, making it nearly impossible to invest the necessary time on building new and sustaining existing relationships.  CW 15 stated that the Individual Defendants' directive to maintain a ratio of revenue to employees in excess of $1 million per employer was the main focus of the company rather than the quality of employees.  When CW 2, a Dot Hill marketing employee, brought these issues to the attention of Defendant Kammersgard, CW 2 said that Kammersgard disregarded the need to hire a better-qualified sales team because the Dot Hill products were so good they would sell themselves. Additionally, CW 14, a marketing executive responsible for dealing with customer relationships, stated that Dot Hill pulled out of programs it was already involved in that had potential for generating new customer agreements.

101.    Internally, Defendants did not want to invest time and money in business development. CW 13, a salesperson who reported directly to Dot Hill's senior sales office Phil Davis, stated that Dot Hill was not willing to invest the time and money in business development with these OEM accounts, and consequently, in nearly a year of employment, CW 13 never made one sale.  Further, CW 16, a Dot Hill marketing employee, stated that Kammersgard almost always refused to approve

expenditures, and that Dot Hill never supported CW 16's marketing efforts or initiatives in any way and merely left CW 16 to sink or swim. According to CW 2 Kammersgard's approval was necessary for all costs associated with marketing projects. However, even when Kammersgard had initially supported one project or another, when it came time to approve funding Kammersgard would never do so. This was a stark contrast to the public statements made by Defendants on several occasions.

102. Additionally, Defendant Romm's October 27, 2004 conference call statement that "we are continuing to work diligently with other potential OEMs to diversify our revenue stream…" was false because, as stated above and in greater detail below, Dot Hill's under-staffed, under-expertised and under-experienced sales department were much less effective in recruiting new customers and gaining new revenue sources than Defendants publicly advertised, so that Defendants' constant optimistic statements were without basis in fact (and were contradicted by the facts). Additionally, the numerous press releases and public statements issued by Defendants trumpeting agreements with VARs and SIs to offer, repackage, distribute and/or resell Dot Hill products were misleading, because they were issued to create the impression that Dot Hill was gaining new customers and new revenue sources when, in fact, such agreements did not mandate any actual sales of Dot Hill products and most often produced little or no revenue at all.

103. Defendant Lambert's statements during the October 27' 2004 conference call were also false in stating that Dot Hill was getting "traction" from NS solutions, which was a small or one off customer according to CW 9.

104. Defendants' statements concerning new customers described in the preceding section were also false and misleading before stating that Dot Hill's sales and marketing departments could generate the new business indicated. Numerous confidential witnesses interviewed in the course of plaintiffs' investigation stated that Dot Hill's sales/marketing department was significantly under-staffed, under-expertised, and under-experienced, all of which degraded Dot Hill's capacity to generate significant new customer business:

(a)     CW 12 was a channel account manager from summer 2003 to summer 2004. CW 12 managed sales quota and supported re-sellers of Dot Hill's Storage Area Network (SAN) hardware and software product lines. CW 12 reported to the Vice President of Sales at Chaparral. CW 12 recalled that Chaparral, at the time of acquisition had only four salespersons while Dot Hill had ten. CW 12 stated that the Chaparral customers were end-users only and only worked out of one office located in Colorado. CW 12 stated that it was difficult to merge the sales staff of Chaparral and Dot Hill because they were structured differently;

(b)     CW 13 was a sales director from the summer of 2004 until the summer of 2005. CW 13 was responsible for business development activities as they related to the sales of Dot Hill storage subsystems at Tier-1 OEM customers HP and Dell. CW 13 reported to the Vice President of OEM Sales. CW 13 stated that Davis had no business running a sales division because Davis had little-to-no sales experience, that Davis was responsible for very few customer accounts and produced no revenue from them, and that Davis claimed to have many relationships within the industry but in fact did not seem know anyone. CW13 described how, upon accepting employment at Dot Hill as an account manager for two large OEMS, CW13 was led to believe that Dot Hill had strong relationships with both OEMs when in reality Dot Hill had no relationship at all with one and a very small one with the other. In fact, CW 13 stated that the HP account was nearly impossible because HP was using its own internally developed product. CW 13 stated that the sales group at Dot Hill experienced extremely high turnover and was like a "revolving door"; and

(c)     CW 14 was a marketing executive from the spring of 2005 until the fall of 2005. CW 14 reported to the Vice President of Channel Sales. CW 14 was brought to the Dot Hill specifically to set up a distribution channel. CW 14's tasks were to contact and make deals with customers who would resell Dot Hill products that were to carry Dot Hill names. This new method of increasing sales would augment Dot Hill sales made to OEMs and VARS. CW 14 stated that Defendants Romm and Kammersgard repeatedly pulled out new customer agreements on which CW 14 had been working. CW 14 stated that CW 14 set up at least four deals with customers to distribute Dot Hill Products and in each of the deals, Dot Hill signed the contracts and within one or tow months pulled out of the deals. CW 14 noted that this was expensive for the company because each

deal took about three or four months of work. CW 14 recalled a deal with Bell Micro that she personally managed whereby Dot Hill paid to place its logo on Bell's car during race that was taking place in eleven cities. In each of these cities, Dot Hill would have an opportunity to speak with key clients. CW 14 recalled that after the seventh or eighth race, Defendant Kammarsgard decided to pull Dot Hill out of the program. CW 14 also recalled that Dot Hill's sales department was headed by low-quality personnel. For example, CW 14 recalled that Dot Hill employed one salesperson whose only prior experience in sales as selling flowers (a memory shared by CW 2 as well).

105. Numerous confidential witnesses interviewed in the course of plaintiff's investigation stated that Dot Hill's sales capacities were further degraded by severe expense constraints imposed by the Individual Defendants on Dot Hill's sales/marketing efforts:

(a) CW 5 was a business development employee from the summer of 2000 to the spring of 2004. CW 5 was mainly responsible for generating new business by working with Value Added Resellers (VARS) and to resell Dot Hill systems. CW 5 reported to an OEM account manager who reported to the Vice President of Sales Operations. CW 5 stated that his main task of generating leads for salespersons to pursue was (ineffectively) accomplished through cold-calling and that most of Dot Hill's resources and marketing dollars were directed at Sun;

(b) CW 2 was a manager in the marketing Dot Hill's marketing department from mid 2000 until early 2004 who planned new marketing programs. CW 2 reported to the Director of Marketing. CW 2 described how the Individual Defendants continuously refused to invest in marketing and sales. CW 2 said Dot Hill management thought their products so great that customers should just come to them. Generally, CW 2 stated, marketing reported to Defendant Kammersgard, and whenever there was a cost associated with a project, Kammersgard's approval was required. According to CW 2, even when Kammersgard had initially supported one project or another, when it came time to approve funding Kammersgard would never do so. As an example, CW 2 described a management-led initiative to increase Dot Hill's sales to resellers, for which marketing developed a strategic plan, but the initiative was abandoned at the last minute when management decided not to continue because of the costs required to succeed (which, in addition to marketing costs, included more significant training and certification costs). CW 2 stated CW 2 and other marketing employees,

including the marketing director, were continually frustrated by working long hours to develop marketing/sales initiatives at management's request only to have management – including Defendant Kammersgard – cancel/refuse each initiative because due to distaste for the requisite spending. CW 2 stated that this scenario was constantly repeated: Dot Hill was always starting something and then changing their mind about it and abandoning it. CW 2 stated that Dot Hill management had effectively tied up the hands of its sales/marketing departments (by failing to provide them with needed, let alone requested, resources and funding) and at the same time used those departments as a "punching bag", blaming them when sales and customers failed to develop. CW 2 said that, as result of this double-bind, Dot Hill was cycling through marketing chiefs every 6 months.

106.    Defendants retroactively admitted, in *sotto voce*, that in their attempts to decrease headcount and thus increase their reported average revenues per employee (e.g., Dot Hill's sales headcount fell by more than 50% between 2000 and 2003), they had impaired the functioning of Dot Hill's sales department:

> We will continue our efforts to grow our non-OEM sales during 2005. Accordingly, we expect sales and marketing expenses for the year ending December 31, 2005 will exceed spending levels incurred during 2004 (2005 10-K, p. 33).

### 4.    Impact

107.    During 2004, as the promised non-Sun revenues consistently failed to appear despite Defendants' promising press releases and quarterly conference call updates, and as Dot Hill's reliance on Sun for 80%-90% of its revenues continued, the market learned to discount Defendants' promises and Dot Hill's shares declined from approximately $16 per share in the beginning of 2004 to $8 per share by the end of 2004.

## VI.
## ADDITIONAL EVIDENCE OF SCIENTER

108.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to Dot Hill. Each Individual Defendant was provided with copies of Dot Hill's

press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their board membership and/or executive and managerial positions with Dot Hill, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants.

### A. Insider Sales

109. Defendants, while in possession of material adverse facts prior to the insider sales of September 23, 2003 concerning Dot Hill's operations, systems, controls and prospects, then decided to take advantage of Dot Hill's share price inflation.

110. On August 8, 2003, Dot Hill issued a press release announcing that it intended to conduct a secondary stock offering in which Dot Hill would sell 7.7 million shares and the Individual Defendants would sell 1.3 million shares, and that Dot Hill had filed a Form S-3 Registration Statement with the SEC for the offering. The Form S-3 filed on August 8, 2003 was updated by a Form S-3/A filed August 11, 2003, Form S-3/A filed September 5, 2003, and Prospectus filed September 18, 2003.

111. On September 5, 2003, shortly before Dot Hill's secondary stock offering, Dot Hill issued a press release re-affirming its previously-stated financial guidance for the third and fourth quarters of 2003, and for 2003 as a whole.

112. On September 18, 2003, Dot Hill issued a press release announcing that it had increased the size of its secondary stock offering by a further 1 million shares, so that 8.67 million shares would be offered by the Company and a further 1.33 million by the Individual Defendants (not

including the 1.5 million share underwriter over-allotment option), and that it had priced the offering at $15.50 per share.

113.   On September 22, 2003, Dot Hill issued a press release announcing that the over-allotment option had been exercised and that a further 1.5 million shares had been sold.

114.   The Individual Defendants, knowing better than anyone the precariousness of Dot Hill's speedy rise during 2003, successfully completed a secondary stock offering of 11.5 million shares at a price of $15.50 per share on September 23, 2003.   Of the 11.5 million shares sold, approximately 10 million were sold by the Company itself, allowing the Company to raise approximately $154 million in much needed funds (after 11 quarters of losses between mid-2000 and the first quarter of 2003, Dot Hill was left with only $12.1 million in funds with which to continue operations).   The remaining 1.5 million shares were sold by the four Individual Defendants, who received approximately $23.1 million dollars from these share sales.

115.   Although these sales gave rise to a legal duty to disclose all known material information, Defendants opted instead for profitable silence. Having spoken publicly, but misleadingly, Defendants were duty-barred to make full disclosure of all known material information. The Individual Defendants monetized their Dot Hill investments at a very favorable rate during a near-optimal time quite close to Dot Hill's share price peak of $18 per share.   Soon afterwards, the true and rickety nature of Dot Hill – which heretofore was known only to the Individual Defendants – started to become clear to the market: (i) during 2004, despite the Individual Defendants' representations to the contrary, the market began to doubt Dot Hill's ability to gain new customers and new sources of revenue growth (i.e., revenue diversification that would lead to lessened dependence on Sun), and Dot Hill's share price lost half of its value (falling from $16 to $8); (ii) during February/March 2005, as Dot Hill was forced to reveal the material weaknesses in its internal controls and the resulting restatement of financial results, Dot Hill shares fell further (from $7 to below $6); and (iii) when, in April 2006 as the culmination of numerous problems with its technology, products and relationship

with Sun, Dot Hill revealed that it had lost a contract to provide Sun with future data storage products, the last inflation was wrung out from Dot Hill's shares (which fell from $6 to below $4).

### B. Small Company With Hands-On Managers

116. Throughout the Class Period, Dot Hill was a very small company, whose total headcount – rising from less than 200 employees during 2003 to slightly more than 250 employees at later times – was intentionally minimized by the Individual Defendants so as to be able to report average revenues per employee of $1 million. The issues that are the subject of this complaint – Dot Hill's relations with Sun, Dot Hill's attempts to enroll new customers, Dot Hill's attempts to upgrade its product technology, Dot Hill's basic operational structure – were, as Defendants themselves repeatedly stated throughout the Class Period, Defendants' top priorities. Given the small size of the Company and the importance of the business areas where problems were extant, it may be inferred that the Individual Defendants were aware of the material adverse facts detailed above concerning these issues.

117. The Individual Defendants' knowledge need not simply be inferred. It has also been shown through the various CW statements described above. In addition, as many confidential witnesses interviewed in the course of plaintiff's investigation stated, Dot Hill's founders – Defendants Lambert, Kammersgard and Sauey – continued to run Dot Hill during the Class Period in a very personal way, as if Dot Hill were still their start-up operation, involving themselves intimately in all major (and many minor) issues and operations:

(a) CW 6 was a senior manager in marketing from 2000 through mid 2006. CW 6's job responsibilities included market research and writing and editing of information about products that Dot Hill had completed. CW 6 reported to Omar Barraza who directly reported to Defendant Kammersgard. CW 6 stated that Defendants Kammersgard and Lambert were specifically involved in the misrepresentation regarding the efficiency of Dot Hill's lean business model and operational structure. CW 6 stated that Kammersgard and Lambert knew that the company's lean business model was not as efficient as the company proclaimed but they would not unburden

1   themselves of their primary mindset to spend as little as possible, to buy as little inventory as

2   possible, to hire as few people as possible, etc. even though Dot Hill was suffering from their

3   adherence to this mindset in the form of inaccuracies in revenue reporting because of overworked

4   staff;

5          (b)    CW 7 was a senior engineering executive who reported directly to Defendant

6   Kammersgard.  CW 7 worked for Dot Hill from mid 2001 until early 2006.  CW was responsible for

7   managing all engineering organizations, sustaining engineering activities, testing and interoperability

8   activity, product delivery, budgeting, project scheduling, manpower assessment, productivity metrics,

9   and project and program management activities.  CW 7 stated Defendants Lambert and Kammersgard

10  were specifically involved in the misrepresentation regarding the efficiency of the lean business

11  model.  Despite the problems caused by this philosophy, for example inaccuracies in accounting due

12  to an overworked staff, Defendants' Lamber and Kammersgard continued to run Dot Hill as a small

13  company.  As a senior executive, CW 7 had personal knowledge of how the company was run; and

14         (c)    CW 3 was a Dot Hill operations executive responsible for managing

15  relationships with other business entities and purchasing prototypes.  CW 3 worked for Dot Hill from

16  2002 until mid 2005 and reported to Senior Vice President of Operations. CW 3 had regular contact

17  with Defendants Kammersgard and Romm. CW 3 stated that on numerous occasions when cost

18  classification issues arose, CW 3 would make recommendations to Romm and later discover that

19  Kammersgard had overridden CW 3's recommendations and re-classified the costs.  CW 3 stated that

20  cost classifications were consistently overridden by Kammersgard In addition, CW 3 sat a short

21  distance from Defendant Romm and as a result, had numerous conversations with Romm involving

22  the cost of goods sold.

23         118.    Additionally, because Defendant Kammersgard also ran Dot Hill's sales and marketing,

24  he was aware of and responsible for issues there.  As alleged above, multiple confidential witnesses

25  who used to be employed in those divisions have described Kammersgard's detailed and hands-on

26  involvement in its operations.

27

28

### C. Suspicious Executive Departures

119.    An inference of scienter is further supported by the resignations of Dot Hill's CEO and Vice Chairman, Defendant Lambert, in February 2006 and of Dot Hill's CFO, Defendant Romm, in March 2006 – shortly before Dot Hill revealed, in an April 2006 disclosure that caused Dot Hill stock to lose approximately 50% of its remaining value, that Sun had awarded the new data storage product contract to another provider.

## VII.
## LOSS CAUSATION

120.    As alleged above, the combination of revenues from Sun and internal cost-cutting (in the sales/marketing and general/administrative departments) allowed Dot Hill to report misleading financial results and to seemingly transform, during the Class Period, quarterly losses into quarterly profits.  Dot Hill's share price consequently tripled in value during 2003, rising from $6.79 on April 23, 2003 to above $18 per share by September 2003.

121.    Dot Hill prided itself on its lean business model, boasting the $1 million revenue per employee and the company's low headcount. While Dot Hill's representation on the $1 million revenue per employee was accurate, what Dot Hill did was misrepresent the efficiency of that lean business model.  Although the market and the investing public did not then know it, Dot Hill was not   as it seemed.  Dot Hill was not the lean, efficient, fast-growing business that Defendants portrayed    it to be.  Rather, it was a rickety contraption unable to maintain its current speed without coming apart at the seams.  Dot Hill's technology and its sales/marketing staff – the components making up Dot Hill's engine – were, respectively, backfiring and inoperational.  Dot Hill's ERP system and accounting staff – to continue the metaphor, Dot Hill's internal systems and external display – were impoverished, dysfunctional, and unable to operate at Dot Hill's current speed without going haywire.  And the Individual Defendants – Dot Hill's driver – knew it.  When the inefficiencies  and harmful effects of the lean business model were finally disclosed in the 2004 10-K, Dot Hill's stock prices began to decline.

122.    On September 23, 2003, before any of Dot Hill's problems were disclosed to the investing public, the Defendants took advantage of Dot Hill's inflated stock price and completed a secondary stock offering, raising approximately $178 million through the sale of 11.5 million Dot Hill shares at $15.50 per share.  Approximately 1.5 million of the shares offered were sold by the Individual Defendants, who collectively received approximately $23.1 million from their share sales. As a reward for their successful efforts to increase Dot Hill's share price, the Individual Defendants were given unprecedented bonuses for 2003: Lambert received a $1.27 million bonus; Kammersgard approximately $780,000; and Romm $488,000.

123.    On October 27, 2004, Jim Lambert finally admitted on a conference call with analysts that the growth rate of the company's business had been declining on a year-over-year basis. Although, he said he was disappointed, he continued to mislead the public by stating that "[w]e are working on a number of fronts, and we believe that the business model that we're employing really positions us well for the future…" and "[w]e have probably the largest group of people focused on the Tier 2 OEM opportunities…"  These misrepresentations were fraudulent because Dot Hill and Dot Hill's under-staffed, under expertised and under-experienced sales department were much less effective in recruiting new customers and gaining new revenue sources than Defendants publicly advertised, so that Defendants' constant optimistic statements were without basis in fact (and were contradicted by the facts).

124.    In fact, in 2004, Dot Hill's sales department, cut to half its staffing levels and given half the resources it was given during 2000, failed to generate any meaningful sales other than sales to Sun. Although the Individual Defendants routinely stated that new customers and new revenue sources were just around the corner, the market increasingly began to suspect, as such customers and revenues always failed to appear, that Dot Hill would remain a one-trick pony dependent almost wholly on sales to Sun. As new customers and new revenues failed to appear, Dot Hill shares lost half their value during 2004, falling from $16 to $8.

125.    In February and March of 2005, the market gained further insight into the true state  of affairs inside Dot Hill when Defendants admitted that Dot Hill possessed numerous material weaknesses in its internal financial and accounting controls, and that such weaknesses stemmed from Dot Hill's failures to invest in adequate ERP software, adequate staffing, and adequate accounting expertise.   When Dot Hill announced in late January 2005 that it would accelerate its scheduled announcement of financial results, the market – fearing an adverse disclosure – began to further devalue Dot Hill shares, which fell further on and after February 3, 2005, when the company disclosed its control weaknesses and the resulting errors in its previously-issued financial statements.  Dot Hill shares fell from $7 to approximately $5.70 as a result.

126.    Still unbeknownst to the Class, however, were the problems Dot Hill was having in integrating into its products the RAID controller technology it had acquired from Chaparral, and related problems in Dot Hill's relationship with by far its largest customer, Sun.   Although the Individual Defendants constantly stated that the technology integration was proceeding excellently and resulting in products that would not only entice customers but also improve Dot Hill's profit margins, such was not in fact the case.   On April 28, 2006, when Dot Hill announced tersely that Sun had chosen another data storage provider to develop data-storage products for Sun, the last inflation was wrung out of Dot Hill's shares, which fell from approximately $6 per share to below $4 per share on the news.

127.    Dot Hill's share price behavior during the Class Period can NOT be explained by general market or industry factors.  A comparison of Dot Hill's share price to relevant indices – the NASDAQ composite index and the NASDAQ computer index – shows that, during the Class Period, Dot Hill's share price behavior was largely opposite that of market/industry indices.   During 2003, Dot Hill's share price rose at three times the rate of the indices.  During 2004, 2005 and 2006, Dot Hill's share price then declined sharply while the indices appreciated slightly.  Ultimately, by the  end of the Class Period, Dot Hill had lost more than 50% of the value that it had started the Class Period

with (and approximately 80% of the value at which it traded during late 2003), whereas the indices had risen in value during that same period by 32%-43%.

## VIII.
### EFFICIENT MARKET

128.   At all relevant times, the market for Dot Hill's stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Dot Hill's stock price.

129.   The common stock of Dot Hill met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly developed and efficient market.  During the Class Period, Dot Hill stock was heavily traded, with volume averaging exceeding 600,000 shares daily.  Dot Hill filed periodic public reports with the SEC, and was followed by analysts from brokerages including Lehman Brothers, Deutsche Bank Securities, RBC Capital Markets, Robert W. Baird & Co., Needham & Co., and Susquehanna Financial Group.  The reports of these analysts were redistributed to their customers and the public at large, and Dot Hill regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports and Dot Hill's press releases entered the public marketplace.  As a result, the market for Dot Hill's stock promptly digested current information with respect to Dot Hill from all publicly-available sources, and reflected such information in Dot Hill's stock price. Lead Plaintiffs and other members of the Class relied on the integrity of the market price of Dot Hill's publicly traded stock.

130.   As would be expected where a security is traded in an efficient market, material news concerning Dot Hill's operations, financial results, and prospects had an immediate effect on the market price of Dot Hill stock.

131.   At the times Lead Plaintiffs purchased or otherwise acquired the Company's stock, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## IX.

# CLASS ACTION ALLEGATIONS

132.     Lead Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of a class of persons who purchased Dot Hill stock from April 23, 2003 through April 27, 2006, inclusive (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party

133.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all Class members is impracticable. As of May 9, 2006, Dot Hill had approximately 44.6 million shares outstanding, and an average of more than 600,000 Dot Hill shares traded per day during the Class Period. Members of the Class are scattered throughout the United States;

(b)     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class predominate over any questions affecting only individual Class members. These common questions include, *inter alia*:

(i)     Whether the Defendants' acts as alleged herein violated the federal securities laws;

(ii)     Whether Defendants participated in and pursued the common course of conduct complained of herein;

(iii)     Whether documents, SEC filings, press releases and other statements disseminated to the investing public and Dot Hill's common stockholders during the Class Period misrepresented material facts about the operations, prospects, financial condition and financial results of Dot Hill;

(iv)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of circumstances under which they were made, not misleading;

(v)     Whether Defendants knew or deliberately disregarded that their

statements were false or misleading;

(vi)    Whether the market prices of Dot Hill stock during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(vii)    To what extent the members of the Class have sustained damages and the proper measure of damages.

(c)    Lead Plaintiffs' claims are typical of the claims of other members of the Class. Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct, which caused all Dot Hill shares to trade at artificially inflated prices throughout the Class Period;

(d)    Lead Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature. Lead Plaintiffs have no interests that are adverse or antagonistic to the interests of the Class. Accordingly, Lead Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class; and

(e)    Lead Plaintiffs anticipate that there will not be any difficulty in the management of this litigation as a class action.

134.    For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size    of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder Against All Defendants**

135.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

136.    This Count is brought by plaintiffs pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

137.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Dot Hill stock and which caused artificially high market prices for Dot Hill stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below

138.    In addition to the duties of full disclosure imposed on the Defendants by their status   as controlling persons of Dot Hill, as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, and as a result of their sales of Dot Hill stock during the Class Period, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to Dot Hill's stock, operations, financial condition and earnings so that the market price of Dot Hill stock would be based on truthful, complete and accurate  information.

139.    Defendants, individually and in concert, directly and indirectly, by using the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Dot Hill as specified herein. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dot Hill's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Dot Hill and its business operations and future prospects, in

light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Dot Hill stock during the Class Period.

140.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the same. Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect    of concealing Dot Hill's true operating results, operating condition and future business prospects from the investing public and supporting the artificially inflated price of Dot Hill's stock, as demonstrated by said Defendants' overstatements and misstatements of Dot Hill's business,    operations and future earnings prospects and/or financial statements throughout the Class Period.

141.    As a result of the dissemination of the materially false and misleading information    and failure to disclose material facts by all Defendants, as set forth above, the market price of Dot Hill stock was artificially inflated during the Class Period. In ignorance of the fact that the market price for Dot Hill stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material    adverse information that was known by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Dot Hill stock during the Class Period at artificially high prices and were damaged thereby as the market price of Dot Hill stock declined in response to disclosures of Dot Hill's true state of affairs.

142.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the true condition and prospects of Dot Hill, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would

not have purchased Dot Hill stock during the Class Period, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

143. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

144. As a direct and proximate result of the wrongful conduct of the Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Dot Hill stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against All Individual Defendants

145. Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

146. The Individual Defendants were controlling persons of Dot Hill within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of Dot Hill's operations and/or intimate knowledge of its internal financial condition, business practices, products and the actual progress of development and marketing efforts, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Dot Hill, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of Dot Hill's internal reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of Dot Hill and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

147. As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act.

148. As a direct and proximate result of the wrongful conduct of Defendants, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Dot Hill stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiffs and other members of the Class damages together with interest thereon;

C. Awarding Lead Plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D. Awarding Lead Plaintiffs and other members of the Class such equitable/injunctive and/or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: October 10, 2008                    Respectfully submitted,

                                           GLANCY BINKOW & GOLDBERG LLP


                                           By:  _s/ **Kara Wolke**_____
                                                    Kara Wolke
                                                    Lionel Z. Glancy
                                                    Peter A. Binkow

                                           1801 Avenue of the Stars, Suite 311
                                           Los Angeles, CA 90067
                                           Telephone: (310) 201-9150
                                           Facsimile:  (310) 201-9160

*Liaison Counsel for Lead Plaintiffs*

IRA M. PRESS *(admitted pro hac vice)*
PETER S. LINDEN *(admitted pro hac vice)*
KIRBY McINERNEY & SQUIRE, LLP
830 Third Avenue, 10th Floor
New York, New York  10022
Telephone:   (212) 371-6600
Facsimile: (212) 751-2540

*Counsel for Lead Plaintiffs*

JAMES P. ALLEN
ALLEN BROTHERS, PLLC
400 Monroe Street, Suite 220
Detroit, MI 48226
Telephone: (313) 962-7777
Facsimile:  (313) 962-0581

*Additional Counsel for Lead Plaintiffs*

**PROOF OF SERVICE VIA MAIL**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On October 10, 2008, I served the following document by posting such document electronically to the ECF website of the United States District Court for the Southern District of California:

**THIRD AMENDED CONSOLIDATED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

on all ECF-registered parties in the action, and upon all others not so-registered but instead listed as follows:

Eric J Belfi
Murray Frank and Sailer
275 Madison Avenue, Suite 801
New York, NY 10016

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 10, 2008, at Los Angeles, California.


*s/Tia Reiss*
Tia Reiss